UNITED STATES DISTRICT COURT

**FILED**

MAR 3 1 2009



DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION


*******************************************************************************

|  |  |  |
|---|---|---|
| DONALD E. MOELLER, | * | CIV. 04-4200 |
| | * | |
| Petitioner, | * | |
| | * | |
| -vs- | * | MEMORANDUM OPINION AND |
| | * | ORDER RE: APPLICATION FOR |
| DOUGLAS WEBER, Warden, | * | RELIEF UNDER 28 U.S.C § 2254 |
| South Dakota State Penitentiary, | * | AND CERTIFICATE OF |
| | * | APPEALABILITY |
| Respondent. | * | |
| | * | |

*******************************************************************************

Pending before this Court is Petitioner Donald Moeller's Third Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief. Petitioner has submitted his Traverse (Doc. 14), Respondent has submitted a Reply to the Traverse (Doc. 18), and Petitioner has also submitted a sur-reply (Doc. 19). In addition, the Court heard oral argument on February 23, 2009, on the habeas corpus issues raised in the Third Amended Petition.

Severance of Causes of Action

In this Court's February 3, 2009 Order scheduling Oral Argument (Doc. 102) this Court directed the parties to be prepared to discuss whether the habeas cause of action under 28 U.S.C. § 2254 should now be severed from Moeller's cause of action under 42 U.S.C. § 1983 or alternatively, under 28 U.S.C. § 2201, challenging South Dakota's lethal injection method of execution. After the United States Supreme Court handed down its decision in *Hill v. McDonough*, 547 U.S. 573 (2006), which allowed a timely filed 1983 action to challenge the constitutionality of the manner in which a lethal injection execution is conducted, and after the 2007 amendments to S.D.C.L. § 23A-27A-32, the statute which establishes South Dakota's lethal injection protocol, became effective, Petitioner filed an Amended Motion for Leave to Serve a Third Amended Petition for Writ of Habeas Corpus And Complaint for Declaratory and Injunctive Relief under 42 U.S.C. § 1983, or alternatively, under 28 U.S.C. § 2201, for violation of his civil rights under state law with regard to the lethal injection protocol which would apply to his execution. Doc. 54. Since the United States

Supreme Court has concluded that the difference in remedy between a habeas claim and a Section 1983 claim does not ipso facto preclude their joinder in a single lawsuit, *see Wolff v. McDonnell*, 418 U.S. 539, 554 (1974); *Preiser v. Rodriguez*, 411 U.S. 475, 499 n.14 (1973), and since joinder is generally encouraged to avoid multiplicity of actions, this Court allowed Moeller to amend his habeas petition to add the cause of action. Subsequently, delays in discovery caused by the development of a new lethal injection protocol in South Dakota and the departure of habeas counsel to begin a new position as a state magistrate judge have caused this Court to reconsider the benefits of joinder of the habeas claim and Section 1983 claim. Counsel for the Respondent advised at oral argument that Respondent favors severing the causes of action, and Moeller's habeas counsel acknowledged that severance would be beneficial to replacement habeas counsel. For these reasons, the Court is severing the Habeas Corpus Petition under 28 U.S.C. § 2254 and the cause of action for Declaratory and Injunctive Relief with regard to the lethal injection protocol which would apply to Moeller's execution.

Counsel for Respondent advised the Court at oral argument that the rule- making on the new lethal injection protocol was not yet complete. The Court is therefore staying discovery on the lethal injection protocol until the rule-making process is completed and denying Moeller's Motions to Compel Discovery (Doc. 87, 90) and denying the Respondent's Motion for Protective Order (Doc. 80) without prejudice to the parties to reassert any discovery issues which have not yet been resolved at the time the rule-making process is completed and the Court and Moeller's replacement counsel have been informed that the rule-making process is completed. In light of this Court's ruling on severing Moeller's causes of action this Memorandum Opinion addresses only the habeas claims made by Moeller pursuant to 28 U.S.C. § 2254.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of May 8, 1990, nine-year-old Rebecca O'Connell of Sioux Falls was reported missing. The next day, her body was found in a wooded area in Lincoln County, South Dakota. An autopsy revealed that Rebecca had been vaginally and anally raped, and had been stabbed in her neck, back, shoulder, chest, hip, arms and hands. She died as a result of a cut to her jugular vein. Circumstantial evidence linked Moeller to the crime and he was interviewed by the police and provided blood and hair samples on May 12, 1990. On May 13, 1990, Moeller fled from Sioux Falls

and eventually resided in Tacoma, Washington where he used a fictitious name. He was located in Tacoma, Washington in February of 1991 and brought back to South Dakota and prosecuted for Rebecca's murder. After being convicted by a jury of first-degree rape and first-degree murder, and after being sentenced to death by lethal injection, Moeller's conviction was reversed by the South Dakota Supreme Court. *See State v. Moeller*, 548 N.W.2d 465 (S.D. 1996).

Moeller was retried in April and May of 1997. He was again convicted by a jury of first-degree rape and first-degree murder, and sentenced to death by lethal injection. The South Dakota Supreme Court affirmed the 1997 convictions and denied rehearing. *See State v. Moeller*, 616 N.W.2d 424 (S.D. 2000). Moeller sought and was denied a writ of habeas corpus in state court. The South Dakota Supreme Court affirmed the denial of state habeas relief. See *Moeller v. Weber*, 689 N.W. 2d 1 (S.D. 2004). Moeller timely filed for federal habeas relief pursuant to 28 U.S.C. § 2254.

## REQUIREMENTS FOR HABEAS RELIEF

Under 28 U.S.C. § 2254(d), a habeas petitioner whose claims were adjudicated on the merits in state court is not entitled to relief unless he can demonstrate that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision by a state court is "contrary to" law clearly established by the Supreme Court if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). *See also Price v. Vincent*, 538 U.S. 634, 640 (2003).

With regard to establishing the existence of an "unreasonable application" of clearly established law, a federal habeas court may not grant habeas relief simply because that court concludes in its independent judgment that the state-court decision applied a decision of the Supreme Court incorrectly. *See Bell v. Cone*, 535 U.S. 685, 698-699(2002). Rather, the habeas applicant has

the burden to show that the state court applied Supreme Court case law to the facts of his case in an objectively unreasonable manner. See *Price v. Vincent*, 538 U.S. at 641.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the question of whether there was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable. *See Williams v. Taylor*, 529 U.S. at 410. In addition, the AEDPA also requires federal habeas courts to presume the correctness of the state courts' factual findings unless an applicant rebuts this presumption with "clear and convincing evidence." § 2254(e)(1). *See also Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 1939-1940 (2007).

## ISSUE I

## WHETHER THERE WAS A FAILURE TO FOLLOW SOUTH DAKOTA'S STATUTORY DEATH PENALTY PROCEDURE WHICH DEPRIVED MOELLER OF HIS RIGHTS TO DUE PROCESS OF LAW, AND EQUAL PROTECTION OF THE LAWS, AND WHICH VIOLATED THE DOCTRINE OF SEPARATION OF POWERS?

Moeller alleges that numerous failures[1] to follow the statutory procedures of S.D.C.L. ch.

---

[1]Moeller's Third Amended Petition sets forth the following specific alleged errors to follow the death penalty statutory procedures:

> A. Donald E. Moeller contends the state's attorney has only the discretion to charge a Class A felony, and that once such decision is made the punishment for any such offense lies solely within the province of the judicial branch.
> B. SDCL ch. 23A-27A has been applied unconstitutionally throughout the state in a manner so as to allow a state's attorney the discretion whether to seek the death penalty.
> C. Other persons who have been charged with Class A felonies have been allowed to enter into plea bargains in which state's attorneys have made promises of life imprisonment in return for a guilty plea.
> D. Under SDCL ch. 23A-27A as interpreted the jury may chose not to impose a death penalty even if aggravating circumstances are found for any reason or without any reason. Because of the discretion given to the jury under South Dakota's statutory scheme, selecting a jury that is "death qualified" skews the composition of the jury pool and eliminates from it those persons who are able to follow the circuit court's instructions but would nonetheless chose not to impose the death penalty.

4

23A-27A constitute structural error[2] that affected the entire trial process from the initial offer of a plea bargain, to the selection of a death qualified jury, and throughout the conduct of the trial and

E. Because the state's attorney offered Donald E. Moeller the opportunity to enter a guilty plea if Moeller accepted a sentence of life without parole, there were no aggravating factors present in the case supporting the imposition of the death penalty.

F. Because the punishment that may be imposed for a Class A felony lies solely within the province of the judicial branch, the proper pool for proportionality analysis consists of all persons who entered guilty pleas or who were convicted of Class A felonies, regardless of whether the death penalty was imposed.

