<pre>
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF SOUTH DAKOTA

 3                     SOUTHERN DIVISION

 4
     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
 5                                    Civ. 04-04200

 6

 7   DONALD E. MOELLER,

                         Plaintiff,
 8
          -vs-
 9


10
     DOUGLAS WEBER, Warden,
11     South Dakota State Penitentiary,

12   DENNIS KAEMINGK, Acting Secretary
       in His Official Capacity as
13     Secretary of Corrections,

14   DOES 1-20, Unknown Employees or Agents
     of South Dakota Department of Corrections,
15
                         Defendants.
16

17

18
                              U.S. District Courthouse
19                            Sioux Falls, SD
                              October 4, 2012
20                            1:30 o'clock p.m.
     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
21
                        H E A R I N G
22
     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
23   BEFORE:   The Honorable Lawrence L. Piersol
               U.S. District Court Judge
24             Sioux Falls, SD

25
</pre>

```
 1   APPEARANCES:

 2
     Mr. Scott W. Braden
 3   Ms. Jennifer L. Molayem
     Federal Public Defender's Office (Arkansas)
 4   1401 W. Capitol Avenue,  Suite 490
     Little Rock, AR 72201
 5
          -and-
 6
     Mr. Mark F. Marshall
 7   Bangs, McCullen, Butler, Foye & Simmons
     PO Box 2670
 8   Rapid City, SD 57709

 9                           for the Plaintiff

10

11   Mr. Marty J. Jackley
     Mr. Paul S. Swedlund
12   Ms. Sherri Sundem Wald
     Attorney General of South Dakota
13   1302 E. Highway 14  Suite 1
     Pierre, SD 57501-8501
14
                             for the Defendants
15

16

17   ALSO PRESENT:  Donald E. Moeller

18

19

20

21

22

23

24

25
```

1        <u>INDEX TO EXHIBITS</u>

2

3                        OFFERED              RECEIVED

4

5   Exhibit A                              p. 23

6   (Letter from Tonya Willingham to Donald Moeller, 8-14-12,

7   with envelope)

8

9   Exhibit B                              p. 24

10  (Postcard from Tim to Donald Moeller, 2-17-12)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good afternoon.  This is the case of
 2    Donald Moeller, Plaintiff, vs. Douglas Weber, Warden of the
 3    South Dakota State Penitentiary, Douglas Kaemingk.  Am I
 4    pronouncing that right?
 5              MR. SWEDLUND:  Kaemingk.
 6              THE COURT:  Kaemingk.  All right.  Acting
 7    Secretary in his Official Capacity as Secretary of
 8    Corrections, and Does 1 through 20.
 9          First of all, I'll take appearances.  First, for the
10    Plaintiff, Petitioner.
11              MR. MARSHALL:  Mark Marshall on behalf of
12    Donald Moeller, Your Honor.
13              MR. BRADEN:  Scott Braden for Don Moeller,
14    Your Honor.
15              MS. MOLAYEM:  Jennifer Molayem for Donald
16    Moeller.
17              THE COURT:  Then for the State?
18              MR. JACKLEY:  Marty Jackley, Paul Swedlund, and
19    Sherri Wald on behalf of the Attorney General's Office, as
20    well as Douglas Weber, Warden of the Penitentiary.
21              THE COURT:  Well, when the Court first scheduled
22    this hearing, it set forth the issues it wanted to argue,
23    and then in addition to that, any other argument counsel
24    wanted to make.  I wanted to make sure we covered issues I
25    particularly wanted to hear in the order I wanted to hear
```

1    them.   Then after that there will be a variety of other

2    things to hear argument on.

3         But after I entered that Order, then the Motion to

4    Dismiss this lawsuit challenging the method of execution

5    was filed by Attorney Marshall on behalf of Donald Moeller.

6    Attorney Marshall is counsel of record for Mr. Moeller in

7    the State Court proceedings, the criminal proceedings that

8    have ultimately resulted in the case being here.

9         I want to point out, just in terms of setting the

10   stage, that the habeas corpus portion of this case is done.

11   Guilt has been finally determined, because the Eighth

12   Circuit Court of Appeals affirmed this Court's decision,

13   which denied habeas corpus relief.   The United States

14   Supreme Court denied certiorari.

15        This Court separated the method of execution issue

16   from the habeas corpus action, so that the habeas corpus

17   proceedings could go ahead.

18        What is left then that's before the Court now is the

19   Civil 1983 claims regarding method of execution.   That's

20   what the Court was going to hear argument on today when it

21   initially entered the Order.

22        So just so everybody is clear, this is not a lawsuit

23   about whether or not Mr. Moeller will be executed.   This

24   lawsuit is about how Mr. Moeller will be executed, and when

25   the execution will take place as it's now set by the State

```
 1    Court, or whether it will have to be at some later date,
 2    which would also ultimately then be set by the State Court.
 3         Now, there have been a lot of filings.  I'm not
 4    critical of anybody about that.  But just so we see where
 5    we are, there have been, for instance, at 11:10 today the
 6    Court received a Motion from Arkansas counsel for
 7    Mr. Moeller to strike untimely exhibits.  That's Document
 8    360.  With the way things have developed, we're not going
 9    to deal with that now.
10         Also, the Court received, once again, from Arkansas
11    counsel for Mr. Moeller, an Emergency Motion for
12    Appointment of Guardian.  Naturally that became Docket 361.
13    The Court got that one close to noon.  We will deal with
14    that one.  Then Exhibits A and B were not attached.  They
15    were subsequently attached, so I've had a chance to go over
16    those, also.
17         Then at 12:25 today the Court received, once again,
18    from Arkansas counsel for Mr. Moeller, another Motion to
19    Strike Untimely Documents, that's what they called them,
20    that were filed by the State.  I refer to the Defendants as
21    the State.  I have identified who all of the Defendants
22    are, but I'm going to refer to them as the "State."
23         Now, also Attorney Marshall has entered a Notice of
24    Appearance on behalf of Mr. Moeller in these proceedings,
25    and Arkansas counsel has resisted that appearance.
```

1    Mr. Marshall is allowed to appear in this Court, also, for

2    Mr. Moeller.  At the same time the Court is not removing

3    Arkansas counsel as counsel for Mr. Moeller.  So everybody

4    is on the same page as to where we are with regard to that.

5         Now, as I indicated in the last Order that the Court

6    entered, the Court is going to question Mr. Moeller with

7    regard to this dismissal.  I'm not going to have

8    questioning by the lawyers.  It will be questioning by the

9    Court.  After I've questioned Mr. Moeller then, then I'll

10   hear from counsel, their views on how we proceed.

11        One thing, and I mentioned this is now a 1983 action.

12   There are cases in the posture that we're in right now that

13   I mentioned.  There is Smith vs. Armontrout, 812 F.2d at

14   1050.  It's a 1987 Eighth Circuit decision that applies

15   Rees vs. Peyton.  Rees vs. Peyton is a 1966 United States

16   Supreme Court decision with regard to the waiver of

17   post-conviction habeas corpus relief.  There's a

18   distinction there in that post-conviction habeas corpus

19   relief could result in freedom for somebody.  That's done

20   in this case.  That's over with.  This is a 1983 action

21   with regard to method of execution.

22        Just so everybody knows, it's the Court's preliminary

23   view, and I say "preliminary," because this case has

24   evolved very recently with the filing of the Motion to

25   Dismiss.  It's the Court's preliminary review that those

```
 1   cases, Smith v. Armontrout and, for that matter, Rees v.

 2   Peyton, are instructive, but not binding, because of the

 3   difference.  This isn't a habeas action with the relief

 4   that could come from a habeas action.

 5       Armontrout, in Armontrout the Eighth Circuit didn't

 6   decide the burden with regard to the dismissal of a habeas

 7   action.  It's my preliminary view that the burden is on the

 8   Petitioner in this civil action, just so everybody knows.

 9       All right.  Now, with that, Mr. Moeller, I'll ask the

10   clerk administer an oath or affirmation to you, as you

11   choose.  You can either take an oath or an affirmation.

12           MR. BRADEN:  Your Honor, before you begin that, I

13   would like to note my objection for the record.  I

14   understand you are going to talk to Mr. Moeller.  I

15   understand that you are going to ask him some questions.  I

16   don't believe that he's competent to answer those questions

17   for a number of reasons.  I don't know whether you want to

18   go into that now or if you want to wait until you are done.

19   But we object to --

20           THE COURT:  Well, he might be interested in

21   hearing about it.  I'm aware of it.

