1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF SOUTH DAKOTA

3                         SOUTHERN DIVISION

4
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
5                                        Civ. 04-04200

6
   DONALD E. MOELLER,
7
                         Plaintiff,
8
        -vs-
9


10
   DOUGLAS WEBER, Warden,
11     South Dakota State Penitentiary,

12   DENNIS KAEMINGK, Acting Secretary
       in His Official Capacity as
13     Secretary of Corrections,

14   DOES 1-20, Unknown Employees or Agents
   of South Dakota Department of Corrections,
15
                         Defendants.
16

17

18
                                    U.S. District Courthouse
19                                  Sioux Falls, SD
                                    October 22, 2012
20                                  10:30 a.m.
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
21
                         H E A R I N G
22
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
23   BEFORE:   The Honorable Lawrence L. Piersol
               U.S. District Court Judge
24             Sioux Falls, SD

25

```
 1   APPEARANCES:

 2

 3   Mr. Mark F. Marshall
     Bangs, McCullen, Butler, Foye & Simmons
     PO Box 2670
 4   Rapid City, SD 57709

 5                              for the Plaintiff

 6   Mr. Robert W. Van Norman
     Nooney Solay & Van Norman
 7   PO Box 8030
     Rapid City, SD 57709-8030
 8   (appearing by videoconference)

 9                              on behalf of Donna Nichols

10

11   Mr. Marty J. Jackley
     Mr. Paul S. Swedlund
     Attorney General of South Dakota
12   1302 E. Highway 14  Suite 1
     Pierre, SD 57501-8501
13
                                 for the Defendants
14

15

16   ALSO PRESENT:  Donald E. Moeller

17

18

19

20

21

22

23

24

25
```

```
1              THE COURT:  Good morning.  Appearances first for
2   Donald Moeller and his counsel.
3              MR. MARSHALL:  Good morning, Your Honor.  I'm
4   Mark Marshall.  I appear on behalf of Donald Moeller.
5              THE COURT:  Let the record reflect Mr. Moeller is
6   also present here in Court.
7          Then Mr. Van Norman, as claimed next friend, your
8   appearance, please.
9              MR. VAN NORMAN:  Thank you, Your Honor.  Robert
10  Van Norman on behalf of Donna Nichols, who appears or would
11  appear on behalf of Mr. Moeller.
12             THE COURT:  Is Ms. Nichols there with you?
13             MR. VAN NORMAN:  No, she isn't, Your Honor.  I
14  talked to her Saturday, and since I anticipated not being
15  able to be in Sioux Falls, she decided and I advised her
16  not to appear in the Courthouse in Sioux Falls without
17  counsel, and I couldn't find anybody to accompany her.
18             THE COURT:  Does she live in Sioux Falls?
19             MR. VAN NORMAN:  Yes, she does, Your Honor.
20             THE COURT:  All right.  Then for the Defendants?
21             MR. JACKLEY:  Good morning, Your Honor.
22  Marty Jackley, South Dakota Attorney General, and
23  Paul Swedlund, South Dakota Assistant Attorney General.
24             THE COURT:  Well, I scheduled this hearing after
25  Mr. Van Norman appeared first for Mr. Semmerling, but then
```

1  amended that one so appearing for Ms. Nichols as a claimed

2  next friend.  Of course I've read your papers,

3  Mr. Van Norman.  What would you like to say?

4       MR. VAN NORMAN:  Your Honor, I think much of what

5  I might say has already been said, so I won't burden the

6  record with that.  I'm referring to both the presentations

7  at the hearing earlier this month at which time the Court

8  examined Mr. Moeller.

9      There have been a plethora of documents submitted,

10  both before and after that hearing, by the Arkansas Federal

11  Defender's Office, many of which don't need to be recited

12  here.  The statements in those documents are, I believe,

13  self-explanatory with regard to the positions taken at that

14  time.  I would renew those positions.

15      I would also like to introduce Donna Nichols further

16  to the Court via my statement.  I have interviewed her

17  first in 1997 during the time of Mr. Moeller's retrial.

18  She lived in Rapid City at that time.  At that time I had

19  also interviewed Agnes Becker, Mr. Moeller's stepmother, on

20  a number of occasions, both in Sioux Falls and later by

21  telephone as I was involved in that prior trial litigation.

22      I have again, and also has my legal assistant,

23  interviewed Donna Nichols in the past 10 days on a couple

24  occasions, as I alluded to earlier.  Ms. Nichols has a lot

25  of information, in large part via Donald Moeller's

```
 1   stepmother, Agnes Becker, who also filed a Declaration,

 2   which I'm referring earlier, asking that she be admitted or

 3   appointed as guardian ad litem.

 4        Those are the bases, generally speaking, on which I

 5   appear on behalf of Ms. Nichols for Donald Moeller as next

 6   friend.  The point being that the sudden change, according

 7   to the family, Ms. Nichols and Ms. Becker, of Donald's

 8   desire to continue to fight for himself, has led them to

 9   the belief that he is not making rational decisions.

10        I have reviewed, of course, the hearing transcript

11   from the last hearing, I believe that was October 5, and I

12   am obviously mindful of what the Court's conclusions were

13   previously.

14        With regard to Ms. Nichols as next friend, I believe

15   she meets the legal standard.

16        That would be the first point or set of points I would

17   wish to make for the Court at this time.

18           THE COURT:  Well, Mr. Van Norman, as you know,

19   because, of course, you were at one point the head of the

20   Federal Public Defender's Office in South Dakota, and

21   you've been before me before, and you know I don't just sit

22   here, but I often ask counsel questions.

23        So one of my questions is this Declaration by

24   Ms. Nichols is dated January 16 of 2012.  In passing, I

25   note that it's not notarized.  Aside from that, though, in
```

1    that I don't see anything where it says Mr. Moeller doesn't

2    know what he's doing, that he's not of sound mind, or

3    anything of the sort.  It's just generally a statement of

4    support for him.

5          MR. VAN NORMAN:  Yes.  That's exactly correct,

6    Your Honor.  In large part, because of my unavailability.

7    I was out of town working via electronics.  I can represent

8    to the Court what she's said, and I have already done that,

9    as an officer of the Court, but I believe as stepsister to

10   Mr. Moeller and her long association with Mr. Moeller, as

11   more fully indicated in the Declaration to which you refer,

12   I believe she can stand as next friend.

13         THE COURT:  All right.  Mr. Marshall, is there

14   anything you wish to say?  You filed a resistance.  I read

15   that, of course.  Counsel here in Sioux Falls, which is

16   Counsel Marshall, as well as Mr. Jackley and Mr. Swedlund,

17   when you speak, if you would speak at the podium, it works

18   better, I've been told, for Mr. Van Norman to be able to

19   see you through the video that we're having.  So if you

20   would speak from the podium, please.