G. The trial court failed to follow the procedures outlined in SDCL ch. 23A-27A by opining that any mitigating evidence must be "relevant" within the meaning of the South Dakota Rules of Evidence and thereby foreclosing Donald E. Moeller from offering evidence during the penalty phase.

H. The trial court failed to follow the procedures outlined in ch. SDCL 23A-27A by circumscribing the argument Donald E. Moeller's counsel could make to the jury during the penalty phase of the trial.

I.. In the penalty phase of some death penalty cases the prosecution has been denied the opportunity to offer rebuttal argument, while in Donald E. Moeller's case the prosecution was afforded the opportunity and did in fact offer rebuttal argument.

J. The trial court failed to follow the procedure outlined in SDCL ch. 23A-27A by refusing Donald E. Moeller's proposed jury instruction regarding mitigating circumstances.

K. The state's attorney secured the attendance of prosecution witnesses at trial by issuing unenforceable South Dakota subpoenas to out-of-state witnesses without complying with the Uniform Act to Secure Attendance of Witnesses from Without a State in Criminal Proceedings as enacted in those states where the witnesses resided.

[2]The Supreme Court has distinguished between"structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards," and trial errors which occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented."For example, the denial of the right to a jury verdict of guilt beyond a reasonable doubt is classified as a structural error since the jury guarantee is a "basic protectio[n]." The precise effects of such a protection are deemed unmeasurable and without such a protection a criminal trial could not reliably serve its function. *Sullivan v. Louisiana*,508 U.S. 275, 281 (1993) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). Moeller has not cited to any cases which identify these alleged defects as structural defects.

penalty phase of the trial. Moeller also contends that this structural error existed in the South Dakota Supreme Court's proportionality analysis and decision on appeal. Moeller's traverse in addressing this issue focuses on proportionality review and prosecutorial discretion.

Proportionality Review

S.D.C.L. § 23A-27A-12 requires that the South Dakota Supreme Court in reviewing a case in which a sentence of death was imposed determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." S.D.C.L. § 23A-27A-8 provides that the South Dakota Supreme Court "accumulate the records of all capital felony cases that the court deems appropriate." The South Dakota Supreme Court has determined that similar cases for purposes of proportionality review are those cases in which capital sentencing proceeding was actually conducted *See State v. Rhines*, 548 N.W.2d 415 (S.D.1996). The South Dakota Supreme Court rejected Moeller's contention that by restricting proportionality review to the decisions of other capital sentencing authorities, it was abridging all of Moeller's rights to due process and equal protection of the laws as protected under the Fourteenth Amendment[3]. *Moeller v. Weber*, 689 N.W.2d at 18. Although Moeller maintains that the South Dakota Supreme Court erred in construing its proportionality review statute, federal habeas relief may not be based on a mere perceived error of state law. See *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

The Supreme Court has consistently held that the Eighth Amendment does not require proportionality review by an appellate court in every case in which such review is requested by the defendant. *See Pulley v. Harris*, 465 U.S. at 50-51; *see also Walker v. Georgia*, 129 S.Ct. 481 (2008)(denial of petition of certiorari in which petitioner claimed Georgia Supreme Court erred in applying its statutorily required proportionality review). Although proportionality review is not

---

[3] Moeller contends that since 18 U.S.C. § 3598 provides that no Indian subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence unless the governing body of the tribe determines that capital sentences should apply and since no Indian tribal government in South Dakota has made that determination, application of the death penalty to the non-Native population is an arbitrary and capricious result that is inconsistent and impermissible under the Constitution. Moeller's analysis does not provide a satisfactory distinction between the disparity between the Indian tribal government's law and South Dakota law and the disparity between South Dakota law and the law of those states that do not have the death penalty.

mandated by the Constitution, once it is required by statute it must be conducted consistently with the Due Process Clause. *See Tokar v. Bowersox*, 198 F.3d 1039, 1052 (8th Cir. 1999). In Moeller's direct review the South Dakota Supreme Court, after analyzing the facts of Moeller's case and comparing those facts to the other cases in the proportionality pool, concluded that the sentence of death was neither excessive nor disproportionate to the penalty imposed in similar cases, after considering both the crime and the defendant. *State v. Moeller*, 616 N.W.2d at 463-465. Having conducted this review and having made this determination, the South Dakota Supreme Court satisfied the due process requirement. The Federal courts do not look behind this determination to consider the manner in which the state Supreme Court conducted its proportionality review or whether the state Supreme Court misinterpreted its state statute in conducting its review. *Tokar v. Bowersox*, 198 F.3d at 1052.

## Prosecutorial Discretion

Moeller contends that in South Dakota there are no standards that govern a prosecutor's decision to seek the death penalty and that charging decisions in South Dakota are based on considerations other than the statutory factors required to impose the death penalty.[4] Moeller contends

---

[4]Pursuant to S.D.C.L. § 23A-27A-4, a person convicted by a jury of a Class A felony may not be sentenced to death unless a jury finds at least one of the aggravating circumstances set forth in S.D.C.L. § 23A-27A-1 and recommends the death sentence. S.D.C.L. § 23A-27A-1 sets forth the following aggravating circumstances:

> (1) The offense was committed by a person with a prior record of conviction for a Class A or Class B felony, or the offense of murder was committed by a person who has a felony conviction for a crime of violence as defined in subdivision 22-1-2(9);
>
> (2) The defendant by the defendant's act knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;
>
> (3) The defendant committed the offense for the benefit of the defendant or another, for the purpose of receiving money or any other thing of monetary value;
>
> (4) The defendant committed the offense on a judicial officer, former judicial officer, prosecutor, or former prosecutor while such prosecutor, former prosecutor, judicial officer, or former judicial officer was engaged in the performance of such person's official duties or where a major part of the motivation for the offense came from the official actions of such

that these alleged facts support his argument that he was deprived of due process and equal protection of the law, and that the doctrine of separation of powers was violated. In rejecting this argument South Dakota Supreme Court stated,

> Unquestionably, the State in the exercise of its discretion may choose whether to prosecute individuals and what charges to bring against them. There is also no question that this general principle extends to the prosecution of a person suspected of committing a crime for which the penalty, upon conviction, is either life imprisonment or execution by lethal injection.

*Moeller v. Weber*, 689 N.W.2d at 14. In the context of this case, this conclusion is neither contrary to, nor involves an unreasonable application of clearly established Federal law. The Supreme Court has recognized that the implementation of criminal laws against murder requires discretionary judgment and that exceptionally clear proof would be required before the Court would infer abuse

---

judicial officer, former judicial officer, prosecutor, or former prosecutor;
(5) The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person;
(6) The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. Any murder is wantonly vile, horrible, and inhuman if the victim is less than thirteen years of age;
(7) The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties;
(8) The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement;
(9) The offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of the defendant or another; or
(10) The offense was committed in the course of manufacturing, distributing, or dispensing substances listed in Schedules I and II in violation of § 22-42- 2.

The State in Moeeler's case relied upon the offense being "outrageously or wantonly vile, horrible or inhuman." At the time the crime was committed in Moeller's case circumstance 6 did not include the provision of the victim being less than thirteen years of age and the jury was not instructed that this provision was an aggravating circumstance.

of that discretion. *See McCleskey v. Kemp*, 481 U.S. 279, 297 (1987). Moeller does not and can not argue that the acts for which he was convicted are not those for which both South Dakota law and the United States Constitution permit the imposition of the death penalty. Moeller only establishes that a number of South Dakota cases, involving one in which a child was murdered, resulted in life sentences. Moeller's speculation regarding and challenges to the policy considerations behind the State's decision to seek the death penalty are considerations more properly to be considered by the State Legislature. The arguments he presents regarding prosecutorial discretion do not support federal habeas relief.

Although Moeller contends that the numerous alleged failures to follow State law call into question the accuracy and reliability of the trial process and require automatic reversal, Moeller has failed to demonstrate that the South Dakota Supreme Court's consideration of his issues regarding failure to follow the State's death penalty statutes resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court. Moeller is not entitled to habeas relief for the alleged failure to follow the statutory procedures set forth in S.D.C.L. ch. 23A-27A .

## ISSUE 2
## WHETHER THE DENIAL OF A CONTINUANCE RESULTED IN DEPRIVATION OF CONSTITUTIONAL RIGHTS WHICH ENTITLE MOELLER TO FEDERAL HABEAS RELIEF?

In Grounds Two and Three of Moeller's Third Amended Habeas Petition Moeller asserts that the trial court's decision to deny his repeated motions for a continuance was a structural error which affected every phase of the trial and which consequently deprived him of his rights to due process of law and effective assistance of counsel. In Ground Four of Moeller's Third Amended Habeas Petition Moeller asserts that the trial court's decision to deny his repeated motions for a continuance of the *Daubert* hearing concerning DNA evidence was a trial error that had substantial and injurious effect or influence in determining the jury's verdict and thereby deprived him of his rights to due process of law and effective assistance of counsel.