22           MR. BRADEN:  Well, first off, the first thing I

23   would ask, Your Honor, is I would ask that you either lift

24   the Protective Order in this case or you close this

25   courtroom.  I think presenting this case to you and having
```

1   to watch the language that we use and the words that we

2   speak and so forth, because we're under this Protective

3   Order, even with Mr. Moeller, makes it almost impossible to

4   effectively argue and present this case to you.

5          THE COURT:  Wait a minute.  Let's talk about

6   that.  The Protective Order does essentially two things.

7   One, it protects the identity of the execution team.

8   That's one thing.

9      The other thing is it also protects the identity of

10  who it is that supplied the active ingredient for the

11  pentobarbital.

12     With regard to what we're doing right now, none of

13  those things have to even be talked about, because we

14  haven't gotten to that.  It does present an issue when we

15  get to that, but we probably won't get to that today.

16          MR. BRADEN:  Well, Your Honor, I disagree with

17  that.  You are going to ask Mr. Moeller here about his

18  waiver.  You're going to ask him about what he wants to do.

19  That waiver isn't fully informed, because we've done some

20  depositions.  Those depositions are under seal, my

21  understanding, anyway.  We've tried very carefully to

22  comply with the Court's order.  In those Protective Orders

23  we were specifically told none of this information could be

24  told to Mr. Moeller.  So we haven't informed him of any of

25  this.  So to the extent he's making a waiver of anything

```
 1    today, he's not fully informed.
 2            THE COURT:  Just a minute.  So you can't tell him
 3    who the execution team is.  You don't know either, by the
 4    way.  You do know who the supplier of the active ingredient
 5    is.  But you don't have to tell him that in order for him
 6    to be able to answer my questions.
 7            MR. BRADEN:  It's my understanding, Your Honor,
 8    from your Protective Order, as I read it, even talking to
 9    Mr. Moeller about the contents of what has happened or
10    reviewing information inside the depositions was restrained
11    from being discussed with Mr. Moeller.  So we haven't been
12    able to tell him that.
13            THE COURT:  Well, he won't talk to you, anyway.
14            MR. BRADEN:  Well, that's not exactly true
15    either.  We visited with him this afternoon in the holdover
16    and had a lengthy discussion with him about this, which we
17    felt very constrained because we couldn't go into a lot of
18    this information.  To the extent that he is not fully
19    informed about this, when we talked with him this
20    afternoon, he informed me, "What's the big deal?  I'm going
21    to be executed with that drug that killed Michael Jackson,
22    which is propofol."  And we know that's not --
23            THE COURT:  Let me ask you.  Have you sent the
24    pleadings that weren't subject to the Protective Order to
25    him as this has gone along?
```

1          MR. BRADEN:  I believe we have.  Sir, I don't

2    know.  I don't do the mail in the office.  I think we've

3    sent him the stuff.

4          THE COURT:  But you don't know?

5          MR. BRADEN:  No.

6          THE COURT:  Well, anything else in your argument?

7          MR. BRADEN:  Well, I just don't believe he's

8    competent to make any sort of waiver of his right to remain

9    silent or his right to make a choice here.  You are going

10   to ask him about a choice and discuss with him the waiver

11   of a constitutional right.  I believe Mr. Moeller is not

12   competent to make that choice right now.  There's

13   indication in the record that he has symptoms in his youth

14   from schizotypal symptoms.  It's enough that this Court

15   should conduct inquiry about his competency before he makes

16   basically what is the waiver of constitutional rights that

17   is going to result in his death.

18         THE COURT:  Well, in terms of fully advising him,

19   did you tell Mr. Moeller, when you met with him today, you

20   filed an Emergency Motion to appoint a guardian for him?

21         MR. BRADEN:  Yes.

22         THE COURT:  Did you tell him you filed that?

23         MR. BRADEN:  I believe we did.

24         THE COURT:  Did he agree with that?

25         MR. BRADEN:  No, but I've never worked with an

```
 1   incompetent person that believes that they are incompetent.
 2          THE COURT:  Okay.  Anything else?
 3          MR. BRADEN:  I also believe that the decision he
 4   is making here today that you will be inquiring about is
 5   just not knowing and intelligent -- or not voluntary,
 6   because I think a great deal of that rests on the
 7   conditions that he's lived in for the past number of years
 8   in the Department of Corrections.  We've discussed that
 9   some in our pleadings.  I think you've seen it.  You
10   mentioned that you read Dr. Haney's Affidavit today.
11      I think what Mr. Moeller here is doing is basically
12   committing suicide, but he'll have the State do it for him.
13   I think that results from the conditions of the confinement
14   in the prison where he's been all these years.  It's
15   detailed in our pleadings.
16      It's equivalent to having a gun at your head and
17   having to make a decision about what he's doing.  He
18   doesn't want to live in the prison anymore.  It's not so
19   much that he doesn't want to live.  He doesn't want to live
20   in that prison.
21      I think it's significant that this Court should note
22   the last execution in the state and the three apparently
23   pending are all volunteers.  There's been six people on
24   death row in this state.  Four of them are volunteers, to
25   the extent we know.  Mr. Moeller apparently is.  I think
```

1    that's a significant fact to look at in determining whether

2    somebody will waive a constitutional right.

3        So we would object to your questioning about that and

4    allowing him to make this decision now without assessing

5    that.

6            THE COURT:  Well, you are presupposing quite a

7    bit with regard to both what I'm going to ask as well as

8    what the Court is going to do.  Your motion is overruled.

9    You may be seated.

10            MR. MARSHALL:  Your Honor, may I make a very

11    brief record, as well?

12            THE COURT:  You may.

13            MR. MARSHALL:  I appreciate the gravity of this

14    situation.  It's with some reluctance that I want to

15    correct the record already made.  In that you observed that

16    this was a Motion to Dismiss.  This is not a Motion,

17    Your Honor.  It's a Stipulation under Rule 41(a)(1)(A)(ii)

18    which Mr. Moeller believes is self-executing, that no

19    ruling is required.

20        I appreciate the Court can make inquiry to satisfy

21    itself.  But we believe with the filing of that

22    Stipulation, the matter has been dismissed, and all

23    subsequent filings are nullities.

24            THE COURT:  And, frankly, it's interesting you

25    make that point, because the last thing I did -- actually I

```
 1   was a little bit late coming out here.  I thought I'm going
 2   to double-check your filing, because I thought it was a
 3   Rule 41 Motion of that sort, and it is.  I looked at that
 4   before when you first filed it.  You are technically
 5   correct.
 6        However, the Court believes, even though, frankly, you
 7   are technically correct in what you say, Mr. Marshall, the
 8   Court believes it is within the inherent power of the Court
 9   to make inquiry before, under these circumstances, I would
10   accept the dismissal.
11        So you are technically correct.  You can't make me
12   dismiss it.  That's what it boils down to.
13             MR. MARSHALL:  And, also, Your Honor, we have no
14   objection to Mr. Moeller testifying.
15             THE COURT:  Go ahead and give the oath.
16                  (Defendant, sworn)
17             THE COURT:  You may be seated, Mr. Moeller.
18   What's your full name?
19             THE DEFENDANT:  Donald Eugene Moeller.
20             THE COURT:  How old are you?
21             THE DEFENDANT:  Sixty.
22             THE COURT:  Can you hear me clearly?
23             THE DEFENDANT:  Yes, sir, I can.
24             THE COURT:  At any point if you don't hear some
25   question that I ask or if you don't understand a question,
```

```
 1    just say so.  I'll either speak up or rephrase it,

 2    depending upon which situation it is.

 3              THE DEFENDANT:  Thank you.

 4              THE COURT:  How much formal education have you

 5    had?

 6              THE DEFENDANT:  GED officially, and I've been

 7    studying since.

 8              THE COURT:  What have you been studying?

 9              THE DEFENDANT:  The Bible, the Book of Mormon,

10    whatever I can get my hands on.

11              THE COURT:  Is that while you've been in prison?

12              THE DEFENDANT:  Yes.

13              THE COURT:  Where have you been housed before you

14    were brought here this afternoon?

15              THE DEFENDANT:  Section A of Jameson, Unit A.

16              THE COURT:  And Section A is what?

17              THE DEFENDANT:  Administrative segregation.

18              THE COURT:  How long have you been there?

19              THE DEFENDANT:  In this particular cell?  Just

20    right at three years.

21              THE COURT:  Were you in administrative

22    segregation then before that, too?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  How long have you been in

25    administrative segregation altogether?
```

1          THE DEFENDANT:  Since I believe August of 1992.

2          THE COURT:  Are you taking any medications now?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  Have you in the past, in the recent

5    past?

6          THE DEFENDANT:  No.  Not legal medication.  I was

7    self-medicated on the outside.

8          THE COURT:  Was that with some things that maybe

9    were illegal to take?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  But that was how long ago?

12          THE DEFENDANT:  Over 22 years.

13          THE COURT:  So as you and I are talking here

14    today, you're not under the influence of any medications.

15    Is that correct?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Is that correct?

18          THE DEFENDANT:  That is correct.

19          THE COURT:  Now, as we're speaking today, are you

20    currently under the care of any psychiatrist or

21    psychologist?

22          THE DEFENDANT:  No, sir.

23          THE COURT:  Have you ever been?

24          THE DEFENDANT:  The Federal Public Defender had a

25    guy come talk to me in August of 2011.  We talked for four

```
1    and a half hours over two days.