21         MR. MARSHALL:  Thank you, Your Honor.  May it

22   please the Court, counsel.  I just want to touch on several

23   of the points that I made in my Brief Resistance.

24      To summarize that, we're here, Your Honor, at the

25   insistence of a lawyer that has a conflict of interest

1  trying to appeal a decision from which no appeal lies on

2  behalf of a stranger to this action.

3      I appreciate and acknowledge the Court's right and

4  duty to make the inquiry that it made, but having made that

5  inquiry, the Court merely accepted the Stipulation and gave

6  it its intended effect.  That effect was a dismissal of

7  this action from which no appeal lies.

8      The next point I would like to make is that

9  Mr. Van Norman did, in fact, represent Donald Moeller in

10  this action, and here he appears on behalf of a different

11  client taking a position that is diametrically opposed to

12  his client's wishes, that is, Mr. Moeller's wishes.  I have

13  called this conflict of interest to Mr. Van Norman's

14  attention.

15      I believe it is a conflict under Rule 1.9(a), a

16  situation where he could appear if Mr. Moeller consented in

17  writing.  Mr. Moeller does not do so.  I respect

18  Mr. Van Norman's decision to the contrary.  Nonetheless,

19  Your Honor, I believe that he is precluded by the ethical

20  rules from representing Ms. Nichols.

21      In Mr. Van Norman's presentation, he repeatedly

22  referred to Agnes Becker as Don's stepmother and

23  Ms. Nichols as a stepsister.  I would like to correct the

24  record.  Agnes Becker is not Donald Moeller's stepmother.

25  She is, instead, married to his stepfather, and has no

1   direct relation to Don whatsoever.

2           THE COURT:  I wondered about that.  I couldn't

3   trace that connection, from what I knew.

4           MR. MARSHALL:  That is the sum and substance of

5   that, Your Honor.

6           THE COURT:  So then Donna Nichols is what

7   relation, if any?

8           MR. MARSHALL:  I believe the proper

9   characterization is a stranger to the family.  They may

10  have a close relationship, but there is no relationship

11  either legally or by blood.

12          THE COURT:  All right.

13          MR. MARSHALL:  Your Honor, again, this appears to

14  be an effort by the Arkansas Public Defender or their

15  employees to assert their wishes for Mr. Moeller, not a

16  representation on behalf of Mr. Moeller, and my authority

17  for that is that signature block, which showed up on the

18  initial Notice of Appearance where Mr. Van Norman appeared

19  on behalf of Dr. Semmerling.

20     The last point I would like to make --

21          THE COURT:  Dr. Semmerling was the fellow that

22  came out here many times through the Arkansas Public

23  Defender's Office.  He's the fellow from Chicago and spoke

24  many times with Mr. Moeller.  Is that correct?

25          MR. MARSHALL:  That is correct, Your Honor.  And

1    the last time apparently under false pretenses, where he

2    represented to Don that he was visiting as a friend, and

3    that visit showed up in the Public Defender's papers as

4    contact by an employee of their office.

5        Finally, Mr. Van Norman suggests that this is a recent

6    change of heart.  I can represent --

7            THE COURT:  By whom?

8            MR. MARSHALL:  By Mr. Moeller.

9            THE COURT:  I don't see any representation that

10   Mr. Moeller has changed his mind.

11           MR. MARSHALL:  No, but the representation I

12   heard, Your Honor, was that Mr. Van Norman said

13   Mr. Moeller's current decision to allow the execution to go

14   forward is a recent change of heart.  I would like to speak

15   to that in a matter that only I am able to.

16       As the Court knows and as the pleadings reflect, I am

17   the lawyer who initiated this civil rights claim on behalf

18   of Mr. Moeller.

19           THE COURT:  The one here in Federal Court?

20           MR. MARSHALL:  That is correct, Your Honor.  I

21   did that --

22           THE COURT:  I appointed you.

23           MR. MARSHALL:  And I appreciate that.  The point

24   is, I brought this claim only with the representation to

25   Mr. Moeller that if he chose to change his mind and drop

1    this action, I would honor that decision.

2        I had to convince Don to bring this action years ago.

3    He has been reluctant to proceed with his federal habeas

4    and with a civil rights action as long as I've represented

5    him.  His consent was only obtained by my representation to

6    him that if he changed his mind, I would honor his wishes.

7        This is not something that has happened in the last

8    few weeks or months.  This is a decision that Don has given

9    thought to for years, and he's only here because I told him

10    that if he changed his mind, I would respect his wishes and

11    do what I could within the rule of law to follow that out.

12        So this is no last-minute effort to capitulate because

13    of intolerable conditions or because of a childhood that

14    was fraught with problems.  Don has thought about this for

15    years, Your Honor.  The thing that that time has allowed in

16    my opinion is the opportunity for Don to accept the

17    consequences of his actions.

18        Your Honor, I believe that is really one of the

19    primary goals of the entire criminal justice system is for

20    a Defendant to come to terms with his conduct and the

21    consequences that flow from that conduct.

22        So while I don't agree with Mr. Moeller's decision, I

23    recognize that it's his and his alone to make, given what

24    he has demonstrated to the Court already.

25        I would respectfully ask the Court to deny the stay.

```
 1    I'm not sure if we're here on a Motion for the Appointment

 2    of a Next Friend, but if that's the case, deny that, and

 3    allow matters to proceed as set by state law.

 4              THE COURT:  Well, so that it's clear, are you

 5    saying that Donald Moeller is doing this despite

 6    intolerable conditions?  Are you saying there are

 7    intolerable conditions?  I mean that could be taken either

 8    way.

 9              MR. MARSHALL:  I do not believe the conditions

10    are intolerable.  I believe others have suggested they are.

11    I disagree with that.

12              THE COURT:  Very well.  Anything further?

13              MR. MARSHALL:  No, Your Honor.

14              THE COURT:  All right.  Thank you.  Let me hear

15    from the State for the Defendants.

16              MR. JACKLEY:  May it please the Court, counsel.

17    Your Honor, much of the State's position parallels what

18    Mr. Marshall just indicated to the Court.  Essentially the

19    State takes three positions in this matter.

20       Number one, that the Court lacks jurisdiction pursuant

21    to Rule 41.  That we've had the hearing of October 4, that

22    the Court has accepted that Rule 41 Stipulation, and that

23    this case has been dismissed with prejudice.

24       The State's second position is that the claimed next

25    of friend lacks standing, and lacks standing for two
```

1   reasons.  Number one, that there's been no sufficient

2   reason or justification for the need to have a next of

3   friend in this case.  Although competency is cited, there's

4   been no evidence to demonstrate an incompetency.

5       Number two, the interest linking the would be next of

6   friend of Defendant has not been sufficiently established.

7   As has been pointed out, we have an unnotarized document

8   that was signed January 16 that doesn't sufficiently

9   establish what would be necessary that we've seen in the

10  case law with the next of friends.