The United States Supreme Court has characterized the due process ramifications of a denial of a continuance as follows:

9

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler v. Fretag*, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

In *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983), the Supreme Court addressed the Sixth Amendment ramifications of a denial of a request for continuance. The Court advised that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial" violates the Sixth Amendment. The Court again maintained that "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. at 589).

The above decisions set forth the governing constitutional rules "at a high level of generality."*See Middleton v. Roper*, 498 F.3d 812, 817 (8th Cir. 2007).Under the AEDPA "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), *quoted in Middleton v. Roper*, 498 F.3d at 817.

With regard to the request for a continuance of the trial, the South Dakota Supreme Court found that Moeller had approximately ten months from the date the remittitur was filed in *Moeller* I to prepare his defense. The South Dakota Supreme Court further found that this was an adequate amount of time for the two attorneys who represented Moeller at his first trial and who were familiar with the evidence in the case to prepare for the retrial. The South Dakota Supreme Court's review of the record led it to conclude that both of his defense attorneys worked diligently to prepare an effective defense and did an admirable job in presenting a thorough case. The South Dakota Supreme Court further found that the trial court did not abuse its discretion in denying the continuance requests. *State v. Moeller*, 616 N.W.2d 424, 432 (S.D. 2000).

With regard to the request for continuance of the *Daubert* hearing, after the State filed motions on December 11, 1996, identifying the DNA evidence it planned to introduce at trial, and which was to be the subject of a scheduled January *Daubert* hearing, Moeller's counsel's request for the continuance of the *Daubert* hearing was granted. Since the Defense claimed that they would not have adequate time to discover and review the results because the State had not yet completed testing on all anticipated DNA evidence, the trial court re-scheduled the *Daubert* hearing to March 3, 1997. *State v. Moeller*, 616 N.W.2d at 433.

On February 19, 1997, Moeller filed a third *Daubert* hearing continuance request, claiming that his counsel had not received the DNA test results in time to conduct a meaningful review, that they had underestimated the necessary preparation time, and that there a conflict between the hearing date and the defense expert's schedule. The trial court denied the motion as untimely, stating that the defense had approximately three months' advance notice of the specific DNA testing which the State intended to introduce at trial.

At the beginning of the *Daubert* hearing which was held on March 3-4, 1997, one of Moeller's attorneys stated to the trial court:

> Mr. Butler and I are totally unprepared to participate in this particular hearing on DNA evidence today. ... I can state on behalf of myself and Mr. Butler categorically that he's not being competently and adequately represented at this particular case. That we have no witnesses. We've been unable to consult with our consultant. We have not had adequate time to secure expert witnesses for the purposes of this hearing or even commence the preparation of the intricacies in connection with this matter.

Although the hearing was held as scheduled, Moeller's attorneys conducted almost no cross-examination of the State's experts and presented no expert of their own to rebut the State's expert testimony. Although the trial court granted the Defense request for a standing objection to any testimony concerning the admissibility of the DNA evidence, the trial court subsequently granted the State's motion to admit the DNA evidence, after it found that the evidence met the *Daubert* standards of relevance and reliability.

In addressing Moeller's claim that he was not adequately prepared for the *Daubert* hearing, the trial court stated:

> The Defendant was afforded every opportunity to present evidence and choose

[sic] not to take advantage of that opportunity. The court would assume that counsel for the defendant would argue that they were not afforded an "opportunity" because they were not given the time that they wanted to prepare

....

A fair interpretation of [the] facts indicates that the defense's claims that they had no witnesses, had been unable to consult with their consultant, and had not had adequate time to secure expert witnesses for the hearing or to commence the preparation of the "intricacies" in connection with the DNA is not credible. The court would conclude that the decision by the defense not to present witnesses or examine witnesses at the *Daubert* hearing was a tactical decision made with the intent to create the appearance of error and not the result of being denied an opportunity to do so.

On review, the South Dakota Supreme Court noted that a DNA expert had been appointed for Moeller in October 1996, and that this expert was present for all of the State's testing of DNA evidence that was admitted at trial. The South Dakota Supreme Court reviewed the record to report that Moeller had the results of the DNA tests for all markers in his possession more than 5 weeks in advance of the *Daubert* hearing. The South Dakota Supreme Court also noted that one continuance had been previously granted to allow the defendant additional time to prepare for the hearing, and that Moeller had not specifically shown how a second continuance would have aided his presentation of a defense, other than to allow more time to prepare. The South Dakota Supreme Court observed that the addition time the defense requested to examine the discovery with a qualified expert would have resulted in obtaining information that goes to the weight not the admissibility of the DNA evidence. The South Dakota Supreme Court ultimately concluded that Moeller had ample time to prepare for the DNA-related methodology testimony presented at the *Daubert* hearing, and that the trial court did not abuse its discretion in denying Moeller's motions for a continuance. *State v. Moeller*, 616 N.W.2d at 434.

Although the South Dakota Supreme Court phrased its conclusion in terms of an abuse of discretion as opposed to a constitutional standard, in light of the individual findings supporting this conclusion, the result is not different from what it would have been if the facts had been subjected to a constitutional violation analysis. Further, given the leeway afforded the state courts in matters involving the denial of continuances, and the standards set forth in *Ungar v. Sarafite*, 376 U.S. 575 (1964), and *Morris v. Slappy*, 461 U.S. 1(1983), this Court cannot conclude that Moeller was

12

deprived of any constitutional right in the denial of his requests for a continuance.[5]

## ISSUE 3
## WHETHER MOELLER'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL?

In Ground Five of Moeller's Third Amended Habeas Petition Moeller asserts that his trial counsel provided ineffective assistance of counsel in numerous instances.[6] In his traverse Moeller focuses on counsel's alleged failure to present evidence at the *Daubert* hearing that APO-B DNA evidence is unreliable and inadmissible, on counsel's failure to test a sample of the material purported to be gahnite, and on counsel's failure to present mitigation evidence at the penalty phase of the trial.

The Supreme Court has set forth the following standard by which claims for ineffective assistance of trial counsel are to be evaluated:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant

---

[5]This Court makes this conclusion even if this Court does not necessarily agree with the State courts' findings that defense counsel was engaging in a tactic to create the appearance of error and ineffective assistance of counsel.

[6]Moeller's Third Amended Habeas Petition lists the following claims of ineffective assistance of counsel which Moeller contends occurred when his trial counsel:

> A. Failed to participate in the *Daubert* hearing concerning the admissibility of DNA evidence;
> B. Failed to present evidence demonstrating that APO-B DNA evidence is not reliable and is therefore inadmissible;
> C. Failed to test samples of the mineral purported to be gahnite;
> D. Failed to test the material found underneath the victim's fingernails that is purported to be blood;
> E. Failed to object to the evidentiary basis upon which the prosecution was allowed to introduce and argue the application of the "product rule" to the DNA evidence;
> F. Failed to object to the prosecution's motion in limine to exclude evidence of a plea bargain under which Donald E. Moeller would have not faced the death penalty; and
> G. Failed to offer evidence of the proposed plea agreements during the penalty phase of the trial.

must show that the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. 668, 687(1984). The deficiency prong is met when a defendant shows that counsel's representation fell below the " 'range of competence demanded of attorneys in criminal cases.' " *Id.* at 688 (quoting *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970)). The prejudice prong is met when a defendant shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Defense Counsel's Handling of the APO-B DNA Evidence

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the "general acceptance" requirement of the *Frye*[7] test is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, and that federal trial judges have the gatekeeping task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand. South Dakota has adopted the *Daubert* test for determining the admissibility of scientific and other expert evidence. *See State v. Hofer*, 512 N.W.2d 482 (S.D. 1994).In *State v. Corey*, the Supreme Court of South Dakota noted that after the adoption of the *Daubert* test, general acceptance in the scientific community is no longer required for the admissibility of expert testimony; but rather, the trial judge must simply determine that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.624 N.W.2d 841 (S.D. 2001).

In his traverse Moeller argues that counsel was ineffective in not fully participating in the *Daubert* hearing and failing to persuade the trial court to deny the admission of the APO-B DNA evidence. Moeller explains why counsel should have accomplished the goal of exclusion of this evidence by stating: "Simply put, although DNA evidence is widely recognized and reliable, APO-B has been found admissible in one reported appellate decision. That decision is *Moeller* II."