2                THE COURT:  Who was that?

3                THE DEFENDANT:  A guy named David.  All I know is

4    he was from Boston.  That was about it.

5                THE COURT:  Did you ever see a report from him?

6                THE DEFENDANT:  No, sir.  But Deborah Czuba told

7    me in September, 2011, that the report from Dave was that I

8    was not crazy.  She told me that.

9                THE COURT:  It was what?

10               THE DEFENDANT:  I was not crazy.

11               THE COURT:  Other than that, have you seen any

12   psychiatrists or psychologists?

13               THE DEFENDANT:  On occasion, I don't know what he

14   is, there's a head shrinker that walks around and asks how

15   you are doing, a mental health worker.  Sometimes he tries

16   to give me puzzles or stuff like that.  We don't sit on the

17   couch or nothing like that.

18               THE COURT:  For what crime is it you've been

19   sentenced to death?

20               THE DEFENDANT:  I kidnapped, raped, and murdered

21   Rebecca O'Connell May 5, 1980.

22               THE COURT:  Now, you had two trials in State

23   Court.  The first trial was overturned by the South Dakota

24   Supreme Court, and then you were retried.  Is that correct?

25               THE DEFENDANT:  Yes, it is.
```

1          THE COURT:  When you were retried then, do you

2     recall who was your defense lawyer for the second trial?

3          THE DEFENDANT:  I had three of them.  Michael

4     Butler of Sioux Falls; David Gienapp of Madison; and

5     Robert Van Norman from Rapid City.

6          THE COURT:  Of course the Court is familiar with

7     all of them.  Were they good lawyers on your behalf or not?

8          THE DEFENDANT:  Butler and Gienapp were, yes,

9     excellent.  Van Norman, I didn't really get to know that

10    guy.  He was doing mitigation, and we didn't use

11    mitigation.

12         THE COURT:  I see.  Now what's your understanding

13    of the punishment that the State Court has ordered you

14    receive for this murder conviction?

15         THE DEFENDANT:  The death penalty by lethal

16    injection.

17         THE COURT:  What is your understanding of the

18    method by which the State is going to execute you?

19         THE DEFENDANT:  Sometime after the 28th of

20    October, I'll be transferred to a holding area in the old

21    prison hospital at the State Penitentiary, and sometime

22    later at their convenience, they will take me to a room,

23    strap me down, and put injections into my arm and kill me.

24         THE COURT:  There's a period, I believe, that the

25    State Court ordered within which you can be executed.  They

```
 1   didn't set a specific date.  What is that period?  Do you

 2   know how long it is?

 3          THE DEFENDANT:  October 28 until November 3, this

 4   year.

 5          THE COURT:  Do you want to take anymore legal

 6   action to try to prevent your execution?

 7          THE DEFENDANT:  No, sir, I do not.

 8          THE COURT:  Why not?

 9          THE DEFENDANT:  As I stated just a minute ago, I

10   killed the little girl.  It is just that the punishment be

11   concluded.  I believe that.  I believe that as just a plain

12   old guy.  I believe that from my Bible.  I think it's a

13   good thing that the death penalty does inhibit further

14   criminal acts.

15          THE COURT:  This lawsuit, what's left of it that

16   is pending now before me, what's your understanding of this

17   lawsuit that is now pending, what's left of it?

18          THE DEFENDANT:  Okay.  That's a couple different

19   things.  I was told -- can I?

20          THE COURT:  Go ahead.

21          THE DEFENDANT:  Okay.  In January of this year

22   Deb Czuba and Julie Pitt came up and told me I couldn't

23   fire them after cert.  I told them I didn't want to do

24   cert.  When they did, I said, "Okay, I'm firing you."  They

25   said I couldn't.  Julie and Deborah both told me they would
```

1    do everything they could to stretch out, delay, and harass

2    the execution.  They would not allow it to happen.

3         Again today, this young lady, probably seen her once

4    before, and now she says she's my lawyer.  That's crap.

5    They just -- that's their agenda; stop, postpone, and

6    harass.

7         What I want to do here is just stop the Federal stuff.

8    Once you take the Federal people away from me, the State

9    can go ahead and do their job, which the jury said is just,

10   the law says is just, God says is just, and I believe it's

11   just.

12              THE COURT:  Have you talked with the Arkansas

13   lawyers with regard to the method of execution the State

14   proposes to use?

15              THE DEFENDANT:  They came up to me today and

16   spent a few minutes with me in the holding cell.  They were

17   saying they couldn't explain it to me because of the

18   Protection Order and all this crap.

19        The thing is, I know what it is.  They are going to

20   put poison in my veins, and they're going to kill me.  It

21   may take five minutes.  It may take 20 minutes.  I accept

22   that.

23        The man there, he said it was just an OD.  Actually it

24   was going to be an OD.  I have OD'd before.  I am not

25   scared.  So if they are worried about being scared, I'm not

```
 1    scared.  I'm not running for it.  I wouldn't hang myself.

 2    But the law has spoken.  I killed.  I deserve to be killed.

 3              THE COURT:  Now, the Arkansas counsel has on your

 4    behalf --

 5              THE DEFENDANT:  No.  Sir, I fired those people.

 6    They are only working for their own agenda.  I do not

 7    believe they are working for me.  I have written them

 8    letters telling them, "You are not my attorneys."  They

 9    still come up.  I refuse their visits.

10              THE COURT:  When did you write them letters

11    saying they're not your lawyers?

12              THE DEFENDANT:  This one I wrote to them May 2nd.

13    "My dear stepmother must have misunderstood something I

14    wrote.  I do not need or want to see anyone connected with

15    your office unless you all agree to stop all the legal

16    activities on my behalf.  This is not a move I've taken

17    lightly.  Stop the bullshit really.  Moeller."

18              THE COURT:  Is that May 2 of this year?

19              THE DEFENDANT:  No.  Yes.  May 2, 1912.  I have

20    other forms here that they know I'm not working for them --

21    I'm not working with them.  If you want to see that, I have

22    evidence.

23              THE COURT:  What do you mean?

24              THE DEFENDANT:  This one lawyer, she wrote and

25    said, "Yeah, I know you're not talking to us, but I took
```

1   money from your mom and I'm going to send it up."  So it

2   come in under her name, under the lawyer's name.  See, it

3   was from my mother, stepmother actually.

4           THE COURT:  Explain that to me a little bit more.

5           THE DEFENDANT:  Okay.  This was August 14, this

6   year.  This woman, Tonya Willingham, said that, "I'm sorry

7   you refused our visit this morning.  I wanted to make sure

8   you knew that Tokey had not written or sent money because

9   she hasn't been feeling well.  She wanted to visit you with

10  me.  She's pretty weak and not able to walk the parking

11  lot.  She's also unable to grip a pen.  Enclosed some money

12  from her.  She's doing better."  It just goes on.  As she

13  said, I refused the visits.

14          THE COURT:  That's a letter to you from whom?

15          THE DEFENDANT:  From one of them, Tonya

16  Willingham, Federal Defender.  Do you want to see it?

17          THE COURT:  Please.

18          THE DEFENDANT:  There is another letter from one

19  of their cronies that says, "I'm not working for you."

20          THE COURT:  Just a minute.  One at a time here.

21          THE DEFENDANT:  Okay.  I'm not really crazy.

22  Just pissed off.

23          THE COURT:  "Tokey" is referred to.  Is that your

24  stepmother?

25          THE DEFENDANT:  Yes.

```
 1              THE COURT:  What's her actual name?

 2              THE DEFENDANT:  Agnes Becker.

 3              THE COURT:  So the "$60 via Tokey," that's

 4   something you wrote here on the bottom of the envelope?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  Since the Court has looked at this,

 7   let me mark the envelope and the letter as Exhibit A, and

 8   then we'll make a copy of this to give to you.  Is that

 9   agreeable with you?

10              THE DEFENDANT:  Yes, sir.

11              THE COURT:  All right.  You had something else

12   you were going to tell me about.

13              THE DEFENDANT:  One of their other litigators --

14   not litigators.  One of the lawyers that worked for them,

15   he had been up about 70 times to see me, and then he said

16   he quit, that they fired him.  He brought my stepmother up

17   to visit and reported back to them.  I just want to show

18   you that that says he was not working for them, and I was

19   not meeting with him.  It was a visit.

20              THE COURT:  Do you recall that lawyer's name?

21              THE DEFENDANT:  Tim Semmerling,

22   S-E-M-M-E-R-L-I-N-G.

23              THE COURT:  How many times did he try and see

24   you?