11      The third point being that there's been no

12  demonstration that there's a significant likelihood of

13  success to justify a stay of the upcoming execution for the

14  week of October 28.

15      Briefly, with respect to competency, the Rees case

16  gives us a standard that, "A Defendant must have the

17  capacity to appreciate his position and make a rational

18  choice with respect to continuing or abandoning future

19  litigation."

20      On October 4 this Court entered a fairly lengthy

21  colloquy with Mr. Moeller where I believe this record and

22  the Court was correct in essentially ruling that he is

23  competent.  That it appeared, at least from my position on

24  October 4, that Mr. Moeller accepted responsibility, and

25  that he had an understanding of the lethal injection

```
 1   process.
 2        I think, further, if one were to dive into the record
 3   of what the Arkansas Federal Public Defender has presented
 4   regarding the competency issue, there's been no even
 5   entry-level or threshold showing of incompetency.  To the
 6   contrary, Dr. David Lisak from August 2011 gave information
 7   that would indicate Mr. Moeller is, in fact, competent.
 8   That submission is in the record.
 9        Similarly, when it comes to Tim Semmerling and
10   Craig Haney, there's some information in the record on a
11   deprived childhood, but not rising to the level of
12   satisfying the Rees standard.
13        Finally, in additional submissions to the Court, and I
14   want to be careful because they are under seal.  Document
15   396 deals with a correctional behavioral therapist that
16   would indicate further evidence of Mr. Moeller's competency
17   under the Reed standard.
18             THE COURT:  Well, I haven't sealed those.  You
19   know, it appeared that certain things I ordered got sealed.
20   Obviously I ordered it sealed.  But the parties sealed some
21   things by them coming in.  I hadn't noticed, since, of
22   course, they don't come to me personally.  I hadn't noticed
23   that some things were under seal.
24        There are things that are sealed that I'm going to go
25   back through and look at the documents.  I might unseal
```

1    some things.

2        What I ordered sealed specifically, of course,

3    pursuant to the Defendant's Motion was protecting the

4    identity of the execution team, that was one thing, and

5    protecting the identity of the compounding pharmacist.

6    That was another.  The final thing was protecting the

7    identity of the entity that provided the active ingredient

8    for the pentobarbital.  Those things, of course, get

9    scattered through other pleadings.

10        For instance, since you are here, we'll talk about it,

11    because nobody made a Motion to me specifically to seal the

12    things you filed today.  Why should they be sealed?

13            MR. JACKLEY:  I think that Motion is coming,

14    Your Honor.  There are three separate documents.

15            THE COURT:  I've read them.

16            MR. JACKLEY:  I would suggest with respect to

17    Document 396, because that document contains behavioral

18    psychological type information regarding the Defendant, I

19    think there's a justification and a basis to seal that

20    document.

21            THE COURT:  I think given the nature -- I didn't

22    mean to cut you off.  Anything else on that?

23            MR. JACKLEY:  No, Your Honor.

24            THE COURT:  Given the nature of this claim in

25    this thing, there might be an overriding public interest in

1    that information being public.  I'll hear from

2    Mr. Moeller's lawyer with regard to that.  There have been

3    all kinds of claims made by people that have never seen him

4    with regard to his mental incompetency.  Here in what's

5    been filed, information from people that have actually

6    talked to him.  Why shouldn't that be public record?

7            MR. JACKLEY:  I'll take the same position as I

8    did in the Berget case in front of the South Dakota Supreme

9    Court.  I don't, as Attorney General, have a problem with

10   that, but out of an abundance of caution of behalf of a

11   Defendant who has had psychiatric care, there are statutes

12   that do tend to indicate that is a privacy matter.  I

13   understand that can be waived by raising certain claims.

14       But in this instance Mr. Moeller has not taken the

15   position that he's incompetent, so I don't believe he's

16   waived that.  He certainly can.  But I believe that

17   probably is his right to waive and not for me.

18       I don't have an objection with respect to its release,

19   but out of respect to Mr. Moeller and that

20   psychological-type process, it's not a doctor, so it's not

21   privileged information contained in that document, but it

22   is behavioral information, and I think that would be more

23   for him to answer whether it should be sealed or not,

24   Your Honor.

25            THE COURT:  Well, I would make a distinction.  I

```
 1    mean he's had psychiatric and psychological observation.  I
 2    don't know that he's ever had psychiatric or psychological
 3    care.
 4              MR. JACKLEY:  That's fair.  With respect to the
 5    other two documents, Your Honor, and, again, I want to be
 6    careful.  But it's Document 394, which would be Deponent
 7    No. 1, as well as Warden Weber's Affidavit, Document
 8    No. 395, because of the sensitive nature of the information
 9    pertaining to the drug protocols and the pharmacy
10    involved --
11              THE COURT:  It does not identify the pharmacy.
12              MR. JACKLEY:  My concern is could you take that
13    data and be able to conclude additional information?  I
14    don't know the answer to that.  But that was the reason, in
15    order to make sure we were cautiously within the Court's
16    Order, as well as the State statute, that would make it a
17    criminal misdemeanor for me to disclose information
18    regarding executions.  I just am asking that it be sealed
19    for that purpose.
20              THE COURT:  You'll have to make a clearer showing
21    to me.  I don't have anything in writing.  They are just
22    filed.  I'm not going to seal them without good cause
23    shown.
24              MR. JACKLEY:  Your Honor, it's coming today.  I
25    apologize.  This Motion came Friday.  We've been scampering
```

1   to get you Affidavits.  We will make sure that's followed

2   up with the appropriate Motion yet today.

3           THE COURT:  Thank you.  Anything further?  I have

4   other questions for you, but I want you to get your share

5   of statements made first.

6           MR. JACKLEY:  Just briefly on the case law,

7   Your Honor.  There's been a reliance on the Florida case,

8   the Eleventh Circuit case.  I just wanted to provide the

9   Court with additional authority that I think is controlling

10  in this instance.

11      I would start with the Nooner v. Norris case,

12  491 F.3d 804.  That's a 2007 Eighth Circuit case.  I think

13  the importance of that case talks about distinguishing the

14  habeas action from the Section 1983 action, and the

15  importance in a habeas action, of course, neither the

16  conviction, nor the sentence is final.

17      In this instance here in Mr. Moeller's case, we are

18  obviously finished with the habeas.  The conviction and

19  sentence is final.  We're at the 1983 action simply dealing

20  with the manner of execution.