It is uncontroverted that APO-B DNA testing is not frequently utilized in the forensic community and that it has not been frequently utilized in courtroom proceedings. This Court is aware of the use of APO-B DNA testimony in one other criminal case, a general court martial in which a

---

[7]*Frye v. United States*, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923).

defendant was convicted of premeditated murder by a an officer panel. *See United States v. Thomas*, 49 M.J. 200 (U.S. Court of Appeals for the Armed Forces 1998). In the trial in this court-martial, which occurred before the *Daubert* decision, the prosecution's expert testified that his laboratory in Germany had conducted research on the APO-B region for 2 years. The Court of Appeals for the Armed Forces noted that only one laboratory in the United States or Canada had attempted to use the APO-B region in their forensic testimony and that the German laboratories determined reliability based on their own validation studies. The *Thomas* decision also discloses that the use of the APO-B region as a forensic standard had been rejected by the FBI. 49 M.J. 202-204. The deposition testimony of Dr. Marcia Eisenberg was admitted at the State habeas proceedings. Dr. Eisenberg, who oversees research and development in the area of molecular diagnostic tests for a private laboratory studied the APO-B DNA marker in the early 1990's. She and her employer determined not to use the APO-B DNA marker for parentage studies because that region of the DNA was complex and created difficulties in distinguishing different DNA types on gels based on that marker. Dr. Eisenberg also testified that other less complex markers became available at that time that made it easier to distinguish between individuals. Consequently APO-B was never used by her laboratory in actual casework. Dr. Eisenberg further testified that in 1992 and still at the time of her testimony, APO-B was not generally accepted in the forensic community as a useful forensic marker.

In *Moeller v. Weber*, 689 N.W.2d 1, 10 (S.D.2004) , the South Dakota Supreme Court in reviewing the habeas record observed that Moeller presented no testimony or other evidence that might have led to the exclusion at the *Daubert* hearing of any DNA evidence based on any marker other than the APO-B marker. The South Dakota Supreme Court further concluded that "trial counsel was faced with the realization that even if the APO-B DNA evidence was excluded, the evidence still showed in the remaining analysis that the probability of a person in the Caucasian population having DNA characteristics common to Moeller's would be 1 in 130 million." The inclusion of the APO-B DNA evidence resulted in testimony that the probability of a person in the Caucasian population having DNA characteristics common to Moeller's would be 1 in 14 billion. The South Dakota Supreme Court observed that at Moeller's trial Defense counsel vigorously cross-examined the State's DNA experts regarding the methodology, reliability, and control procedures of their DNA testing, and that trial counsel even obtained an admission from the State's DNA expert that only

recently had his laboratory determined that APO-B DNA evidence was reliable forensic evidence and that no other laboratory had made this determination.[8] The South Dakota Supreme Court further observed that trial counsel presented the questionable reliability of the APO-B DNA evidence to the jury to support an inference that the remaining DNA evidence was equally unreliable. Based on these observations and the fact that the APO-B DNA evidence was effectively challenged at trial, the South Dakota Supreme Court concluded that the strategy to forego a vigorous defense against the admission of the APO-B DNA evidence in the *Daubert* hearing was not ineffective.

In reviewing the State court's findings regarding the handling of the ABO-B DNA evidence at the *Daubert* hearing and at trial, this Court does not find "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In addition, this Court does not find the State court's conclusion regarding the ineffective assistance of trial counsel on this issue to be an "unreasonable application" of clearly established law.

Failure to Test the Alleged Gahnite

Shortly before Moeller's trial the State disclosed that it's mineral expert would be testifying that gahnite, a very rare material[9], was found at both the murder scene and in the left front wheel well of Moeller's pickup. Although there was considerable testimony regarding the alleged gahnite the specimen was never offered or received into evidence. The mineral samples which were provided to the defense had been lost in the office basement of one of Moeller's attorneys and located by his secretary shortly before the trial commenced. Defense trial counsel did not have the samples tested to see if they contained gahnite and the trial court refused to conduct a *Daubert* hearing regarding the expert testimony that the rare gahnite was located at both the murder scene and in the wheel well of Moeller's pickup.

Habeas counsel had specimens previously examined by the State's expert tested on a scan-electron microscope by a geologist from the South Dakota School of Mines and Technology, Dr.

---

[8]This Court notes that although little cross-examination was conducted at the *Daubert* hearing, defense counsel did cross-examine one of the DNA experts, Robin Cotton, who acknowledged that her laboratory did not use the APO-B marker and that she was unaware of any laboratory other than that of the State's witness, Dr. Schanfield, that used the APO-B marker.

[9]Gahnite is far more rare than gold and at the time of trial had never been reported to be found west of the Mississippi. Most mineralogists have never seen gahnite.

Edward Duke. Dr. Duke testified at the State habeas hearing that based on his testing and with a reasonable degree of scientific certainty, that it was "not conceivable" that any of the minerals he examined were gahnite. Dr. Duke further testified that generally his laboratory could get a mineral sample tested within a few days of receiving a request.

The deposition testimony of the State's mineral expert who testified at Moeller's trial was received into evidence at the State habeas hearing. The expert testified that he did not preserve the grains of gahnite that he had testified he had found in the samples from the murder scene or in the left front fender well of Moeller's pickup. These alleged gahnite grains were disposed of even though the expert had written the former State's attorney on May, 1991, stating that all of the items were in his possession and would be returned when the prosecutor or court need them. The State's expert testified that he disposed of the alleged gahnite because he was directed to present his findings in a "fairly generalized manner" and because the acetone bromoform he had used on the gahnite sample was a dangerous substance which required disposal. Dr. Duke testified, however, that the hazardous oil used for a visual identification of the grains could be washed off and the grains preserved. Dr. Duke also opined that you would expect a scientist to preserve a mineral so rare as gahnite.

At trial, Moeller's soil expert testified that ancient glaciers moving through what is now South Dakota deposited the soils now found in the Minnehaha and Lincoln county areas. Moeller's expert also opined that soils found throughout the eastern part of the state would be substantially similar. Moreover, the expert explained that any mineral deposit, such as gahnite, if found in a specific area of the state would likely be found in other areas of the state due to the manner in which the soils were deposited. Lastly, the defense expert testified that the mineral found by the State's expert was more likely common spinel, a rare mineral, though not as rare as gahnite.

In rejecting Moeller's claim that his counsel was ineffective for failing to test the gahnite, the South Dakota Supreme Court found that the trial testimony of the defense mineral expert established that instead of attempting to show that the mineral found in the wheel well was common spinel rather than gahnite, defense counsel chose to proceed with a theory that the State's expert was mistaken in his conclusion that a soil analysis could isolate any locale in the eastern part of the State because the glacier left basically the same minerals in all parts of eastern South Dakota. The South Dakota Supreme Court reasoned that proceeding under such a theory was neither unreasonable nor

17

ineffective. *Moeller v. Weber*, 689 N.W.2d at 11.

Defense counsel attempted to exclude the State's expert's gahnite testimony by requesting a *Daubert* hearing. When that request was denied, defense counsel competently countered the State's expert testimony with the defense expert's testimony and argument. The State courts' resolution of this issue involves no unreasonable application of clearly established Federal law or an unreasonable determination of the facts. Moeller is not entitled to federal habeas relief on his ineffective assistance of counsel claim regarding the failure to test the soil samples.

Failure to Present Evidence in Mitigation During Penalty Phase

In his traverse, Moeller contends that his counsel conducted little, if any, investigation of evidence for the penalty phase. Moeller further contends that his counsel improperly acquiesced to Moeller's request that his daughter not testify and that the jury not be shown pictures of his grandchild. The defense presented no mitigation evidence at the penalty phase of the trial. However, all three of Moeller's attorney addressed the jury and pleaded for their client's life during the penalty phase of the trial. In addition, the State presented only argument, not evidence, at the penalty phase of the trial.

At the State habeas hearing, one of Moeller's attorneys, Mike Butler, testified that about 60 days before trial Robert VanNorman, an attorney experienced in death penalty cases, was appointed to assist in jury selection and in preparing a mitigation case. VanNorman became aware that Moeller had a daughter who had children. This daughter met Moeller for the first time either shortly before or during trial. After the jury convicted Moeller counsel discussed what should be presented in the penalty phase of the trial. Counsel was concerned that presenting evidence from the daughter and Moeller's step-mother regarding their love for Moeller would allow the State to do as it argued it should be able to do - present evidence of people who did not love Moeller and testimony of why they viewed him as they did. Butler testified, "Based on that, we decided not to take what we thought might be a risk of inviting evidence that we didn't want the jury to hear about Don's past."[10] Butler

---

[10]*See State v. Moeller,* 548 N.W.2d 465, 468-470 (S.D.1996). At Moeller's first trial the State introduced graphic prior bad acts testimony from individuals who claimed that Moeller attempted to sexually assault them while threatening them with a knife. Even though that evidence was not admissible in the retrial guilt phase, it could have been admissible in the penalty phase. Moeller also had an extensive criminal record.

testified that Moeller advised that he did not want anyone taking the stand and begging for his life and that he was innocent. Butler testified that he believed it was a mistake to not present mitigation evidence and that he had overreacted to the concern of inviting rebuttal evidence and should not have allowed his client to dictate what should be presented in mitigation.