25              THE DEFENDANT:  I actually seen him about 70
```

```
 1    times, and I refused him I think three times.
 2              THE COURT:  All right.  Let me see that then.
 3              THE DEFENDANT:  That's back in February there.
 4    So that's a long-running feud.  It's on record that I did
 5    not want these people working for me.
 6              THE COURT:  So this is Tim -- how do you think
 7    the last name is spelled?
 8              THE DEFENDANT:  I have it right here.
 9    S-E-M-M-E-R-L-I-N-G.
10              THE COURT:  Thank you.  Is it all right if this
11    becomes Exhibit B, and we'll make a copy of it for you?
12              THE DEFENDANT:  Yes, sir.
13              THE COURT:  You say he visited you about 70
14    times?
15              THE DEFENDANT:  About 70 times in two years.  His
16    first visit I believe was in '09.
17              THE COURT:  Was he from Arkansas?
18              THE DEFENDANT:  Actually he was from Chicago.  He
19    worked at SAGE.  They do mitigation, Federal mitigation,
20    and he was hired by these guys.
21              THE COURT:  Was he a lawyer, or was he in some
22    other capacity?
23              THE DEFENDANT:  He was a lawyer.  Yes.
24              THE COURT:  All right.  I have talked about your
25    relationship with Arkansas counsel.
```

```
 1        Now, what about with regard to Attorney Marshall?
 2   When did you first meet him?
 3            THE DEFENDANT:  Oh, man.  I have to think back.
 4   As soon as my case went into Federal Court, my State
 5   lawyers, Mike Butler and David Gienapp, turned it over to
 6   Mark.  Mr. Marshall was my attorney for about two years, I
 7   believe, and then he took another job and handed me off to
 8   these people.
 9            THE COURT:  Now, are you aware that Mark Marshall
10   and the people representing the State in this action have
11   entered into an Agreement to Dismiss this Federal Action
12   that Challenges your Method of Execution?
13            THE DEFENDANT:  Yes.
14            THE COURT:  Now, did Mr. Marshall bring that up
15   to you, or did you bring it up to him?  How did that come
16   about?
17            THE DEFENDANT:  The Stipulation, you mean?
18            THE COURT:  Well, yes.  I mean was it your idea?
19            THE DEFENDANT:  No, that was not my idea, but I
20   agreed with it the second I heard it.
21            THE COURT:  Well, whose idea was it?
22            THE DEFENDANT:  Mr. Marshall.
23            THE COURT:  Explain that to me.
24            THE DEFENDANT:  It was one of the things we were
25   talking about, like -- just one of the things that we were
```

```
 1   discussing, and that was brought up, that it was a

 2   possibility.  Did I want to consider it?  I said, "Yes, I

 3   did."  It's like this.  I wanted this to stop.  So I said,

 4   "Yes, let's make this Motion."

 5              THE COURT:  Were you talking about different ways

 6   this Federal lawsuit could be stopped?  I mean how did it

 7   come up?  That's what I'm trying to understand.

 8              THE DEFENDANT:  I'm not sure how it come up.

 9              THE COURT:  How long ago did it come up?

10              THE DEFENDANT:  It was just after 9-19 of this

11   year.

12              THE COURT:  After September 19?

13              THE DEFENDANT:  Yes, but I couldn't tell you the

14   date.  I don't have Mark's logs.  I keep logs of

15   everything.  I know when everybody sees me and everything.

16   I'm not sure when that day was.  I know it was after

17   Semmerling was here.

18              THE COURT:  Now, if this lawsuit that's pending

19   before this Court, before me, is dismissed, do you know

20   what the result of that will be?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  What's that?

23              THE DEFENDANT:  The State will go ahead and

24   execute me on or after October 28.

25              THE COURT:  Of this year?
```

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  You understand, of course, that the

3    Arkansas Public Defender's Office does not agree you should

4    dismiss this action that challenges your method of

5    execution.

6          THE DEFENDANT:  Yes.  They also think I'm crazy.

7          THE COURT:  They have filed a Motion for the

8    Appointment of a Guardian Ad Litem.  Do you agree with

9    that?

10         THE DEFENDANT:  This is the second time I heard

11   that, earlier when you first started talking about that.

12   They never said that when they met with me at the Pen.  So

13   I don't know what this means.  A guardian, I know what that

14   means.  But "ad litem," what's that?

15         THE COURT:  It means a guardian for purposes of

16   litigation.  They are proposing to have your stepmother

17   become your guardian ad litem so somebody else can, in

18   essence, direct your litigation.

19         THE DEFENDANT:  Okay.  That's a ploy, because

20   they know she's soft.  She's sick.  She's 80 years old, and

21   she doesn't want me to die.  So they know they can bully

22   her.  That is exactly what they would do.  I don't mean to

23   holler at her and stuff, but they give her horror stories

24   about what all this poison would do to me and stuff like

25   that.

```
 1          THE COURT:  You realize the claims that have been

 2   made on your behalf by the people from the Arkansas Public

 3   Defender's Office says, according to their experts, is

 4   there's a high probability the execution won't go smoothly.

 5   Do you understand that?  That's what they claim.

 6          THE DEFENDANT:  I know.  That's their agenda.

 7   Anything they can do to hamper, stop, slow down, harass.

 8          THE COURT:  You understand they also claim

 9   because it won't go smoothly, that you'll be subject to

10   more than a little pain.  Do you understand that?

11          MR. DEFENDANT:  Yes, sir, I do.

12          THE COURT:  So until today then, I gather the

13   last person you met from the Arkansas Public Defender's

14   Office was Deborah Czuba.

15          THE DEFENDANT:  Czuba.

16          THE COURT:  Czuba.  Thank you.  Back in January

17   of this year.  Is that correct?

18          THE DEFENDANT:  That was the last official one.

19   This Tim Semmerling, he come up in September of this year.

20   The first day on the 18th, he brought my stepmother for an

21   hour visit.  He said could he come back tomorrow as a

22   friend and visit.  I said yes.  We ended up in the attorney

23   office, in the attorney's visiting room.  That's where they

24   can't record it.  But, again, that was a visit and not a

25   meeting.
```

```
 1              THE COURT:  Did you talk about legal matters with

 2    him, or was that just a visit among acquaintances?

 3              THE DEFENDANT:  That was just shooting the

 4    breeze.  Like that card, he talks about one thing and

 5    another.  How I brought up I taught him how to see the oil

 6    rigs and just stuff like that.

 7              THE COURT:  You taught him what?

 8              THE DEFENDANT:  How to recognize oil rigs.  See,

 9    he's from Texas, and he didn't know nothing about the oil

10    fields.  So I told him some stuff about that.

11              THE COURT:  You worked in the oil fields in

12    Wyoming.  Haven't you?

13              THE DEFENDANT:  Yes, sir.

14              THE COURT:  Do you still want this Court to

15    dismiss this lawsuit?

16              THE DEFENDANT:  Yes, I do.

17              THE COURT:  Why?

18              THE DEFENDANT:  Because it's right.  A few

19    minutes ago he said I didn't know, understand what I was

20    doing, pleading guilty and all this.  I was first sentenced

21    to the South Dakota Penitentiary June 30, 1972.  That's a

22    whole lot of years ago.

23        I know how the system works.  I know -- I may not know

24    your fancy words and all your procedures.  But I know

25    what's going on.  I know what my rights are.  I also know
```

```
1    what's right.

2              THE COURT:  You mentioned 1972.  That was for

3    another offense, wasn't it?

4              THE DEFENDANT:  Yes, but still I've been dealing

5    with the Penitentiary, the Court system, since the '70s.

6    Before '72 actually.  I have an extensive juvenile record,

7    and that was in the late '60s.

8              THE COURT:  Has anyone in any way tried to force

9    you to withdraw this lawsuit?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  Do you think Mr. Marshall has in any

12   way tried to get you to go ahead and dismiss this lawsuit?

13             THE DEFENDANT:  No, sir.

14             THE COURT:  Do you think Mr. Marshall has been

15   operating in your best interests or not?

16             THE DEFENDANT:  Yes, sir.  I believe he disagrees

17   with it.  He has told me that he doesn't want me to die.

18   He always tells me if I ever change my mind, let him know

19   immediately.  One of the first things he says, "Hello.  How

20   are you doing?  Have you changed your mind?"