21          THE COURT:  Well, I think in the past at the

22  October 4 hearing I made the observation that the habeas

23  case law is instructive, but not controlling with regard to

24  the 1983 action.  It's still instructive, though.  Do you

25  agree?

```
 1              MR. JACKLEY:  I agree it's instructive, but it

 2     wouldn't be controlling, Your Honor.

 3         I would also point out, and this is contained in our

 4     briefing, Smith v. Armontrout, 812 F.2d 1050, citing 1059.

 5     It's a 1987 Eighth Circuit case, for the proposition that

 6     even assuming the State's method of execution is contrary

 7     to the Eighth Amendment, which we're not saying here, but

 8     if you were to assume that, "It does not serve to confer

 9     standing upon a next friend in the absence of some other

10     basis for standing."

11         Here the only claimed basis is a competency issue.

12     The Court has gone through this on October 4, and I

13     presented the argument.  But there is no evidence of record

14     that Mr. Moeller is incompetent under the Rees standard.

15         Finally, Your Honor, I would argue there is no

16     significant likelihood of success on the merits, and I

17     would cite the recent carrying out of the Roberts'

18     sentence.  I would cite Documents 394 and 395, and I would

19     further cite the testing results that have been submitted

20     to the Court.

21         With that, Your Honor, I have no further argument.  If

22     the Court has any questions, I would be happy to answer

23     those.

24              THE COURT:  I do.  It always catches the Court's

25     attention when everybody is saying no jurisdiction.  A
```

couple things on that.  Of course that was argued at the
October 4 proceedings, not by the State, and, of course, I
proceeded there on the basis -- because Mr. Marshall was
arguing no jurisdiction, you know, that Rule 41 under the
Federal Rules of Civil Procedure are self-executing.  I
said, "Well, but under the circumstances the inherent power
of the Court allows the Court to proceed, anyway," which
you agreed with at that point.

Now we're back to somebody claiming to be a next
friend.  In the papers that Mr. Van Norman filed, he
referred to Appellate Rule, now we're into Appellate Rules,
not the Civil Rules, but Appellate Rule 8(a)(1) where it
says, in asking for a stay, then it says, "Initial Motion
in the District Court.  A party must ordinarily move first
in the District Court for the following relief:  A stay of
the judgment or order of a District Court pending appeal;
approval of a supersedeas bond; or an order suspending,
modifying, restoring, or granting an injunction while an
appeal is pending."

Well, "stay of the judgment or order of a District
Court pending appeal," there wasn't actually a judgment
dismissing, because I ultimately ruled it was a
self-executing Stipulation, which under Rule 41 it could
be.

But then Mr. Van Norman, out of probably an abundance

1    of caution, which isn't a bad thing in these matters, then

2    applied here for a stay.  If there was an inherent

3    authority in the Court to review the rule, the claimed

4    Rule 41 dismissal, then might there not be inherent power

5    in the Court, particularly in view of Rule 8(a)(1) in the

6    proceedings of this matter, for the Court to hear this

7    matter instead of just dismissing it out of hand?

8              MR. JACKLEY:  Your Honor, it's the State's

9    position, because of the nature of Rule 41 and what

10   occurred at the October 4 hearing wherein the competency

11   determination was made, that that decision by the Court has

12   been made.  The Court has exercised its inherent authority.

13       This matter at this point in time, there is no

14   jurisdiction, either in the Appellate Court or with this

15   Court, based upon Rule 41, the self-execution and the

16   evidence, the complete lack of any evidence that

17   Mr. Moeller is incompetent under the Rees standard.

18             THE COURT:  Whether he's incompetent or not

19   doesn't have anything to do with whether the Court has

20   jurisdiction inherently.

21             MR. JACKLEY:  It would appear from some of the

22   case law, and even if one were to go to the Ford case, that

23   when you are dealing with the competency issue, that

24   appears to be a basis upon which a Court can go in under

25   the law under its inherent jurisdiction to examine that.

1           But then once that's been examined, like my position

2     is it has been in this case, it was on October 4, that the

3     Court now has dismissed the case, and it's been dismissed

4     with prejudice.  Therefore, there's no jurisdiction.

5           THE COURT:  Let's take it the other side.

6     Instead of, frankly, the weak showing that's been made by

7     Mr. Moeller -- excuse me, by Ms. Nichols, I don't mean to

8     be showing my hand on that, so to speak, but, nonetheless,

9     it's a weak showing.  Let's say instead of that, that

10    Mr. Van Norman came in, and there was some psychiatrist

11    that had examined Mr. Moeller and found that not only was

12    he not competent, but he was way beyond any kind of

13    rationality about what was going on, so on and so on.  Very

14    strong showing.

15          The Court wouldn't have any authority then to act, do

16    you think?

17          MR. JACKLEY:  First of all, that isn't the case

18    here.

19          THE COURT:  That isn't what I'm asking you.

20          MR. JACKLEY:  I understand.  I would still say

21    no, because of Rule 41 --

22          THE COURT:  Why?  You just let it proceed ahead

23    and you then execute somebody who is stark-raving mad?

24          MR. JACKLEY:  When you look at the Smith

25    decision, the case I cited to the Court, there is talk of

```
 1    it's in the nature almost of a waiver.  That depending on

 2    when these claims are brought, including with a 1983

 3    action, that there comes a point in time, and in this

 4    instance it's 22 years, Your Honor, that --

 5             THE COURT:  Don't go back to the facts here.  I

 6    put a hypothetical to you because it tests your

 7    jurisdiction argument.

 8             MR. JACKLEY:  I would say the Court lacks

 9    jurisdiction, and I would cite the Smith case, Your Honor.

10             THE COURT:  All right.  That's a short answer.

11    It's not very convincing.  Anything else?

12             MR. JACKLEY:  No, Your Honor.

13             THE COURT:  Thank you.  Mr. Van Norman, you are

14    the moving party.  Go ahead.

15             MR. VAN NORMAN:  I would like to start

16    chronologically or sequentially here.

17        With regard to the issue of conflict of interest, I

18    would advise the Court that there was a serious search made

19    to find attorneys who had no connection with Mr. Moeller

20    previously.  That was unsuccessful.  That was undertaken by

21    my legal assistant, by me while I was out of town, and, as

22    well, by the Arkansas Federal Defender's Office.  I talked

23    with them on a number of occasions, and had, in fact, told

24    them I didn't want to become an object of any controversy

25    here because of my prior representation of Mr. Moeller.
```

1          I did e-mail Mr. Marshall yesterday, after I got back

2     to town, after I thought about his having raised this

3     issue, and concluded that, in fact, under the circumstances

4     that Mr. Moeller's competency is still in question,

5     according to Ms. Nichols, based on her background with

6     Mr. Moeller, that I don't have a conflict in that instance.

7          Assuming, Your Honor, with all due respect to the

8     Court's prior decision, if logically the Court were wrong

9     in that regard, obviously I don't have a conflict.  But

10    that really is a side issue, I think.

11         With regard to the --

12              THE COURT:  Just a moment.  I want you to be able

13    to say your piece to defend yourself with regard to the

14    conflict issue.  But if you get tossed out of Court on this

15    thing, it isn't going to be because of a conflict issue.

16    So you don't have to worry about that one.

17              MR. VAN NORMAN:  I understand, Your Honor.  I

18    just wanted to make a record very briefly on that topic,

19    because I didn't want to become the issue here.