Moeller relies on *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002), as authority that his defense counsel was constitutionally defective in failing to present mitigation evidence. The *Silva* case is factually distinguishable from the case at hand. In the *Silva* case defense counsel conducted no investigation whatsoever into the defendant's past and also failed to even minimally assist in the preparation of a possible mental defense related to psychiatric disorders or substance abuse suffered by the defendant. In addition, the Ninth Circuit observed that there was potentially compelling mitigating evidence which could have been presented to the jury during the penalty phase of Silva's capital murder trial. *See also Williams v. Taylor*, 529 U.S. 362 (2000) (petitioner was denied effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence during the sentencing phase of capital murder trial).

In a more recent Supreme Court case, *Schiro v. Landrigan*, 550 U.S. 465 (2007), the Court held that defense counsel's failure to present mitigating evidence during the sentencing phase in a death penalty case did not deprive the defendant of effective assistance of counsel. In the *Schiro* case the defendant prohibited his ex-wife and mother from testifying on his behalf. The Supreme Court held that since the defendant actively interfered with and refused to allow the presentation of mitigating evidence and no Supreme Court case had held that counsel was ineffective under those circumstances, the state court's determination that counsel was not ineffective was not an unreasonable application of clearly established law.

In the case at hand counsel investigated Moeller's background and later made a reasonable strategic decision not to risk opening the door for damaging rebuttal evidence. Further, the existence of a daughter that Moeller had not met until immediately before his retrial for murder cannot be characterized as substantial mitigating evidence. Under the circumstances of this case, defense counsel was not ineffective for abiding by Moeller's wishes to not present mitigating evidence. In this and all other claims of ineffective assistance Moeller has not met his burden of demonstrating that the State habeas courts incorrectly determined that he failed to establish ineffective assistance of

counsel pursuant to the requirements of *Strickland v. Washington.*

ISSUE 4
WHETHER THE ADMISSION OF TESTIMONY REGARDING GAHNITE
ENTITLES MOELLER TO FEDERAL HABEAS RELIEF?

In ground Six and Seven of his Third Amended Petition Moeller contends that the trial court's admission of certain testimony, including soils evidence, without proper foundation and the trial court's decision to admit testimony that a certain mineral was in fact "gahnite"when in fact the mineral was not "gahnite," were trial errors that had substantial and injurious effect or influence in determining the jury's verdict and thereby deprived Moeller of his rights to due process of law. In *State v. Moeller*, 616 N.W.2d at 446-447, the South Dakota Supreme Court opined that based on the extreme rarity of gahnite "whether gahnite was indeed found in both the wheel well of Moeller's pickup and at the crime scene was a strong piece of circumstantial evidence and material to the issue of guilt." Although the State's expert's disclosure of the alleged gahnite was late and the trial court denied the defense a *Daubert* hearing on the admission of this testimony, the South Dakota Supreme Court found no abuse of discretion because "the challenged evidence did not present any new scientific theory, and the methodologies were neither complex nor unusual." 616 N.W.2d at 449. The South Dakota Supreme Court also concluded that Moeller presented no evidence that the methodology was so flawed as to be unreliable . *Id.*

On the State habeas appeal the South Dakota Supreme Court rejected Moeller's contentions that the State's expert's conclusions were "demonstrably false," and that because the grains identified by the State's expert as gahnite were destroyed before his second trial, Moeller was entitled to an inference that the evidence would not support the State's expert's conclusions. The South Dakota Supreme Court found no fault with the State habeas trial court's conclusion that the State soil expert's conduct was negligent and not a calculated effort to destroy exculpatory evidence. The South Dakota Supreme Court stated that the conclusion that the destruction of the "gahnite" grains did not amount to a violation of Moeller's right to due process was bolstered by the fact that at the time of the destruction comparable, albeit not identical, evidence was available for Moeller's review. *Moeller v. Weber*, 689 N.W.2d at 7-8.

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court considered the extent to

which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that may be useful to a criminal defendant. Under the *Youngblood* decision, due process is held to be violated only if there is bad faith on the part of the government in failing to preserve evidence. *See also Carlson v. State*, 945 F.2d 1026, 1029 (8th Cir. 1991).

In his May 9, 1991 report to the prosecuting attorney, the State's soil expert stated that the soil samples sent to him were in his possession and would be returned "when either you or the Court requires them."The State's soil expert testified in a deposition used for the State habeas proceedings, however, that he did not preserve the grains of gahnite that he had testified he observed under the microscope. He testified that he disposed of the gahnite because the oils that he had used on it were considered carcinogenic. The State's soil expert further testified that another reason he did not preserve the gahnite was that he was directed by the prosecuting attorney to present his findings in a fairly generalized manner. The State's soil expert testified that before 1998 he had not advised anyone associated with the prosecution that he had discarded the samples.

Although it evidenced bad judgment to destroy the alleged gahnite grains, this Court cannot conclude that the State habeas court's determination that the destruction was not in bad faith was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Also, a review of the testimony presented by the State's expert regarding the alleged gahnite and the competent testimony challenging that testimony which was presented by the defense expert at Moeller's trial leads this Court to conclude that the State court's determination that the admission of the gahnite testimony did not violate Moeller's right to due process was not an unreasonable application of clearly established Federal law.

## ISSUE 5
## WHETHER THE ADMISSION OF EXPERT TESTIMONY ABOUT DNA EVIDENCE WAS SO UNRELIABLE AS TO ENTITLE MOELLER TO FEDERAL HABEAS RELIEF?

Moeller contends that the trial court's decision to admit testimony about APO-B DNA evidence and product rule evidence incorporating this evidence was a trial error that had a substantial and injurious effect or influence in determining the jury's verdict and thereby deprived Moeller of his rights to due process of law. In addition to previously discussed issues regarding defense counsel's virtual boycott of the *Daubert* hearing and the majority of the forensic community's declination to

utilize APO-B DNA evidence, Moeller has presented additional challenges to the reliability of the APO-B DNA evidence admitted at his trial. Moeller contends that the validation studies for APO-B DNA evidence had not been completed when the testing was done in Moeller's case and that some of the validation work was performed by students. Moeller also takes the position that all of the validation material from the State's APO-B DNA expert had not been turned over to the defense prior to trial. Although Moeller raises the issue of contamination, his expert at the State habeas proceedings testified in her deposition that she had no concerns about contamination as it related to the testing in Moeller's case.

In addressing Moeller's challenges to the validity and reliability of the APO-B DNA evidence, the South Dakota Supreme Court reviewed the guidelines delineated in *Daubert* and concluded as follows:

> In furtherance of our belief that the trial court did not err in admitting the disputed DNA evidence, we note that the habeas court effectively conducted what might be referred to as a "post-conviction" *Daubert* hearing. During the habeas hearing, Moeller's DNA expert was allowed to testify at length on problems she perceived in the APO-B testing. However, even at this stage, Moeller's expert was unable to convince the habeas court that the evidence based on the APO-B marker failed to meet our admission standards. All the habeas court found was that there is disagreement in the DNA community on whether APO-B is a valid marker. Again, perfect agreement is not a prerequisite to admission of scientific evidence.

*Moeller v. Weber*, 689 N.W.2d at 14.

"Questions regarding admissibility of evidence are matters of state law, and they are reviewed in federal habeas inquiries only to determine whether an alleged error infringes upon a specific constitutional protection or is so prejudicial as to be a denial of due process." *Rousan v. Roper*, 436 F.3d 951, 958 (8th Cir. 2006), *quoted in Bell-Bey v. Roper*, 499 F.3d 752, 759 (8th Cir. 2007). Although the Court is cognizant of the controversy regarding whether the APO-B marker should be utilized in forensic DNA work, the Court's review of the trial record discloses that defense counsel competently challenged the use of the APO-B marker in this case. Further, this Court cannot conclude that the admission of evidence regarding the APO-B marker or any other of the DNA evidence infringed upon any specific constitutional protection or was so prejudicial as to be a denial of Moeller's due process rights.

22

## WHETHER THE EXPERT SCHANFIELD'S ACTIONS IN CONTACTING THE STATE AND ACTING AS ITS EXPERT AFTER HAVING BEEN RETAINED BY THE DEFENSE ENTITLES MOELLER TO FEDERAL HABEAS RELIEF?