21        Your Honor, even before Mr. Marshall had to give up

22   this case and go be a Judge, we discussed this right here,

23   this action, that I was going to stop it.  The reason we

24   didn't at that time was my stepmother was ill, and I didn't

25   want to add any crap on her.  Now I figure she can handle
```

```
 1    it.  I talked to her this morning.  She'll be sad, but I
 2    believe she can handle it.
 3              THE COURT:  Do you have any questions of me?
 4              THE DEFENDANT:  No, I don't think so.
 5              THE COURT:  That's a pretty good opportunity, you
 6    know.
 7              THE DEFENDANT:  Yeah, I know.
 8              THE COURT:  Any questions I've asked you that you
 9    don't understand?
10              THE DEFENDANT:  No.  I think there are a couple
11    you could have asked.
12              THE COURT:  Like what?
13              THE DEFENDANT:  What I do that makes me consider
14    myself sane.
15              THE COURT:  Tell me.
16              THE DEFENDANT:  I watch the news regularly, Brian
17    Williams, just about every night.  I read the Argus Leader
18    daily.  I do the crossword puzzle everyday.  I write.  I
19    read.
20              THE COURT:  Brian Williams, in addition to the
21    evening news show, he has another one.
22              THE DEFENDANT:  Yeah.
23              THE COURT:  Do you ever watch that?
24              THE DEFENDANT:  I watch a movie.  Station movies.
25    Turner Classic movies.
```

```
 1              THE COURT:  There's another show Brian Williams
 2    has once a week.
 3              THE DEFENDANT:  30 Rock.
 4              THE COURT:  Yes.  Do you see that one?
 5              THE DEFENDANT:  No.  I don't watch that one, but
 6    I know what it is.
 7              THE COURT:  My son is the news director for that
 8    one.  That's why I was wondering if you were watching it.
 9         You said there might be another question I should ask
10    you.  What's that?
11              THE DEFENDANT:  What my day is.
12              THE COURT:  Go ahead.  Tell me.
13              THE DEFENDANT:  Okay.  I get up always at about
14    6:00 o'clock when they turn the big lights on.  I turn the
15    TV on, and I wash my face.  I wait for them to bring my
16    breakfast.  I clean my house.  I have a top bunk, so I have
17    to keep that clean.  I dust and I sweep up my floor.
18         Then they come in and do what they call a walk-through
19    everyday.  They walk in my house, handcuff me.  They bring
20    me out.  They come in and walk in my house, just to make
21    sure everything is kosher, and then they lock me up and I
22    take a nap until lunch.
23         I get up at lunch and see what's on TV.  If there's
24    nothing on, then I'll listen to the radio until 3:30 when I
25    get my supper.  About the time Brian Williams comes on,
```

```
1    they bring the mail, and that's when I get my Argus Leader.

2    So while I listen to what Brian is talking about, I do the

3    crossword.  I stay up and watch TV until about midnight.

4        At 12:00 I turn on the radio, turn off the TV and turn

5    on the radio, because they play an album every night

6    without any commercials, this radio station I listen to.

7    So I listen to that.  After that I go back to bed.

8              THE COURT:  What radio station is that?

9              THE DEFENDANT:  KYBB.  I think it's 102.7.  It's

10   out of Canton.

11             THE COURT:  That's an AM station?

12             THE DEFENDANT:  No, it's an FM.

13             THE COURT:  What do you read?

14             THE DEFENDANT:  I like history, Civil War.  I

15   really like the Civil War stuff.  Carl Sandburg's books.

16   Novels, I like the Graham Greene books.  Just anything, but

17   science fiction.  I'm not into science fiction at all.

18             THE COURT:  I want to ask you again, even though

19   I've already asked you.  Tell me, why is it that you want

20   to be executed?

21             THE DEFENDANT:  Your Honor, that's a tricky

22   question, the way you put it there.  I don't want to be

23   executed.  I don't want to die.  I want to pay what I owe.

24   I believe the death penalty is just in this case.  I told

25   you twice here today.
```

1    I've denied it for 20 years.  The last couple years I

2   have accepted responsibility.  I did rape and kill that

3   little girl.  I had nobody help me.  Nobody forced me.  I

4   wasn't drunk.  I wasn't stoned.  I just did it bad.

5    The State has a law, and the law says when you do that

6   evil a thing, you have to pay for it.  The Bible says when

7   you do evil things that bad, you have to pay.  I believe I

8   have to pay.

9    THE COURT:  Thank you.  Is there anything else

10   you would like to say?

11    THE DEFENDANT:  Even if you can't grant what I'm

12   asking here today, I would ask you to give me a different

13   attorney, because these people don't want to work with me.

14   They only want to do what they want to do.  They told me

15   they will keep fighting.  I think they should do what I

16   want them to do.

17    THE COURT:  Let me ask you a question then.

18   Let's say if you had a choice between getting executed when

19   it's scheduled now or six months from now, which would your

20   choice be?

21    THE DEFENDANT:  Now.  Do you want to know why?

22    THE COURT:  Go ahead.

23    THE DEFENDANT:  Have you been following the news

24   where this batter, this guy played for the Cubs one game

25   and got hit in the head.  For two years he was out of

```
 1    baseball.  Then the Marlins gave him a chance yesterday.

 2              THE COURT:  I don't follow baseball.

 3              THE DEFENDANT:  Anyway, for two years he was

 4    dreaming of it.  He got up to the plate, took three swings

 5    and was out.  He got it over with.  That's it.

 6        I've been swinging for 22 years.  I've been living

 7    with this, dealing with this, and it's time.  Way past

 8    time.  If the rape and murder of Rebecca O'Connell does not

 9    deserve the death penalty, then I guess nothing does.

10              THE COURT:  All right.  Thank you.  Now, I'm

11    going to hear now from counsel as to argument that you want

12    to make.  I'll hear from Petitioner's counsel, to begin

13    with, Counsel Mr. Braden.

14              MR. BRADEN:  Let me just talk about a couple

15    things that Mr. Moeller mentioned, and then, of course,

16    I'll certainly address whatever you want me to address.

17        One of the things Mr. Moeller mentioned is the State

18    has laws.  He seeks for the State to carry out these laws

19    in his way.  But the laws of this State, as well as all the

20    49 other states, are bound by the United States

21    Constitution.  You know that.  In that Constitution there

22    is that Eighth Amendment.

23        That Eighth Amendment forbids this state or any other

24    state from carrying out a cruel or unusual punishment.  The

25    punishment here, I believe, is cruel, and it certainly is
```

1    unusual.  Because if Mr. Moeller is executed by

2    pentobarbital that the Department of Corrections or their

3    agents make, wherever they make it at, and they administer

4    it to him with contaminated APIs or with the raw chemicals

5    that they are going to make it with, that will be the first

6    time I'm aware of that that type of execution is going to

7    be carried out in the United States.  That certainly meets

8    the unusual.

9         THE COURT:  Of course that's kind of getting in

10   the part we weren't going to talk about, but I understand

11   why you want to bring it up now.

12        But looking forward, this probably isn't going to be

13   that unusual, because each time the chemical is turned to,

14   then the manufacturer, which I'm not critical of them, but

15   the manufacturer says, "No, we're not going to sell that

16   chemical for use in execution."  It's happened not only

17   with pentobarbital, but, likewise, Missouri went to yet

18   another chemical for one drug execution.  Same thing

19   happened.  That drug is no longer available, too.  We'll

20   wind up with compounding, unfortunately, it looks like.

21        MR. BRADEN:  That may be.  But I think what the

22   United States Supreme Court has told us in Baze is that

23   what they look at, is there another alternative?  I think

24   what you are talking about in Missouri and what's happened,

25   there is another alternative.  Propofol is a drug that is

```
 1   used by states.  So there is a readily available

 2   alternative, as opposed to making the drug here.

 3           THE COURT:  Just a minute, though.  Of course, we

 4   don't have much of a showing with regard to propofol as to

 5   what's available.  But the only thing people will be able

 6   to use is stockpiled, because the manufacturer won't sell

 7   it for use in execution.

 8           MR. BRADEN:  That's a question of fact we should

 9   resolve at a hearing later on, what is available, what

10   alternatives do we have.  Actually, as you say, we kind of

11   set that to the second part of this hearing to deal with

12   the summary judgment arguments.  But that's a question of

13   fact that needs to be resolved at a trial, at a hearing

14   with evidence.  The evidence before you in the pleadings in

15   the Summary Judgment Motions indicates that certainly is a

16   genuine issue of material fact.

17       But going back to Mr. Moeller and his notion that he

18   wants the laws to be followed, the Eighth Amendment is the

19   supreme law of the land.  I think we start with that right

20   there.