20              THE COURT:  I understand, and that's why I let

21    you make the record, because I understood you wanted to.

22    But I'm going to decide this thing on its merits, not the

23    question on whether or not you can appear here or not.

24         One other thing you haven't said, but I thought,

25    because this case has been around me for a long time, I

1   thought you were mainly a mitigation lawyer in the second

2   State prosecution of Mr. Moeller after it was first

3   overturned because of an evidentiary error.  I thought your

4   work was mainly in mitigation, which then wasn't presented.

5   Am I wrong on that?

6           MR. VAN NORMAN:  Yes, you are incorrect,

7   Your Honor.  That was what the original appointment by

8   Judge Rusch was for.  By the time the defense team moved to

9   Rapid City, I was deeply involved in the case.

10          I can describe that very quickly for the Court.  That

11  was, we did panel selection.  There were 16 panels that we

12  reviewed an hour to an hour and a half as a panel.  I did

13  all 16 panels for jury selection.  Then the other two

14  attorneys and I rotated one juror at a time on individual

15  sequestered voir dire.

16          After that, Your Honor, I don't want to omit this at

17  all, because I also saw Mr. Moeller's reference during the

18  October 4 hearing to my role, so I want it to be very

19  clear.

20          I also then handled both the State's forensic

21  pathologist for purposes of cross-examination, presented

22  the defense pathologist, forensic pathologist to the jury

23  during the guilt and innocence phase.

24          Following that, because of a conflict that I had

25  become aware of between Mr. Gienapp and Mr. Moeller, now

```
 1   Judge Gienapp, I was nominated to prepare Mr. Moeller to

 2   testify.  I did present him as a witness in his own

 3   defense, and I spent many hours with Mr. Moeller at the

 4   Pennington County Jail alone discussing his testimony.

 5        So my participation was deeper than what Mr. Moeller

 6   indicated and perhaps had been disclosed in prior

 7   proceedings by this Court.

 8        The issue with regard to mitigation, that's how I was

 9   initially appointed, and we did work on mitigation issues.

10   Those were precluded from being presented by client

11   decision, Your Honor.

12             THE COURT:  All right.  Go on to your merits

13   argument then.

14             MR. VAN NORMAN:  Thank you.  I believe under the

15   circumstances of the Declarations by various individuals in

16   this case, that there's an indication of a substantial

17   possibility of prevailing on appeal, Your Honor.

18             THE COURT:  Just a moment.  I'm going to

19   interrupt you, because one of the things that strikes me,

20   because naturally I've read and reread those Affidavits.

21   But, of course, none of them have ever even spoken to

22   Mr. Moeller.  None of them in their Affidavits have even

23   indicated they've ever read any documents with regard to

24   his incarceration, anything with regard to any

25   incarceration reviews that have gone on.
```

1      They didn't indicate in their documents even that they

2   read any report from or spoke with the psychologist that

3   came out and apparently interviewed Mr. Moeller on behalf

4   of the defense team.  None of that is in there.  It's all

5   talking about prison conditions and how it conditions him

6   to waive.

7           MR. VAN NORMAN:  Yes.  I think that's part of the

8   competency issue, from my perspective on behalf of

9   Ms. Nichols under these circumstances.  I understand

10  exactly what the Court is saying.

11     I would also like to address another issue that goes

12  to the merits here.  That has to do with the actual prison

13  conditions.  I don't believe that the actual prison

14  conditions have been thoroughly examined.  I can call that

15  a failure by the Federal Defenders, or I can call it

16  whatever as a defect in the record.

17     I am more than passingly familiar with the prison

18  conditions, Your Honor.  Last summer, a year ago now, I

19  spent five weeks in a resentencing trial as part of the

20  defense team on behalf of Briley Piper, who remains in

21  administrative segregation and on death row.

22     I questioned at length a number of the correctional

23  officers, including the one affiant here, and is it okay if

24  I make reference to it?  The affiant in Document 396, Your

25  Honor, that we just received this morning.  I'm very

1    familiar with that individual, who is not a therapist.

2    They call him a correctional behavioral therapist in the

3    sense that, as I recall, he has a Bachelor's degree, and

4    that is the extent of his knowledge.

5         But I do refer to Dr. Haney's review of the

6    circumstances, and can only say, yes, it is secondhand in

7    some respects.

8              THE COURT:  That's in every respect.

9              MR. VAN NORMAN:  He hasn't talked to Don Moeller.

10   I understand that.

11             THE COURT:  Nor has he ever been to the South

12   Dakota State Penitentiary.

13             MR. VAN NORMAN:  I'm not sure of that,

14   Your Honor.

15             THE COURT:  Well, it doesn't say that he has.

16             MR. VAN NORMAN:  He didn't say he had been.  I

17   know Craig Haney from prior work I've had with him.  I can

18   assure the Court that he is very reputable and very

19   informed with regard to the conditions he describes and the

20   effect it normally has on --

21             THE COURT:  He doesn't describe the conditions at

22   that prison.  He describes prison conditions generally in

23   his literature.  Right?