Moeller contends that the trial court's decision to allow expert witness Schanfield to testify for the prosecution after having been retained as a consultant for Moeller deprived Moeller of his rights to due process. In 1990, prior to Moeller's first trial, the prosecution hired Dr. Moses Schanfield to performed conventional serological tests and extract DNA so that it could be sent to another lab for testing. At the time Scanfield's lab was not conducting DNA testing. In January of 1992 Moeller filed a motion to appoint Dr. Schanfield as an expert for the defense to conduct forensic DNA testing and for review and replication of tests conducted at the direction of the State. The trial court granted this motion.

In May of 1992 Schanfield received defense samples, and in compliance with the directives of the defense, DNA was extracted but no tests were conducted. In June of 1992 Schanfield testified for the prosecution at the *Frye* hearing on the issue of the admissibility of DNA PCR-based testing of the DQ-alpha marker. After testifying at the *Frye* hearing, Schanfield approached the prosecution and advised that his lab had developed the capability to conduct PCR-based APO-B DNA typing. The prosecution then wrote the defense and asked whether Moeller intended to pursue the APO-B testing with Schanfield. Moeller's attorney contends he responded that the inquiry was premature because the trial court had not yet issued a decision on whether to admit any PCR-based typing. Defense counsel also indicated that he wished to review Schanfield's validation studies before determining whether to pursue the APO-B testing.

The prosecution then directed Schanfield to conduct the DNA tests on its samples. The results of these tests failed to exclude Moeller as a possible semen donor on the fluids taken from the victim. Approximately two weeks into Moeller's first trial, the prosecution sought to introduce the evidence of the PCR-based APO-B typing. The defense objected to the introduction of this evidence on the basis that it was untimely offered and demanded a *Frye* hearing. The trial court in the first trial

then excluded the APO-B evidence.

After the reversal and remand and prior to the second trial, the prosecution again moved to introduce Schanfield's APO-B DNA evidence. Moeller then filed a motion to exclude the evidence on the grounds of prosecutorial misconduct. Moeller alleged that the prosecution and Schanfield improperly acted in collusion by conducting APO-B typing without informing the defense and without its approval. The trial court in the second trial denied the defendant's motion to suppress and allowed the admission of Schanfield's testimony.

On direct appeal Moeller argued that the inclusion of Schanfield's APO-B tests violated his attorney-client privilege, his Sixth Amendment right to effective counsel, and his Fifth Amendment rights to due process and protection against self-incrimination. In rejecting these arguments the South Dakota Supreme Court acknowledged the existence of considerable conflict of authority regarding the circumstances under which an expert witness retained by one party may testify upon the request of the other party. The South Dakota Supreme Court concluded, however, that there was no abuse of discretion in admitting Schanfield's expert testimony because both sides were aware that Schanfield was performing work for the other side. Although the Court noted it did not condone such a practice, it saw no prejudice under the facts of the case. *State v. Moeller*, 616 N.W.2d at 445.

Moeller presents no persuasive authority which supports a determination that the South Dakota Supreme Court's resolution of this issue was contrary to, or involved an unreasonable application of clearly established Federal law, or that the decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State proceedings. Consequently, Moeller is not entitled to Federal habeas relief on this issue.

ISSUE 7

## WHETHER MOELLER WAS DEPRIVED OF DUE PROCESS WHEN THE TRIAL COURT RESPONDED TO A JURY QUESTION REGARDING THE MEANING OF LIFE IMPRISONMENT WITHOUT TELLING THE JURY THAT LIFE WITHOUT PAROLE MEANT LIFE WITHOUT THE CHANCE OF PAROLE?

After the jury had deliberated in the sentencing phase of Moeller's trial, the jury sent a note asking the following question:

> If the penalty of "life imprisonment without parole" should be imposed upon the defendant, will he EVER have a chance to appear before a parole board?

In response to the note, the trial court responded:

We acknowledge your note asking questions about life imprisonment without parole. All of the information which I can give you is set forth in the jury instructions.[11]

S.D.C.L. § 24-15-4 provides: "No inmate sentenced to life imprisonment is eligible for parole by the Board of Pardons and Paroles." Prior to a 2004 modification of this statute the statute read: "A person sentenced to life imprisonment is not eligible for parole by the Board of Pardons and Paroles." Moeller had requested that the jury be instructed, "You are to assume that if you sentence Donald Moeller to life imprisonment, he will spend the rest of his life in prison." This instruction was denied. Moeller contends that the failure to give his instruction and the manner in which the trial court answered the jury's question denied Moeller of due process.

In rejecting Moeller's argument the South Dakota Supreme Court in Moeller's direct appeal analyzed and distinguished *Simmons v. South Carolina*, 512 U.S. 154 (1994), from the facts of Moeller's case. *State v. Moeller*, 616 N.W.2d at 461-462. In *Simmons* a plurality of the United States Supreme Court held that when a state has raised the specter of the defendant's future dangerousness, the defendant's due process rights are violated by refusing to instruct the jury that, as an alternative to the death sentence, a sentence of life imprisonment carries with it no possibility of parole. The plurality further held in *Simmons* that the trial court's jury instruction that life imprisonment was to be given its ordinary meaning and that the jury was not to consider parole did not satisfy in substance

---

[11]This response to a jury question concerning life without parole was characterized as adequate in *Rhines v. Weber*, 608 N.W.2d 303 (S.D. 2000). In that case, however, the jury asked the following set of questions:

Will Mr. Rhines be allowed to mix with the general inmate population?
Will Mr. Rhines be allowed to discuss, describe or brag about his crime to other inmates, especially new and/or young men jailed for lesser crimes? (ex: drugs, DWI, assault, etc.)
Will Mr. Rhines be allowed to marry or have conjugal visits?
Will Mr. Rhines be allowed to have or attain any of the common joys of life (ex. TV, radio, music, telephone, or hobbies and other activities to distract him from his punishment)?
Will Mr. Rhines be jailed alone or will he have a cell mate?
What sort of free time will Mr. Rhines have (what would his daily routine be)?

the defendant's request for a jury charge on parole ineligibility when the jury had submitted the following question: "Does the imposition of a life sentence carry with it the possibility of parole?" 512 U.S. at 160.

In distinguishing *Simmons* from Moeller's case the South Dakota Supreme Court in Moeller's direct appeal noted that future dangerousness was not specifically raised as a concern by the State, and that while not explicitly instructed that "life means life," the jury in Moeller's trial was informed that a sentence of life imprisonment was "life imprisonment without parole." The Court observed that these were the words used on the sentence verdict form.[12] *State v. Moeller*, 616 N.W.2d at 461. The South Dakota Supreme Court concluded that the jury was instructed as to "life imprisonment without parole," and that there was no abuse of discretion in the trial court's rejection of Moeller's additional instruction referencing the same. The South Dakota Supreme Court also relied on its previous holding in *Rhines v. Weber*, 608 N.W.2d 303 (S.D. 2000), and noted that the trial court acknowledged patterning its response to the jury question after the *Rhines* trial court's response to a similar set of questions, which response was met with approval on appeal. 616 N.W.2d at 462.

In *Shafer v. South Carolina*, 532 U.S. 36, 43 (2001), which was decided after Moeller's death sentence was affirmed on direct appeal, the state during the sentencing proceeding in another South Carolina death penalty case introduced evidence of the defendant's criminal record, past aggressive conduct, probation violations and misbehavior in prison. The trial judge twice quoted from the state statute in advising the jury "life imprisonment means until the death of the defendant." The judge did not instruct that a life sentence, if such was recommended by the jury, would be without parole. During sentencing deliberations the jury submitted the following two questions:

> "1) Is there any remote chance for someone convicted of murder to become elig[i]ble for parole?
>
> 2) Under what conditions would someone convicted for murder be elig[i]ble."

The trial judge in *Shafer* eventually responded to the questions with the following instruction:

> "Section 16-3-20 of our Code of Laws as applies to this case in the process we're in, states that, quote, for the purposes of this section life imprisonment means until

---

[12] Instructions No. 1, 2 and 13, however, only refer to life imprisonment or life in the penitentiary without specifying "without parole."

the death of the offender, end quote.

"Parole eligibility or ineligibility is not for your consideration."

532 U.S. at 44-45.

The trial judge in *Shafer* refused the defense request to advise the jury that a person subject to life imprisonment was ineligible for parole. In closing argument, defense counsel had plead to the jury that, if Shafer's life is spared, he would "die in prison " after "spend[ing] his natural life there." The jury unanimously recommended the death penalty. The South Carolina Supreme Court on appeal ruled that *Simmons* no longer governed capital sentencing under South Carolina's death penalty statutes.