21       A couple other things I wanted to mention about

22   Mr. Moeller and maybe his discussion with you.  I noticed

23   in your conversation with him that you asked a lot of

24   questions.  He answered a lot of questions.  He gave you a

25   lot of detail.  The critical things, it seemed to me,
```

1    anyway, how is he going to die, what's going to happen, he

2    couldn't answer that.  He wasn't able to answer those

3    questions.  That's really what's at stake here today.  Not

4    what's happening on the baseball teams or whatever.

5         Another thing, smart people can be mentally ill.

6    Smart people can have problems.  Mr. Moeller has told you

7    repeatedly this morning that he has lived in this prison

8    for 22 years, and for 22 years -- actually longer than

9    that, because he's been in prison, as he said, since 1972.

10   He's been in prison, so him making a decision --

11              THE COURT:  Well, that was for a different

12   offense.

13              MR. BRADEN:  Right, for a different offense, but

14   he's been confined since 1972.

15              THE COURT:  No, he hasn't been.  He was out, and

16   then he went back.

17              MR. BRADEN:  But at least for 22 years he's been

18   confined for this crime.  Again, we're not here, as you

19   said, as we began this, to determine whether he's guilty or

20   innocent of this crime.  What we are here actually to

21   determine today his knowledge and his ability to give up

22   this Eighth Amendment right, not the laws of the State of

23   South Dakota, but the Eighth Amendment that he has.

24        One other thing briefly.  His comment about

25   Mr. Semmerling, who does happen to be a lawyer.  He's not

1    acting as a lawyer in this case or with us, for what it's

2    worth.  He's somebody my office contracts with, because

3    he's closer to South Dakota and he acts as a litigation

4    specialist, an investigator.  And in this last --

5         THE COURT:  I understood that.  Actually

6    Mr. Moeller indicated that.

7         MR. BRADEN:  My point is, in this last

8    conversation he talked about where he and Mr. Moeller had a

9    visit, and, as he said, they shot the breeze, and I'm sure

10   they did.  Mr. Semmerling reports, and I believe it's in

11   some of the Affidavits you have, and if you don't have

12   them, they'll be coming eventually.

13        THE COURT:  I suspect.

14        MR. BRADEN:  We want the citizens to get their

15   dollar's worth in the litigation.  But in those

16   conversations Mr. Moeller discussed with Mr. Semmerling his

17   fears of dying.  So we know Mr. Moeller does think about

18   that.

19      The rest of the stuff I don't need to address unless

20   you have questions or something you want to ask me about

21   what Mr. Moeller may have said that you need further

22   information.

23        THE COURT:  I'll probably have some questions.

24   You haven't been in front of me before.  I do ask lawyers

25   questions.  After I hear from the State, I'll probably want

1    to hear from you again.  I'm going to ask questions when we

2    talk over how we're going to proceed.

3            MR. BRADEN:  Sure.  Addressing the voluntary

4    dismissal, which I think is what we are really here on

5    right now and want to discuss, and I'm glad you mentioned

6    it, because when you talked with Mr. Marshall the terms of

7    that, that was my opening paragraph.  This Court has the

8    inherent power to go behind any document.  First off, that

9    is a voluntary dismissal, so it has to be voluntary by the

10   nature of it.  The way it's denominated, it means it has to

11   be voluntary.  In this situation I don't think it is.

12           THE COURT:  Well, I mean those are filed pretty

13   commonly in civil cases.  But this is not the typical civil

14   case.

15           MR. BRADEN:  Right.  And in those cases it's

16   usually because the parties have settled.  They've

17   exchanged money.  They've resolved a contract dispute or

18   something like that.  That's not what's happening here.

19       This voluntary dismissal is, in effect, a waiver of

20   his Eighth Amendment right and his waiver of due process

21   rights in the way the State will carry out the execution.

22       Another thing that I think is interesting, and some of

23   this came from Mr. Moeller, is he says that he talked with

24   Mr. Marshall on the 19th of September about this, but for

25   one thing, Mr. Marshall was not even under the Protective

```
 1    Order of this Court, for what it's worth, until the 28th of
 2    September, and didn't even enter an appearance in this
 3    Court until the 2nd of October, until two days ago.
 4        One hour after that or less, Mr. Marshall filed this
 5    voluntary dismissal.  I think it's clear, from just looking
 6    at the records in the case and the way it's happened, that
 7    Mr. Marshall has been working with the State to prevent
 8    this Court --
 9            MR. MARSHALL:  Your Honor, I object to the
10    reference that I am working for the State.  That is
11    entirely unfounded.  There is no factual basis for it, and
12    I would ask the comment be stricken.
13            THE COURT:  Well, counsel can make their
14    argument.  I would note there is no basis for it.  But
15    counsel can make their argument.
16            MR. BRADEN:  Well, I think part of the basis,
17    Your Honor, is we need a hearing on this, as we've
18    mentioned in some of our pleadings.
19            THE COURT:  That means you don't have any basis
20    now.
21            MR. BRADEN:  Well, because I think this Court
22    needs to inquire.  The Court has the ability, as you
23    mentioned, to inquire behind this document to see what
24    happens.
25        We know that several weeks ago or a couple months ago
```

1    Mr. Marshall talked to lawyers in my office, actually

2    Jennifer who is here with me, and he expressed concern

3    about Mr. Jackley calling him and asking to take over this

4    case, and thought it was an effort to cut us out.  Things

5    have gone differently since then, so now Mr. Marshall has

6    filed this document to dismiss this case and bring this to

7    an end.

8        Mr. Marshall couldn't have explained all of the

9    details of this.  For one thing, as the Court has

10   mentioned, there's been a lot of filings in this case.  We

11   filed a lot of paper on this.  On the 28th of September

12   this Court allowed Mr. Marshall to see this stuff, to be

13   part of this Protective Order.  Assuming he's read

14   everything and gone through everything, within four days

15   he's in this Court seeking to dismiss the lawsuit.

16       There are Affidavits from doctors and chemists in this

17   case that make my head spin.  It's very difficult for me to

18   understand it.  I've been doing this case for a year.  I

19   find it really hard to believe that he has a full

20   understanding of what was going on in this case and the

21   subtle issues that has happened here in four days.  Maybe

22   he has more experience in this stuff than I do.

23       But I believe that this Court needs to inquire behind

24   that.  The only way we can get to that is with discovery.

25   So I do think there's a bit of a basis.  It just needs to

1    be flushed out.  There needs to be more of a basis to help

2    this Court in its inquiry.

3         I just don't believe Mr. Marshall is acting as a

4    proper agent for Mr. Moeller.  I think he's conflicted.  I

5    also know, and if you look at Document 300 in this case,

6    there's a letter, I forget what the document is, where

7    Mr. Marshall talks about where he or somebody -- or he's

8    going to represent Mr. Moeller's estate or he's going to

9    represent the personal representative of Mr. Moeller's

10   estate.  So he has a continuing interest in this case after

11   Mr. Moeller dies.  I just believe these conflicts that lay

12   upon him create such a conflict that he's not able to bind

13   Mr. Moeller with these pleadings.

14        All of that being said, and to get to something I

15   talked briefly about before you started talking with

16   Mr. Moeller, is I just don't believe Mr. Moeller is capable

17   of making this waiver, which is what it is, the waiver of

18   his Eighth Amendment right, via this Motion to Dismiss, for

19   three basic reasons.

20        I just don't think it's knowing and intelligent.

21   Mr. Moeller doesn't understand this.  He doesn't understand

22   how he's going to be executed, as I say.  Even this

23   afternoon he talked about how they were going to use the

24   drug that killed Michael Jackson on him, and we just know

25   that's not true.

1          So he doesn't have an understanding of all the details

2     that we know from all the depositions and all the pleadings

3     and all the Affidavits from the doctors in here and the

4     scientists who discuss in detail suppliers.

5          And I think it's very interesting in this morning's

6     newspaper, just in this morning's newspaper, there is a

7     whole -- I don't know what word -- I don't want to sound

8     too overly dramatic, but there's a crisis now dealing with

9     compounding pharmacists on the east coast.  Four people

10    have died because of compounding pharmacists.  Pharmacists

11    didn't make a proper sterile drug, and people are dying and

12    suffering from that.

13         I think that once the Court has a chance to inquire,

14    and I believe I'm a little constrained in going into some

15    of the details, because a lot of the parties that are

16    happening in that are part of this Protective Order, but I

17    believe the Court will see that there are serious questions

18    with compounding pharmacists that spill into today.

19              THE COURT:  I've read everything you've filed on

20    that.  It isn't a matter of me seeing it subsequently.

21    I've read everything, reread in some instances.

22              MR. BRADEN:  We know the active ingredient in

23    this case is contaminated.  The dispute here seems to be

24    now, well, can we get that contaminate out?  Can we get

25    that out of that active ingredient?  We have serious

experts here that say that can happen, and that the State

is not going to use the proper way to do that.  But we'll

deal with that if we get to the summary judgment stuff.

As I say, I just don't think Mr. Moeller is competent

to make this waiver.  Even though he talks clearly and

concisely here, talks about books he's read, as we all

know, smart people have mental health problems.  I think

the Court has an obligation to conduct a more full inquiry

to allow us to let experts on the stand to present

testimony about that.

Thirdly, I just don't think this waiver is voluntary

because of his 22 years that he's lived in this prison.  He

said here today.  "I don't want to die.  I don't want to

die.  I just want to receive the punishment.  I want the

law of the state to be followed."

He seemed to not want the Federal law followed, which

is the Eighth Amendment, but it seems to me that is more of

a catch phrase on his part to just say, "I just want to

die."  Basically what he's saying is, "It's not that I want

the laws to be followed.  I just want to die."

One has to wonder why does he just want to die?  I

think at a full hearing we can present conditions that he's

lived in for 22 years and present evidence.  One thing I

pointed to and continue to point to is the number of people

in this prison that are asking to be executed or have asked

```
 1    and actually have been executed, I think it's significant.

 2              THE COURT:  It's one so far.

 3              MR. BRADEN:  Yes, sir, one.  One person, but you

 4    have to look at your totals here.  There are six people

 5    here as opposed to 400 in California or whatever.