24             MR. VAN NORMAN:  I agree with you.  That's

25   correct.  Absolutely.

```
 1          I wanted to clear up one matter, as I understand it,
 2     with regard to Dr. Lisak, if I'm pronouncing his name
 3     correctly.  I believe it's L-I-S-A-K.  He did not do a
 4     psychiatric evaluation of Mr. Moeller.  I understand that
 5     Dr. Lisak is a trauma expert, and he evaluated Mr. Moeller
 6     with regard to the effects of history -- historic effects
 7     of trauma on him primarily, and that was face to face.
 8               THE COURT:  Well, have you read his report?
 9               MR. VAN NORMAN:  Yes, sir.
10               THE COURT:  Of course that was never provided to
11     the Court, and I assume, and this is perfectly fair, I
12     assume it wasn't provided, because it wouldn't be helpful
13     to Mr. Moeller.
14               MR. VAN NORMAN:  I'm sorry, let me back up.  I
15     have read his Declaration.  I have not had access to his
16     actual report.  I want that to be clear.  Yes.
17          And I presume in civil litigation, you are absolutely
18     correct.  That might be an inference that might be drawn.
19     I understand.
20          When I mentioned earlier, and Mr. Marshall mentioned
21     this, too --
22               THE COURT:  Just a moment.  Technically this is
23     civil litigation.
24               MR. VAN NORMAN:  Yes.  That's why I mentioned it
25     in that context.
```

```
1          Mr. Marshall indicated that this had not been a sudden

2    change of opinion or decision-making by Mr. Moeller.  I was

3    referring to the fact that Ms. Nichols and Ms. Becker, both

4    of whom have known Don Moeller for decades and have had

5    relatively frequent contact with him --

6          THE COURT:  Now just a minute.  Ms. Becker isn't

7    on the horizon at this point.  This is Ms. Nichols you are

8    asking to be a next friend.  I am still troubled by the

9    fact that this is an Affidavit taken last January, January

10   2012, that is just generally showing her support for

11   Mr. Moeller, but, number one, it's not under oath.  Number

12   two, it doesn't show that she -- what kind of contact she's

13   had with him, the frequency of the contact, the recency of

14   the contact, and it doesn't have one scintilla of a hint

15   that he doesn't know generally what's going on, or, more

16   specifically, what's going on in these proceedings.

17         MR. VAN NORMAN:  I understand that, Your Honor.

18   As an officer of the Court, I've made representations

19   earlier during this hearing, based on my interviews of

20   Ms. Nichols, which I believe properly supplement that

21   Declaration by her.

22         THE COURT:  I don't think so.

23         MR. VAN NORMAN:  I accept the Court's

24   observation, of course.  Ms. Nichols has also relied on who

25   Mr. Moeller has described as a stepmother, Agnes Becker.
```

```
 1            THE COURT:  This statement doesn't say that, that
 2    she's representing something that Ms. Becker says with
 3    regard to his not being competent or knowing what's going
 4    on.  There's nothing in that statement about that.
 5            MR. VAN NORMAN:  I agree, Your Honor.  As an
 6    officer of the Court, I am supplementing that by my
 7    interview of her, and saying, in fact, she has told me
 8    those very same things, that she's relying on her mother's,
 9    that is, Agnes Becker, Ms. Nichols' mother's observations.
10        With regard to the merits of the claim, Your Honor, I
11    believe that an Eighth Amendment claim has been presented.
12    I don't think it's been fully adjudicated, and I think
13    there are serious issues with regard to both the substance
14    proposed to be used, the compounding issues, as well as the
15    protocol as represented or laid out in the depositions and
16    the other Declarations that have been presented to the
17    Court under seal.
18            THE COURT:  Let's talk about that for a minute.
19    The State filed documents this morning that showed -- one
20    of the big points that was made by the Arkansas Public
21    Defender's Office was the fact that this pentobarbital is
22    not available in a manufactured complete form for execution
23    purposes, because the manufacturer took it off the market
24    for that purpose.  I mean it's available otherwise, but not
25    for execution.  So they made a lot of points with regard to
```

1    that.

2        Now what was filed this morning shows that there was,

3    with regard to the pentobarbital that's proposed to be used

4    on Mr. Moeller, that that's been subject to separate

5    laboratory examination, and found to meet standards that

6    are set forth in the Affidavit.  I'm not relitigating that,

7    but I mean you brought it up.

8        So that addresses that issue, and particularly in view

9    of -- it was alluded to at the October 4 hearing.  It

10   hasn't gotten any better with regard to those compounding

11   pharmacies that really wind up manufacturing large, large

12   quantities of drugs, but not under manufacturing regimens.

13   This is an individual mix, rather than a manufacturing mix.

14       Nonetheless, that is addressed in what the State filed

15   today.  You recognize that.

16           MR. VAN NORMAN:  Yes.  I acknowledge obviously

17   that just before the hearing I received an Affidavit of

18   Deponent No. 1, and I believe it's Document 394.  I have no

19   way to respond more specifically to that, and I understand

20   what the contents are.

21           THE COURT:  Okay.  Go back to the merits.

22           MR. VAN NORMAN:  Yes, Your Honor.  I think there

23   is some question obviously, based on the Affidavit, as to

24   the merits of a portion of this claim.  I don't believe

25   that that takes care of the protocols followed that

1   apparently are at issue.  I believe there's still an issue

2   based on I believe it's Dr. Seller's Declaration to the

3   Court with regard to the whole chemical procedure and

4   potential problems here that remains.  That's separate from

5   whether or not there was a proper competency determination

6   made.

7       I would like to say this about the knowing and

8   voluntary issue.  I have interviewed the Federal Defenders.

9   They also said on the record at the October 4 hearing that

10  they had, they thought, misunderstood the Court's Order

11  with regard to protected or sealed information.  They have

12  confirmed that again as recently as last night when I

13  talked with them again about that very topic, because I

14  wanted to be very clear.

15      They had not advised Mr. Moeller with regard to the

16  specific issues that they developed, both through

17  depositions as well as through the Declarations of the

18  chemists or the scientists who have looked at this

19  situation.

20          THE COURT:  Of course, it wouldn't be easy since

21  he refused to see them after January of 2012.

22          MR. VAN NORMAN:  Well, I think there are other

23  ways to inform people.  They said they had understood the

24  Court would not permit them to advise him specifically as

25  to what they believed they had found.

```
 1          THE COURT:  If they had any question about that,

 2   and they were vigorous in their presentation of their

 3   positions.  If they had any question about that, they could

 4   have filed yet another pleading.  We have 390 or something

 5   like that in this file.

 6          MR. VAN NORMAN:  And I'm not defending what their

 7   omissions are or their failures, if they were, Your Honor.

 8   I'm saying that didn't happen.  Based on that, I don't

 9   believe it was a knowing and voluntary decision by

10   Mr. Moeller.

11      Now, how far that could have gone as far as explaining

12   to him in Court or in other examination or another

13   presentation is a different issue that didn't happen on

14   October 4.  I don't believe it's happened subsequently in

15   any way.

16      This is, as the Court knows, and I'm a late-comer

17   obviously to the file, a huge file with a lot of very

18   complicated issues in it which are difficult to understand

19   and address.

20      What I'm asking for obviously, that Donna Nichols be

21   appointed as guardian ad litem here, and separately that

22   the Court issue a stay.

23      I would like to move to the jurisdictional issue, if I

24   might.

25          THE COURT:  Sure.
```

1              MR. VAN NORMAN:  I don't think there's any

2    question that the Court has under Rule 8 of the Rules of

3    Appellate Procedure, which I anticipated is what we would

4    look at in that regard, that the Court has -- I have to

5    apply to this Court, unless there's something unusual.  I

6    believe this is run-of-the-mill in some respects as far as

7    procedurally applying to the Court for a stay.

8         Of course I am applying to the Court for a stay.  In

9    this instance there is jurisdiction clearly in this Court

10   to consider both the request I've made on behalf of

11   Ms. Nichols, as well as with regard to a stay.  So I don't

12   think it's correct at all that there's no jurisdiction.  I

13   agree entirely with the Court's hypothetical to Mr. Jackley

14   that the Courts have to be open obviously, and the Court

15   has to, as a matter of course, consider something as

16   serious as this.