The prosecution in the *Shafer* case argued before the United States Supreme Court that the defense counsel's closing pleas and the trial judge's instructions reiterating that "life imprisonment means until the death of the defendant" satisfied the requirements of *Simmons v. South Carolina*, 512 U.S. 154 (1994). The Supreme Court rejected this argument by reasoning that the jurors would not have sought further instruction if defense counsel's closing argument or the judge's instructions had provided "any clear understanding of what a life sentence means." 532 U.S. at 53. The Supreme Court in *Shafer* further opined that the court's final instruction that "[p]arole eligibility or ineligibility is not for your consideration," did not prevent the jury from being misled and may well have been construed to mean "'that parole was available but that the jury, for some unstated reason, should be blind to this fact.'" *Shafer*, 532 U.S. at 53(quoting *Simmons*, 512 U.S. at 170).

The prosecution in *Shafer* maintained that it had not argued future dangerousness as a predicate for a *Simmons* charge. The United States Supreme Court determined, however, that this issue was not ripe for resolution in the *Shafer* case because the South Carolina Supreme Court had not homed in on that question, and reversed and remanded the case for further proceedings. *Shafer*, 532 U.S. at 55.

Moeller cites to a subsequent Supreme Court death penalty case, *Kelly v. South Carolina*, 534 U.S. 246 (2002), in challenging the South Dakota Supreme Court's conclusion that future dangerousness was not raised as a concern in Moeller's case. In the *Kelly* case the prosecutor at the sentencing proceeding presented testimony that the defendant had made a knife while in prison and

had taken part in an escape attempt with plans to hold a female guard hostage. The prosecutor also cross-examined a psychologist to present evidence of the defendant's sadism at an early age and of his "current desires to kill anyone who irritated him." 534 U.S. at 727. In closing argument, the prosecutor in *Kelly* referred to the defendant as a "dangerous" "bloody" "butcher." The defense counsel's request for a jury instruction stating that the defendant would be ineligible for parole if he received a life sentence was refused. This refusal was based on the trial court's conclusion that the State's evidence went to the defendant's character and characteristics, and not to his future dangerousness. In affirming the defendant's death sentence, the South Carolina State Supreme Court concluded that future dangerousness was not in issue so that *Simmons* was inapposite.

The United States Supreme Court rejected the South Carolina State Supreme Court's analysis of *Simmons* with regard to future dangerousness in *Kelly* and held that an instruction on ineligibility for parole was warranted. The Supreme Court explained:"Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." 534 U.S. at 253. The Supreme Court further held that it was not dispositive that the jury in *Kelly*, unlike the *Simmons* and *Shafer* juries, did not request further instruction on parole eligibility. The Supreme Court reasoned that a trial judge's duty to give instructions sufficient to explain the law, exists independently of any jury question or other indication of jury perplexity. 534 U.S. at 256.

In *Moeller v. Weber*, 689 N.W. 2d 1, 8-9 (S.D. 2004), the South Dakota Supreme Court acknowledged *Kelly v. South Carolina*, 534 U.S. 246(2002), and *Simmons v. South Carolina*, 512 U.S. 154(1994), as holding that a defendant's right to due process is violated when a defendant is facing the possibility of execution, and the prosecution argues that the defendant poses a future threat to society, and a trial court refuses to inform the jury whether life imprisonment precludes the opportunity for parole. The South Dakota Supreme Court distinguished these cases, however, by maintaining the position it took in Moeller's direct appeal that "future dangerousness was not specifically raised as a concern by [the] State." *Moeller v. Weber*, 689 N.W.2d at 8 (quoting *State v. Moeller*, 616 N.W.2d at 461). The South Dakota Supreme Court further reiterated its position that that the instructions given to the jury and the subsequent response to the jury question were accurate, complete, and unambiguous. The South Dakota Supreme Court opined that "any further explanation

would have been at best redundant and at worst confusing."689 N.W.2d at 9.

Moeller challenges the South Dakota Supreme Court's conclusion regarding whether future dangerousness was raised by the prosecution. Moeller contends that future dangerousness was raised when the prosecution in argument in the guilt phase of the trial characterized Moeller as a butcher, mentioned three of Moeller's convictions and stated that Moeller "enjoyed killing Becky." In supplemental briefing to the Court Moeller contends that this guilt phase argument must be considered in context with the instructions given at the sentencing phase of his trial. At the sentencing phase of Moeller's trial the jury was instructed:

> Neither the State or the Defendant is required to produce any evidence during this hearing, but instead, if either so chooses, may rely entirely on the evidence produced at trial. In reaching your decision on the appropriate punishment to be imposed in this case, you are authorized to consider all of the evidence received at both phases of trial, presented by the State and the Defendant . . .
> .

The State presented as the aggravating circumstance which if found would allow a death sentence, the statutory circumstance that the "offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The jury was thus instructed regarding these aggravating factors, and after being instructed as to the definitions of those aggravating factors, was instructed that in making its decision on penalty it should consider "all of the evidence, whether direct or circumstantial, which was previously received during the guilt phase of this trial." Moeller argues that the evidence of torture, depravity of mind, or an aggravated battery to the victim – is also evidence of future dangerousness. In making this argument Moeller relies upon the Supreme Court's acknowledgment in *Kelly* that "it may well be that the evidence in a substantial portion, if not all, capital cases will show a defendant likely to be dangerous in the future."[13]  534 U.S. at 254 n.4. Moeller also contends that his argument is supported by the

---

[13]After making this acknowledgment the Supreme Court further stated:

> But this is not an issue here, nor is there an issue about a defendant's entitlement to instruction on a parole ineligibility law when the State's evidence shows future dangerousness but the prosecutor does not argue it. The only questions in this case are whether the evidence presented and the argument made at Kelly's trial placed future dangerousness at issue.

534 U.S. at 254 n.4.

conclusion in *Kelly* that a "[a] jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee." 534 U.S. at 253-54.

Although the jury in Moeller's case heard evidence at the guilt phase of the trial relating to the defendant's demonstrated propensity for violence, the Supreme Court has not interpreted or extended its holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994), to hold that due process requires that a jury in a capital case be advised that a person subject to life imprisonment is ineligible for parole when, in a case such as the one at hand, the State has presented no evidence at the penalty phase and has not at the penalty phase argued future dangerousness. This is particularly true, when as in the case at hand, the jury was instructed in the body of the instructions [14] and in the Verdict Form that it had the option of returning a verdict of a sentence of "life imprisonment without parole." The South Dakota Supreme Court's determination of the issue regarding the trial court's response to the jury's question regarding parole eligibility was not an unreasonable application of clearly established Federal law as determined by the Supreme Court.

## ISSUE 8

### WHETHER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT AND THE NOTICE AND JURY GUARANTEES OF THE SIXTH AMENDMENT REQUIRE THAT THE AGGRAVATING CIRCUMSTANCE UPON WHICH MOELLER'S DEATH SENTENCE WAS BASED BE ALLEGED IN THE INDICTMENT?

Moeller contends that since the aggravating circumstance upon which the State relied in obtaining the death penalty for Moeller was never alleged in an indictment or an information the State did not comply with either the Due Process Clause of the Fifth Amendment or the notice and jury guarantees of the Sixth Amendment. The Notice of Intent to Request Presentence Hearing, which was served on defense counsel and filed on September 3, 1996, more than seven months before Moeller's jury trial, gave notice that pursuant to S.D.C.L. § 23A-27A-2[15] the State intended to prove beyond

---

[14]Instruction No. 22 provided in part: "You may return the verdict which reads: We find that a sentence of life imprisonment without parole should be imposed upon the defendant."

[15]S.D.C.L. § 23A-27A-2 provides in part:
> In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall

a reasonable doubt two statutory aggravating circumstances and seek a jury recommendation of a sentence of death. One of the listed aggravating circumstances, that "the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," *see* S.D.C.L. § 23A-27-1(6), was found to be present by the jury in the determination of Moeller's death sentence.