 6    Statistically if you look at it, over 50 percent of the

 7    people that have been on South Dakota's death row have

 8    asked to be executed, or "volunteering" is kind of the

 9    shorthand term.  I just don't think that's a voluntary

10    decision on Mr. Moeller's part, partly because of the

11    conditions and the way he lives.

12              THE COURT:  Of course in terms of the execution

13    world, so to speak -- I served -- one of the cases talks

14    about, you know there was the 1989 Powell Commission, the

15    Ad Hoc Commission for the Judicial Conference of the United

16    States.  Retired Justice Powell sat as the chair.  They did

17    that.

18        Then there was a subsequent one, another Ad Hoc

19    Committee for State Capital Habeas in Federal Court.  That

20    one I sat on as a representative of the Executive Committee

21    at the Judicial Conference.  It just ended about a year and

22    a half ago.

23        One of the things we found was -- because you used

24    California as an example, and they have all kinds of people

25    on death row, but California doesn't execute.  That's the
```

```
1    result, because there's about 30 some states that have
2    capital punishment laws.  Some of the states are states
3    that execute.  Others are ones that don't.
4        The ones that do, one can probably see why some people
5    might, for a variety of reasons, wish to go ahead with
6    their execution.  In a state like California, it seems to
7    me if you know you aren't going to get executed, even
8    though you are on death row, there's less reason to ever
9    volunteer.  There are a lot of your articles that deal with
10   that, since you talked about California.
11       MR. BRADEN:  I suppose that could be true,
12   Your Honor, but I definitely think that's an area of
13   inquiry.  When you look at the prison, the conditions here
14   -- I shouldn't even be talking about this because I've not
15   been to -- this is why we need a hearing on this.
16       He's kept in a cell 24 hours a day, except for these
17   occasional visits when he comes out to see Tokey, his
18   stepmother, or somebody from our office when he does come
19   out, or Mr. Marshall occasionally now, and with a plastic
20   cover over his door, as I understand it.  He doesn't leave
21   for recreation.  You've read this in the Affidavits that
22   we've submitted, so you understand it.  That's the way he
23   lives day in and day out.  Not in a situation where he gets
24   yard.  Partly it's because he doesn't choose to do that.
25       But, again, in the Affidavits we presented, to do that
```

1   he goes through this humiliating process of getting

2   escorted to go out or people jeering at him on a dog lead

3   and so forth, and I think 22 years of that would wear on

4   somebody.

5       Particularly, again, if you look at the Affidavits we

6   submitted, Mr. Moeller I think went in with preexisting

7   problems, to begin with, into this solitary confinement

8   world.  He's lived a difficult upbringing that I think

9   makes one prone to problems like that.

10      So, suffice it to say, this is a suicide effort.  It's

11  made for a variety of reasons, and I think partly because

12  of the conditions in the prison, but this is something we

13  need to have a more full inquiry about with a hearing.

14      I think that's all -- may I have just one minute to

15  consult with my co-counsel?

16          THE COURT:  Certainly.

17          MR. BRADEN:  One thing, stepping back a little

18  bit.  One thing Mr. Moeller mentioned earlier when you

19  asked him if he was on drugs or medication, and he

20  mentioned that he had been on illegal drugs when he was not

21  in prison.  Even he recognized in what he said, I could be

22  wrong, but I think it was Mr. Moeller that said, "Yes, I

23  was on illegal drugs.  I was self-medicating."

24      Well, what was he self-medicating himself for?  I

25  think he was self-medicating himself, because he knows he

1    had mental health problems in the world outside of the

2    prison.  The mental health problems inside the world of

3    prison are different.  If he was self-medicating himself,

4    he was self-medicating for some reason.

5        I don't have any other comments on this, except we

6    certainly will address the Motion for Summary Judgment,

7    should we get there.

8             THE COURT:  You brought up and kind of tried to

9    paraphrase this Document 300.  I think that you brought it

10   up.  I had it brought up, and this is a letter from

11   Attorney Marshall to this Court dated August 6 of 2012.

12   This is Document 300.  I'll just read it into the record,

13   so we don't have any misunderstanding what it says.

14       "Dear Judge Piersol:  The state circuit court

15   appointed me to represent Donald E. Moeller with regard to

16   matters surrounding his execution.  A copy of the order

17   appointing me is enclosed for your information."  It's

18   attached to the letter.

19       "While I do not represent Don in the above matter,"

20   that's referring to this lawsuit, "I have nevertheless met

21   with him in prison four times in the past few weeks.

22   During these meetings Don talked at length with me about

23   his federal civil rights claim.  He asked that I convey the

24   following information to you."  That would be to me.

25       "Don prefers that the case proceed to a final

 1    decision.  He believes that a condemned person enjoys a

 2    right to have a death sentence carried out in a manner

 3    that's consistent the federal and state constitutions."  I

 4    think "with" should be in there.  "Nevertheless, Don

 5    strongly prefers that nothing be done to delay his

 6    execution.  Don asks that this Court not to stay his

 7    execution.  Don also asked me to call to your attention

 8    that he has not authorized anyone to seek a stay or any

 9    form of executive clemency on his behalf.

10         "Don believes that the civil rights action, if pending

11    at the time of his execution, will survive his death.  Don

12    signed a last Will and Testament and provided the named

13    personal representative with directions concerning his

14    wishes with regard to his civil rights claim.

15         "Sincerely," signed by "Mark Marshall."

16         That's what was on the record.  I had that filed so it

17    was on the record.

18         Anything else?

19              MR. BRADEN:  No, sir.  Thank you.

20              THE COURT:  Thank you.  I'll hear from the State.

21              MR. JACKLEY:  Thank you, Your Honor.  Your Honor,

22    I believe this record establishes a knowing, voluntary, and

23    intelligent decision by Donald Moeller to stop further

24    legal proceedings.  I, therefore, am requesting this Court

25    to allow the Rule 41 Stipulated Motion for Dismissal to

1    Self-Execute.

2         I will assure this Court that Mr. Marshall is not an

3    agent of the State and is not working for the State.  He

4    appears to following out the responsibilities of carrying

5    out his client's wishes consistent with Rule 1.2 of the

6    Rules of Professional Responsibility.

7         The reason I state that I believe this is a knowing

8    and voluntary stoppage of further legal proceedings is

9    based upon the legal standard of competency.  The Court

10   earlier talked about the Rees decision, and I agree with

11   the Court's analysis.  I cite Rees for the purpose of what

12   the standard is in determining competency.

13        What the Rees Court said is a competent person "has

14   capacity to appreciate his position and make a rational

15   choice with respect to continuing or abandoning further

16   litigation."  Cited U.S. at 314.  And I believe that's

17   happened today.

18        Conversely, what the Rees Court indicates is an

19   incompetent person "is suffering from a mental disease,

20   disorder, or defect, which may substantially affect his

21   capacity in the premises."  Again at Page 314.  And I don't

22   believe that's been demonstrated today, and I believe, in

23   fact, the colloquy between the Court and Mr. Moeller would

24   indicate that he is clearly competent.

25        I would further cite the Godinez v. Moran case at

1    509 U.S. 389, Page 402, a 1993 Supreme Court case, for the

2    proposition, "A competency determination is necessary only

3    when a Court has reason to doubt the Defendant's

4    competence."  I don't believe it's been demonstrated that

5    there is that reason existing here today.

6         Finally, I would cite the Whitmore v. Arkansas Supreme

7    Court decision at 495 U.S. 149 at Page 165.  It's a 1990

8    Supreme Court case, where the Court declined to find that,

9    "A hearing on mental competency is required by the United

10   States Constitution whenever a capital Defendant desires to

11   terminate future proceedings."

12        Your Honor, in trying to grasp and gain a better

13   appreciation of what was going to happen today, I saw the

14   words of the Kentucky Supreme Court that I think sheds

15   light on what has occurred.  What the Kentucky Supreme

16   Court said in Chapman v. Commonwealth, 265 S.W.3d 156,

17   Pages 175 to 76, it's a '97 Kentucky case, "Adhering to a

18   Defendant's choice to accept the death penalty honors the

19   last vestiges of personal dignity available to such a

20   Defendant."

21        Your Honor, I believe Donald Moeller has made a

22   knowing, voluntary, and intelligent decision.  I further

23   believe he accepts the execution as a consequence of his

24   actions, and would request, again, that this Court would

25   allow the Rule 41 Stipulation to be self-executed.  Thank

1    you, Your Honor.

2              THE COURT:  Mr. Braden?

3              MR. BRADEN:  Well, Your Honor, to a certain agree

4    I agree with Mr. Jackley.  It doesn't happen very often in

5    my business that I agree with the other side.  It does have

6    to be a rational choice.  It's not a rational choice.

7         When I went to see Mr. Moeller today and talk to him

8    in the lockup or the holdup back here, the Marshals Office

9    was very nice and let us in there, he said, "What's the big

10   deal?"  I can't remember his exact words, and I'm not

11   trying to put words in his mouth.  The gist of what he said

12   was, "What's the big deal?  I'm going to be executed with

13   those drugs that killed Michael Jackson."  We said,

14   "Propofol?"  Jennifer, my co-counsel, said, "You mean

15   Propofol?"  He said, "Yes."

16        That's not what's happening here, so this isn't a

17   rational choice.  He doesn't understand what's happening

18   here, and he doesn't understand what he's giving up.  He

19   may say he wants to be executed because he's following out

20   the laws of the State of South Dakota, but I just find it

21   hard to believe that the State of South Dakota wants to

22   execute somebody that doesn't understand how they are being

23   executed and what's happening here.  He hasn't made a

24   rational choice.

25        As far as the question whether there's been sufficient

```
 1   evidence here to prove that he meets this Rees vs. Peyton

 2   standard, we have presented evidence to you.  We have

 3   presented evidence to you by affidavit.  We presented

 4   evidence from several doctors that talked about trauma.