17        So those are the things I'm asking for here,

18   Your Honor.  It's fairly simple, and I think it's fairly

19   straightforward, but it's very grave circumstances, as the

20   Court is aware.

21              THE COURT:  Thank you.

22              MR. MARSHALL:  May I, Your Honor?

23              THE COURT:  You may.

24              MR. MARSHALL:  Thank you for your indulgence.

25   First of all, I'd like to represent to the Court on behalf

```
1   of Mr. Moeller that he sees no need to seal the documents

2   that were proffered today, and would consent to their

3   filing and being of record.

4       Your Honor, you asked a question about jurisdiction,

5   and I want to be very respectful when I say this.  But this

6   is a case which calls for counsel and the Court to observe

7   their proper role.  Death cases are charged with emotion, a

8   sense of what's right and wrong, and a sense of value.

9       I respectfully suggest, Your Honor, that that

10  Stipulation is effective, whether you found competence or

11  not.

12      I would respectfully suggest that there is no appeal

13  of any kind from that Stipulation.

14      Finally, and, again, respectfully, Your Honor, suggest

15  that while --

16          THE COURT:  You don't have to worry about the

17  respectful part.  Go ahead.

18          MR. MARSHALL:  Well, you don't have jurisdiction,

19  Judge.

20          THE COURT:  You argued that last time, too.

21          MR. MARSHALL:  And I understand I lost that.

22  But, nevertheless, there was an effective Stipulation.

23      I appreciate that Rees may be instructive, but it's

24  not controlling.

25      This case, when you strip away the emotion and
```

gravity, is no different than any other civil rights case
that the parties can agree to dismiss.  This case becomes
important, because everyone is injecting their own view of
what is right and wrong, and sometimes we must confine
ourselves to the role defined by law for us.

In this case, Your Honor, I believe that that is to
deny the Motions for want of jurisdiction.

How do you appeal an Order from which both sides have
agreed that the case is gone, other than to inject your own
view of what is right and what is wrong?

Again, it's Don Moeller's arm, Your Honor.  It's his
case.  The issues, touching the public interest, if they
were present, why didn't they happen in the last execution?
They are only present in this case because he brought a
civil rights case.  He was competent then.

Mr. Van Norman talked at length about how deeply he
was involved.  Suggests he shouldn't be here taking a
position directly opposed to what he was doing then,
contrary to his client's interests.

It's difficult for me to stand here and say these
words, but I took an oath as a lawyer to be a zealous
advocate within the boundary of law, and not to step over
that boundary and advocate on behalf of what I think is
right, even though the law says otherwise.  This isn't a
circumstance where we're arguing for an extension of law,

1    for anything that is even colorably debatable.

2        Don Moeller stood or sat in that witness box and told

3    you, as cogently and intelligently as any person I have

4    ever heard, that he wants to dismiss this appeal.

5        Your Honor, please allow him that last element of

6    dignity and end these proceedings.

7            THE COURT:  Don't sit down yet, because we're

8    going to talk about jurisdiction a little bit.  This has

9    been before this Court since 2004.  At some point along the

10   line I made a decision to separate the habeas action from

11   the 1983 action, so that the habeas, in other words, the

12   guilt or innocence, which was contested at that time, could

13   go up to the Eighth Circuit and to the Supreme Court, which

14   it did.  The Eighth Circuit affirmed this Court's decision

15   with regard to the guilt or innocence phase and the habeas.

16   The Eighth Circuit affirmed that.  Then, of course as you

17   know, the United States Supreme Court denied certiorari,

18   which was the end of that.

19       Just thinking out loud about this, if the Court had

20   instead not severed the two separate causes of action and

21   instead left them together, where would we be different

22   now?  Because we would have the habeas that would have had

23   to have gone up with this issue, and would we have then

24   waited -- we would have had to wait, I guess -- I'm

25   thinking out loud on this since you brought it up.  We

```
 1    would have, in order to adjudicate the 1983, in other

 2    words, the protocol for execution in the mode and manner,

 3    which has been a moving target with the State, because the

 4    State hasn't done this, you know, it sits then until 2007.

 5         So would we just now be at some point going up to the

 6    Eighth Circuit?  Because then there would be no question

 7    about jurisdiction, because you would have the habeas and

 8    the 1983 intertwined.

 9              MR. MARSHALL:  Your Honor, I think there is one

10    element absent in your hypothetical, and that is had these

11    cases' claims stayed together, would you have issued a

12    Rule 54(b) Certificate to allow the habeas to go up, or

13    would you have exercised your judicial discretion and kept

14    the case together?  Don't know the answer to that question.

15         Had they been kept together, I don't believe we would

16    be here, because all of these issues would have been

17    decided, and there would be no question of jurisdiction.

18              THE COURT:  So then what kind of test would there

19    have been of the protocol then, because the protocol we're

20    talking about here was only entered in October of 2011.

21              MR. MARSHALL:  Well, I think we would have been

22    addressing a different protocol, Your Honor.

23              THE COURT:  To the dismay of your client,

24    frankly, because the old protocol is clearly a less

25    desirable one than the current one.  You weren't involved
```

1    in that part of it, though.

2              MR. MARSHALL:  Indeed I was, because part of my

3    argument concerned the initial protocol.

4              THE COURT:  Not the latest, though.

5              MR. MARSHALL:  I have read those documents,

6    Your Honor, but you're correct.  Not what we call the

7    intermittent protocol.

8              THE COURT:  There is that one, too.  All right.

9    Anything else?

10             MR. MARSHALL:  Thank you for your indulgence.

11             THE COURT:  Certainly.  Well, Mr. Marshall got

12   the second bite at the apple.  Anything further from the

13   State?

14             MR. JACKLEY:  Can I have a moment, Your Honor?

15             THE COURT:  Sure.

16             MR. JACKLEY:  The State has nothing further,

17   unless the Court has any questions, Your Honor.

18             THE COURT:  No.  I want to test your jurisdiction

19   argument again, Mr. Marshall, if you'd come up to the

20   podium.

21        I'm going to put essentially the same question to you

22   that I put to Mr. Jackley.  That is, let's say that instead

23   of, frankly, the record that we have, which is one where

24   Mr. Moeller spoke clearly, cogently, without hesitation, on

25   October 4 when I was questioning him for about half an

1    hour.

2        At the end I said, "Do you have anything further you

3    want to say?"  He said, "Well, there were a couple more

4    things I thought you might ask me."  I said, "What's that?"

5    And he told me.  I thought they were good questions, so I

6    asked him those, too.

7        Well, let's say instead of that situation and the rest

8    of the facts we have in this case, we had a situation where

9    we had a Rule 41(b) and there had been intervening time,

10   and then a solid evaluation from a psychologist or

11   psychiatrist came in and said, "This person is stark-raving

12   mad.  Doesn't understand anything about what's going on."

13   But, nonetheless, there was a Rule 41 of record.  Let's say

14   there were intervening events that stretched out the time,

15   and somebody was just absolutely mad.  No understanding

16   what was going on to him and so on.  Would there be

17   jurisdiction then?

18            MR. MARSHALL:  No.

19            THE COURT:  So we just go ahead and execute

20   somebody that is stark-raving mad?