Moeller bases his contention that his indictment needed to list the aggravating circumstance on his interpretation of *Ring v. Arizona*, 536 U.S. 584(2002), and two related Supreme Court cases preceding *Ring*. See *Jones v. United States*, 526 U.S. 227 (1999); and *Apprendi v. New Jersey*, 530 U.S. 466, (2000). In *Jones v. United States*, 526 U.S. 227 (1999), the Court addressed the federal car jacking statute, 18 U.S.C. § 2119. The Court interpreted the statute as defining three distinct offenses, one which provided a maximum penalty of 15 years, one which provided a maximum penalty of 25 years, and the last, which provided imprisonment for any number of years up to life. The Court in *Jones* distinguished the case from *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), in which it was held that facts establishing recidivism and increasing the maximum penalty for a crime need not be stated in a felony indictment. By construing the federal car jacking statute as establishing three separate offenses specifying distinct elements, as opposed to the involvement of sentencing factors which have previously been established through procedures satisfying fair notice, the Supreme Court concluded that the elements of the car jacking statute must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict. *Jones*, 526 U.S. at 252.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a defendant was convicted of possession of a firearm for an unlawful purpose and unlawful possession of a prohibited weapon, and was

---

resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing the jury shall receive all relevant evidence, including:

(1) Evidence supporting any of the aggravating circumstances listed under § 23A-27A-1

. . . .

sentenced to an extended term under New Jersey's hate crime statute. The Supreme Court reversed the conviction, holding that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. In reaching this holding the Court in *Apprendi* reasoned that since the state hate crime statute authorized an increase in the maximum punishment based on a judge's finding by a preponderance of evidence that a defendant had acted with the purpose to intimidate a victim based on particular characteristics of that victim, this procedure violated the Due Process Clause of the Fourteenth Amendment. The Court in *Apprendi* specifically noted as follows that it was not determining that the Indictment in the case was insufficient:

> Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment. He relies entirely on the fact that the "due process of law" that the Fourteenth Amendment requires the States to provide to persons accused of crime encompasses the right to a trial by jury, *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and the right to have every element of the offense proved beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). That Amendment has not, however, been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury" that was implicated in our recent decision in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). We thus do not address the indictment question separately today.

530 U.S. at 477 n.3.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Defendant had been sentenced to death under Arizona's death penalty system. In that system, following an adjudication of a defendant's guilt of first-degree murder by a jury , the trial judge, sitting alone, would determine the presence or absence of the aggravating factors required under Arizona law for the imposition of the death penalty. Ten years before deciding *Apprendi*, the Supreme Court had held that Arizona's sentencing system was compatible with the Sixth Amendment because the additional facts found by the trial judge qualified as sentencing considerations, not as elements of the crime of capital murder. *See Walton v. Arizona*, 497 U.S. 639, 649 (1990). The Defendant in *Ring* successfully challenged the viability of *Walton v. Arizona* in light of the Supreme Court's holding in *Apprendi*. The Supreme Court thus held that

32

because Arizona's enumerated aggravating factors operated as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that these aggravating factors be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi*, 530 U.S., at 494). In *Ring*, the Supreme Court also noted that Ring had not contended that his indictment was constitutionally defective. *Ring*, 536 U.S. at 597 n.4.

The holding in *Ring v. Arizona*, 536 U.S. 584(2002), however, does not apply to Moeller's case because Moeller's case was final on direct review in 2000. *Ring* was not decided until 2002 and in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Supreme Court held that its decision in *Ring v. Arizona* was properly classified as procedural rather than substantive and that it did not announce a watershed rule of criminal procedure. Therefore, the decision in *Ring* did not apply retroactively to death penalty case already final on direct review.

Even if *Ring* had been decided before Moeller's case was final on direct review, Ring would not have imposed a requirement that Moeller's aggravating factor be included in his indictment. In *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005)(en banc), a case under the Federal Death Penalty Act, the Eighth Circuit observed that *Ring* did not address whether the Fifth Amendment requires capital aggravating factors to be included in an indictment. The Eighth Circuit held in *Allen*, however, that in a federal case *Ring* necessarily implies such a Fifth Amendment requirement to include the statutory aggravating factors in an Indictment.[16] In explaining why it was implying such a requirement when the same was not set forth in *Ring*, the Eighth Circuit stated, "Ring did not address the indictment issue because it involved a state prosecution, and the Fifth Amendment's grand jury requirement has not been construed to apply to the states." *Id.* at 942; *see Hurtado v. California*, 110 U.S. 516 (1984)(neither the Fifth Amendment, which provides for the right to an indictment by a grand jury for serious criminal charges brought in federal court, nor the Fourteenth Amendment's Due Process Clause requires the states to afford a defendant the right to be tried only upon an indictment issued by a grand jury).

---

[16]More recently in *United States v. Honken*, 541 F.3d 1146 (8th Cir. 2009), a death penalty case under the Anti-Drug Abuse Act (ADAA), a panel of the Eighth Circuit again held that *Ring* necessarily implies a Fifth Amendment requirement to include such statutory aggravating factors in an Indictment.

In addition, even if *Ring* were construed to require that a statutory aggravating factor be included in an indictment or information, Moeller cannot demonstrate that he was prejudiced by having received notice of the statutory aggravating factor in the September 3, 1996, Notice of Intent to Request Presentence Hearing, instead of in an indictment or information. Moeller is unable to seriously contend and has not contended that the evidence in his case was insufficient to support the jury's determination that the offense for which he was convicted was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."*See Cooksey v. Delo*, 94 F.3d 1214, 1218 (8th Cir. 1996)( state habeas petitioner could not demonstrate prejudice in his claim that the substitution of an information for an Indictment violated the requirements of the Due Process Clause when he never argued that the evidence was insufficient to support his convictions and when the evidence was sufficient to provide probable cause "which is all that a grand jury indictment or a preliminary hearing would have established"). [17]

Moeller contends that Article 6 § 7 of the South Dakota Constitution[18] requires that all essential elements of a capital offense be charged in an Indictment and returned by a grand jury. The South Dakota Supreme Court concluded, however, that the notice of aggravating factors given to Moeller was sufficient. *See Moeller v. Weber*, 689 N.W.2d at 21. This Court will not challenge that conclusion since federal habeas review is limited "to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)."[A] mere violation of state law is not the automatic equivalent of a violation of the federal Constitution." *Chambers v. Bowersox*, 157 F.3d 560, 564 (8th Cir.1998) (citation omitted). A state court's determination of issues of state law are binding on a federal habeas court. *See Lupien v. Clarke*, 403

---

[17]*Cooksey v. Delo*, 94 F.3d 1214, 1217 (8th Cir. 1996), stated that the Due Process Clause "clearly requires some pretrial screening in criminal charges."

[18]Article 6 § 7 of the South Dakota Constitution provides:
> In all criminal prosecutions the accused shall have the right to defend in person and by counsel; to demand the nature and cause of the accusation against him; to have a copy thereof; to meet the witnesses against him face to face; to have compulsory process served for obtaining witnesses in his behalf, and to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.

F.3d 615 (8th Cir. 2005). Moeller's challenge to the state courts' interpretation of the State Constitution's charging requirements does not provide a basis for federal habeas relief.

The South Dakota Supreme Court correctly observed that the trial court in Moeller's case made no findings independent of the jury findings regarding the aggravating factor. *See Moeller v. Weber*, 689 N.W.2d at 22. In addition, this Court cannot conclude that the South Dakota Supreme Court's interpretation and application of *Ring v. Arizona*, 536 U.S. 584(2002), *Apprendi v. New Jersey*, 530 U.S. 466, (2000), and *Jones v. United States*, 526 U.S. 227 (1999), was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court. Accordingly,

**IT IS ORDERED**:

1. That the claims in Moeller's Habeas Corpus Petition under 28 U.S.C. § 2254 are now severed from the cause of action for Declaratory and Injunctive Relief under 42 U.S.C. § 1983, or alternatively, under 28 U.S.C. § 2201, for alleged violation of Moeller's civil rights under state law with regard to the lethal injection protocol which would apply to his execution;

2.That discovery on the lethal injection protocol is stayed until the rule-making process is completed and Moeller's Motions to Compel Discovery (Doc. 87, 90) and the Respondent's Motion for Protective Order (Doc. 80) are denied without prejudice to the parties to reassert any discovery issues which have not yet been resolved at the time the rule-making process is completed and the Court and Moeller's replacement counsel have been informed that the process is completed;

3. That Moeller's Third Amended Petition for Writ of Habeas Corpus is denied in all respects; and

4. That since the Court finds that Moeller has made a substantial showing of the denial of a constitutional right on the following claims the Court is issuing a certificate of appealability under 28 U.S.C. § 2253( c) on the following issues:

> A. Whether Moeller is entitled to federal habeas corpus relief based on his trial counsel's performance at the March 3, 1997, *Daubert* hearing and the ultimate admission of expert testimony regarding the Apo-B region of the DNA evidence;

> B. Whether Moeller is entitled to federal habeas corpus relief based on his trial counsel's failure to have tested the alleged gahnite which was the subject of the State's soil expert's testimony, and/or based on the trial court's failure to conduct a *Daubert* hearing and the subsequent admission of expert testimony regarding the alleged gahnite;

> C. Whether Moeller is entitled to federal habeas corpus relief based on the trial

court's response to the jury's question regarding whether Petitioner would ever have a chance to appear before a parole board; and

D. Whether a pretrial screening requirement of the Due Process Clause of the Fifth Amendment requires that the aggravating circumstance upon which Moeller's death sentence was based be returned by a grand jury in an indictment or be set forth in an information under South Dakota law.

Dated this ___31ST___ day of March, 2009.

BY THE COURT:

_Lawrence L. Piersol_
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY:_____
DEPUTY