 5   They talked about his background.  We believe there is

 6   evidence here that requires further inquiry by this Court

 7   into Mr. Moeller's capacity to make these decisions.

 8            THE COURT:  I don't have several doctors.  What I

 9   have from you is Exhibit A, Docket 364-1, which is from

10   Craig Haney, who is J.D., Ph.D. in psychology, M.A. in

11   psychology, undergraduate from the University of

12   Pennsylvania.  He is not a medical doctor, but he is a

13   Ph.D., however.  That's what I have, which I've read, that

14   you submitted.  All right.  Thank you.

15            MR. BRADEN:  Anyway, we would ask you to strike

16   this Motion -- this voluntary dismissal, and at least go

17   behind it and inquire why and how it was made.  Thank you,

18   Your Honor.

19            THE COURT:  Mr. Marshall?

20            MR. MARSHALL:  May I be heard, Your Honor?

21            THE COURT:  You may.

22            MR. MARSHALL:  May it please the Court, counsel,

23   Mr. Attorney General.

24     I noted that the Court conducted an inquiry that

25   seemed to track SDCL 23A-2A-22.  That is the statute which
```

1    defines competency to be executed in South Dakota.  The

2    burden that statute places is low.  The burden simply is,

3    is the Defendant aware of an impending execution and does

4    he know the reason for it?  That's clearly the case here.

5    Don knows there's an execution pending.  He knows and

6    accepts that the execution is pending because he raped and

7    murdered a nine-year-old girl.

8         Aspersions have been cast on me for my role in this,

9    and I accept those.  I was appointed by the State Court to

10   represent Don.  In the course of that representation, Don

11   told me he wanted to stop this lawsuit.  I believed it was

12   my obligation to do what I could to carry out his wishes.

13        Today Don has told the Court and provided evidence

14   that he has tried to discharge his lawyers from the

15   Arkansas Public Defender's Office in writing, and they have

16   refused to do that.  They refuse to acknowledge his wishes.

17   And now several months after that, they've decided they

18   might need a guardian ad litem.  They've been making these

19   decisions all along without his input, without his

20   approval, without his consent.

21        I think this case is best summarized by an anecdote,

22   and I beg the Court's indulgence.  I was taught about

23   client relationships by Joe Butler, a man this Court knows

24   both as a friend, as an adversary.  Early in my practice

25   Joe told me about a circumstance where Joe and Hub Fellows

1    had settled an arm-off case, a railroad case.  As they

2    would want to do at that time, they called the client into

3    the conference room at the office and divided the proceeds

4    of the settlement in cash.  So Hub had a stack of hundred

5    dollar bills.  He started out, "Here is one for you, one

6    for me, one for you, and one for me."  He got down to the

7    last dollar bill, Your Honor, and Hub, the Plaintiff's

8    lawyer that he was, put it on his own stack.  The client

9    looked at him and said, "You know, Hub, that one is mine.

10   After all, it was my arm."

11        Here I think the Arkansas Public Defender has

12   forgotten, if you follow the analogy, whose arm it is.

13   This is Don Moeller's case.  He's made the decision to

14   dismiss it, based on advice of counsel giving him a way to

15   carry out his wishes.

16        I would ask the Court to accept that Stipulated

17   Dismissal and not address any of the other pending motions,

18   because they were filed at a point after which this case

19   was effectively dismissed.

20        The reason for that is practical, Your Honor.  Those

21   Motions, particularly the Amended Emergency Motion to

22   Dismiss, cite Rules 59 and 60.  Their goal, I believe, is

23   to create an appealable order to try to further slow down

24   this execution.  That is not what Don wants.  He simply

25   wants his Stipulation acknowledged and this matter closed.

1    Thank you for allowing me to be heard, Your Honor.

2             THE COURT:  Thank you.

3             MR. MARSHALL:  Have you any questions of me?

4             THE COURT:  No.  Anything from anybody else?

5             THE DEFENDANT:  May I?

6             THE COURT:  You may.

7             THE DEFENDANT:  One.  He said I talked about the

8    drug that killed Michael Jackson.  It was just schematics.

9    I made a mistake on the drug.  I'm not a chemist.  I know

10   the stuff is poison.  I know it's going to kill me, no

11   matter what you call it.

12       Two.  He said something about self-medication.  That's

13   a buzz word, self-medication.  I got drunk.  I got stoned.

14   Self-medication.

15       Judge, I know what's happening.  I am competent.  I

16   don't want this to drag through the Courts anymore, because

17   there's no reason to do it.  It's been judged.  Let's do

18   it.  Thank you.

19            THE COURT:  I, of course, have thought a lot

20   about this in anticipation of this hearing.  Of course one

21   of the things about the law is you don't know what's going

22   to happen at the hearing.

23       This Court has never heard from Mr. Moeller, much less

24   asked Mr. Moeller a lot of questions.

25       The Court wants a bit of time, which it can grant

1    itself and will, to decide what the outcome of this hearing

2    will be.

3         I'm not going to hear argument this afternoon with

4    regard to the various Motions for Summary Judgment,

5    Cross-Motions for Summary Judgment and so on with regard to

6    the questions that I outlined I wanted to hear from counsel

7    on, as well as other issues they would have wanted to argue

8    on, ex post facto issues, administrative law issues.  Some

9    of those are law questions which I have ready answers for.

10   But I'm not going to hear argument on that today, because

11   there are two possibilities without regard to those issues.

12        One is that the Court -- does the Court find that it

13   would be a knowing and voluntary waiver on the part of

14   Mr. Moeller, and that would be the end of it.

15        The other would be that the Court feels we should

16   proceed further before the Court makes that final

17   determination.  That's with regard to the 1983 action with

18   regard to the Eighth Amendment and Equal Protection claims

19   that have been made.

20        So with regard to the first part, that is, whether or

21   not to accept the Rule 41 dismissal, the Court is going to

22   take that under advisement and shortly issue an opinion.

23   With that, we're going to be in recess.

24        Anything further from the Petitioner?

25             MR. BRADEN:  Just for the record, on the

1    assumption if the Court does sustain the voluntary

2    dismissal, the Rule 41 dismissal, we would like an

3    opportunity at that point to make an offer of proof about

4    what we could have shown and what we would show in the

5    Summary Judgment argument.  I suppose we could do it on

6    paper.  It has been fully hashed out, as you're aware.  But

7    we certainly would like an opportunity to make some offer

8    of proof at that point.

9              THE COURT:  I understand the request.  Anything

10   further from anybody else?

11             MR. MARSHALL:  I'm sure Your Honor will

12   understand this response.  We believe that would be a

13   nullity if it happens after the Court accepts the

14   Stipulation of Dismissal, because at that point there is no

15   longer jurisdiction.

16             MR. JACKLEY:  The State would concur with

17   Mr. Marshall's statement on that, Your Honor.

18             THE COURT:  Very well.  Thank you.  We're in

19   recess.

20             (End of proceedings at 3:07 p.m.)

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT
    DISTRICT OF SOUTH DAKOTA :SS    CERTIFICATE OF REPORTER
2   SOUTHERN DIVISION

3

            I, Jill M. Connelly, Official United States
4   District Court Reporter, Registered Merit Reporter,
    Certified Realtime Reporter, and Notary Public, hereby
5   certify that the above and foregoing transcript is the
    true, full, and complete transcript of the above-entitled
6   case, consisting of Pages 1 - 59.

7           I further certify that I am not a relative or
    employee or attorney or counsel of any of the parties
8   hereto, nor a relative or employee of such attorney or
    counsel, nor do I have any interest in the outcome or
9   events of the action.

10          IN TESTIMONY WHEREOF, I have hereto set my hand
    this 9th day of October, 2012.
11

12                          /s/ Jill M. Connelly
                            _____
13                          Jill M. Connelly, RMR, CRR
                            Court Reporter
14                          United States Courthouse
                            400 S. Phillips Avenue
15                          Sioux Falls, SD 57104
                            Phone:  (605) 330-6669
16                          E-mail:  Jill_Connelly@sdd.uscourts.gov

17

18

19

20

21

22

23

24

25
```