21            MR. MARSHALL:  Well, unfortunately Justice Scalia

22   has observed that sometimes an innocent person is executed.

23            THE COURT:  Well, that wouldn't be an innocent

24   person.  That would be a person that the Supreme Court says

25   shouldn't be executed because they're not competent at that

```
 1   time, even though they might have been guilty as all

 2   get-out when the crime was committed.  So that doesn't

 3   quite fit Scalia's statement.

 4           MR. MARSHALL:  But our rules, Your Honor, are

 5   more important than the individual case.  We are governed

 6   by the rule of law which we have all sworn to uphold.

 7   There are occasions, and I hope that they are extremely

 8   rare, where those rules suggest such an outcome.  I don't

 9   believe, under the letter of the law, that there would be

10   jurisdiction in that case.

11           THE COURT:  All right.  I know your position.

12   Thank you.

13      Mr. Van Norman, they each got another opportunity.

14   You are the moving party.  Anything else?

15           MR. VAN NORMAN:  Thank you.  Very briefly,

16   Your Honor.

17      I understand Mr. Marshall's position.  He, also, I

18   thought, maybe it was a misstatement earlier in his

19   argument before the Court called him back to the podium,

20   that he said, "Notwithstanding competence or incompetence,

21   that the Rule 41 would be enforceable," and I obviously

22   have derived from what he just said again that a

23   stark-raving mad person who signed, when competent, a

24   Rule 41 Stipulated Dismissal can be executed based on their

25   earlier Stipulation.
```

1      That is incorrect, I believe, under both

2   Constitutional and State law.  The State statutes that I

3   recall, in fact, preclude a person who is stark-raving mad

4   from being executed.

5      The other statement I would like to make, Your Honor,

6   is this isn't the regular run-of-the-mill case.  The

7   U.S. Supreme Court has declared in various contexts that

8   that was different.

9      I am not here because I'm an opponent of the death

10   penalty, generally speaking.  I am here because I believe I

11   can represent Donna Nichols under the circumstances, and

12   underline the portion "under the circumstances."

13      I would also like to say that the public interest of

14   waiting cruel and unusual punishment being imposed on any

15   citizen I believe outweighs any interest of that specific

16   individual in simply asking to be executed, which I believe

17   amounts or can amount to state-assisted suicide.  That is

18   troubling, of course, on a moral scale.  But that isn't why

19   I'm here, Your Honor.  Thank you.

20         THE COURT:  Let me ask you another question,

21   Mr. Van Norman.  I have this Declaration of Ms. Nichols,

22   who lives here in Sioux Falls, you informed me.  The

23   Declaration doesn't say that she ever went up to see

24   Mr. Moeller.  He's been here for 20-some years now in the

25   Penitentiary here in Sioux Falls.  She may well have

```
 1   visited him.  But the Declaration doesn't reflect that at

 2   all.

 3           MR. VAN NORMAN:  That's correct.  The Declaration

 4   doesn't.  The last time she saw him, I understand, was last

 5   spring before she had two hip surgeries this summer.  She

 6   has taken Agnes Becker to the Penitentiary, whenever they

 7   were able to arrange it, based on both of their health

 8   conditions.

 9       I understand the last verbal communication she may

10   have had with him was within the last six weeks, some kind

11   of controversy over a money order or something.

12           THE COURT:  And the Declaration dated January 12,

13   before her hip surgeries, doesn't say anything about

14   visiting him or anything about his wishes at all.

15           MR. VAN NORMAN:  That's correct.  It doesn't.

16           THE COURT:  Mr. Marshall, is there anything your

17   client wishes to say?

18           MR. MARSHALL:  Yes, Your Honor.  Mr. Moeller

19   would like to testify, if the Court would allow.

20           THE COURT:  Well, he can make a statement.

21           MR. MARSHALL:  Would you like him to come to the

22   podium?

23           THE COURT:  Probably, since I suspect he's in leg

24   shackles, it's probably easier for him to speak through the

25   microphone.
```

1          THE DEFENDANT:  Thank you, Judge.  First of all,

2    I haven't seen Donna in over three years, maybe four times

3    in the last five years.  The only time she came up was to

4    bring her mother to visit me.

5          I've gotten two notes from her this year, 2012.  One,

6    she was really mad because I asked her mother for a few

7    bucks, and the second one to apologize.

8          She never told me about this January thing you've got

9    in front of you.  So I don't know what they're doing.

10          They are not my friends, because they know my

11    position.  I have written to them and spelled out that I'm

12    going to be executed and what to do with my property.  So

13    they know this is my wishes.

14          Mr. Van Norman, when he was my attorney in Rapid City,

15    we talked about mitigation, and I told him that if I was

16    found guilty, there would be no mitigation.  I did not want

17    family involved.  Now somebody got my family, the shirttail

18    family involved.

19          As for being related, my stepfather, Glen Becker, was

20    married to my mother for eight years.  After they were

21    divorced, Glen Becker married Mrs. Stelzer, who became

22    Mrs. Becker, Agnes Becker.  She had a bunch of kids on her

23    own.  That's how they become my family.  So there's no

24    blood, no real connection there at all.

25          I have stayed with them when I was out of the

1    Penitentiary, but that was on a short, you know, surfing on

2    the couch type thing.  Spent the nights and stuff.

3        She's not family.  She's not been a friend.  Like I

4    said, two notes this year.

5              THE COURT:  All right.  Thank you.

6              THE DEFENDANT:  Thank you.

7              THE COURT:  Well, I'll take this under

8    advisement, and after the October 4 hearing, I issued an

9    Opinion promptly.  I'll take this under advisement, and

10   I'll issue an Opinion promptly in this instance, too.

11   Thank you.  We're in recess.

12              (End of proceedings at 11:14 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT
     DISTRICT OF SOUTH DAKOTA :SS      CERTIFICATE OF REPORTER
2    SOUTHERN DIVISION

3
            I, Jill M. Connelly, Official United States
4    District Court Reporter, Registered Merit Reporter,
     Certified Realtime Reporter, and Notary Public, hereby
5    certify that the above and foregoing transcript is the
     true, full, and complete transcript of the above-entitled
6    case, consisting of Pages 1 - 45.

7            I further certify that I am not a relative or
     employee or attorney or counsel of any of the parties
8    hereto, nor a relative or employee of such attorney or
     counsel, nor do I have any interest in the outcome or
9    events of the action.

10           IN TESTIMONY WHEREOF, I have hereto set my hand
     this 23rd day of October, 2012.
11

12                        /s/ Jill M. Connelly
                          _____
13                        Jill M. Connelly, RMR, CRR
                          Court Reporter
14                        United States Courthouse
                          400 S. Phillips Avenue
15                        Sioux Falls, SD 57104
                          Phone:  (605) 330-6669
16                        E-mail:  Jill_Connelly@sdd.uscourts.gov

17

18

19

20

21

22

23

24

25
```