STATE OF SOUTH DAKOTA )
                        ) SS
COUNTY OF PENNINGTON )

IN CIRCUIT COURT

SEVENTH JUDICIAL CIRCUIT

File No. Civ. 02-924

**CHARLES RUSSELL RHINES** )
                                 )
             Petitioner, )
                                 )
                                 )
                                 )
                                 )
**DOUGLAS WEBER,** Warden, South )
Dakota State Penitentiary, )
                                 )
             Respondent. )

**AMENDED
MEMORANDUM DECISION
ON CHALLENGE TO
SOUTH DAKOTA'S
EXECUTION PROTOCOL
AND ORDER**

## I. PROCEDURAL AND FACTUAL BACKGROUND

The extensive procedural and factual background of this habeas petition was set forth in the Motion to Dismiss/Summary Judgment decision filed on September 17, 2012. Summary Judgment was denied as to Petitioner's Counts 8, 11 and 12. On December 18, 2012, a hearing was held for the purpose of receiving evidence as to those remaining claims. Both parties submitted exhibits including deposition testimony. Petitioner's objections to Exhibits 7R, 8R, 9R, 10R, and 25R are sustained. The admission of this evidence was not stipulated to by the parties nor was the information elicited from any witness. No live witnesses were called at the hearing. Most of the exhibits referenced in this decision are all sealed; therefore, references will be to the numbers/letters in the sealed court file. The issues remaining are:

**Ground Eight:**

¶28 The manner of execution as provided by SDCL 23A-27A-32 as in effect at the time Charles R. Rhines' conviction violated his rights to due process of law and constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution and the corresponding Article under the South Dakota Constitution:

         a. Executions are unconstitutional if they involve unnecessary and wanton infliction of pain or torture or lingering death.

         b. Where pain is inflicted in an execution results from something more than the mere extinguishment of life, the United States Constitution Eighth Amendment and the corresponding South Dakota articles' prohibition against cruel and unusual punishment are implicated.

         c. Given the two chemicals specified in SDCL 23A-27A-32 in effect at the time of Charles R. Rhines' conviction and the absence of a person trained to administer and monitor

1



anesthesia, it is reasonably foreseeable that Charles R. Rhines may experience suffocation and excruciating pain during his execution in violation of the Eighth Amendment and the corresponding South Dakota Amendment.

d. An execution pursuant to SDCL 23A-27A-23 as codified on the date of Charles R. Rhines' conviction violates the United States Constitution and the South Dakota Constitution prohibition against cruel and unusual punishment and is therefore unconstitutional.

### Ground Eleven:

¶ 31 The execution of Charles R. Rhines by lethal injection as set forth in the present SDCL 23A-27A-32 violates Rhines' rights to due process under law and his rights against cruel and unusual punishment guaranteed under the United States Constitution and the South Dakota Constitution.

a. SDCL 23A-27A-32 was amended by the South Dakota Legislature during the 2007 legislative session.

b. On information and belief, the South Dakota Legislature rejected proposed amendments requiring executions be carried out in the most humane manner possible.

c. SDCL 23A-27A-32 removes the requirement of a physician participation in the execution process.

d. Executions are unconstitutional if they involve unnecessary and wanton infliction of pain or torture or lingering death.

e. Where pain inflicted in an execution results from something more than the mere extinguishment of life, the constitutions of the United States and South Dakota, South Dakota Articles prohibition against cruel and unusual punishment are implicated.

¶32 Upon information and belief, the protocol presently in effect for lethal injection execution uses a three drug cocktail.

¶33 With the three drug cocktail presently believed to be used in executions, in the absence of a person trained to administer and monitor an anesthesia, it is reasonably foreseeable that Charles R. Rhines may experience suffocation and excruciating pain during his execution in violation of the Constitutions of the United States and South Dakota.

¶34 An execution pursuant to the present SDCL 23A-27A-32 violates the United States Constitution and the South Dakota Constitution's prohibition against cruel and unusual punishment and it is therefore unconstitutional.

**Ground Twelve:**

¶35 Charles R. Rhines' right to due process of law against cruel and unusual punishment is guaranteed under the United States Constitution and the South Dakota Constitution is violated by the statutory procedure set forth in 23A-27A-32.

      a. SDCL 23A-27A-32 was passed by the South Dakota legislature during the 2007 legislative session.

      b. SDCL 23A-27A-32 was amended in two specific areas: it removed the specifications of the two drug cocktail to be used in the lethal injection by the prior statute, and substituted in its place the requirement that the Warden should determine the substances and the quantity of substances used for the punishment of death. The statute provided no other detail recording the Warden's decision. The second change was that a physician was no longer required to participate in the execution process.

¶36 Executions are unconstitutional if they involve unnecessary and wanton infliction of pain or torture or lingering death.

      a. Pain inflicted in an execution results from something more than the mere extinguishment of life, the United States Constitution and the South Dakota Constitution is prohibition against cruel and unusual punishment is implicated.

      b. On information and belief, the South Dakota legislature rejected proposed amendments requiring executions to be carried out in the most humane manner possible.

¶37 Given the fact that the Warden is given no guidance as to the type of substances used or the quality of substances used for the punishment of death, and there is no requirement by law that the execution be carried out in a humane manner, and the absence of a person trained to administer and monitor an anesthesia, it is reasonably foreseeable that Charles R. Rhines may experience suffocation and excruciating pain during his execution, as allowed under the present statute.

¶38 An execution pursuant to the present SDCL 23A-27A-32 violates the United States Constitution and the South Dakota Constitution prohibition against cruel and unusual punishment and therefore is unconstitutional.

Essentially, Petitioner's claims can be summarized into two issues. First, whether the lethal injection protocol adopted and implemented by the State of South Dakota complies with the mandates of the United States Supreme Court as set forth in the *Baze v. Rees* case? And, secondly, whether the lethal injection protocol violates Article VI, §23 of the South Dakota Constitution? The Petitioner's claims will be addressed separately below. All other issues raised by Petitioner in his Writ of Habeas Corpus have been addressed in the Memorandum Decision On Motion To Dismiss Or For Summary Judgment issued in September, 2012.

## II. ANALYSIS

### History of the Death Penalty and its application in South Dakota

Over South Dakota's history as both a territory and a state, 18 men have been executed. When South Dakota was first settled and was still Dakota Territory, hangings were the preferred method of execution. Between 1877 and 1915, 14 men were executed by hanging in South Dakota. See Dept. of Corrections, http://doc.sd.gov/about/faq/capitolpunishment.aspx. The first was Jack McCall, the killer of Wild Bill Hickok, who was hanged in 1877. While hanging was the most "universal method of execution" in the United States during this time, the Governor of New York commissioned a panel to find:

> the most humane and practical method known to modern science of carrying into effect the sentence of death,' " New York became the first State to authorize electrocution as a form of capital punishment. *Glass v. Louisiana*, 471 U.S. 1080, 1082, and n. 4, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari); *Denno*, supra, at 373. By 1915, 11 other States had followed suit, motivated by the "well-grounded belief that electrocution is less painful and more humane than hanging." *Malloy v. South Carolina*, 237 U.S. 180, 185, 35 S.Ct. 507, 59 L.Ed. 905 (1915).

*Baze v. Rees*, 553 U.S. 35, 42, 128 S.Ct. 1520, 1526 (2008).

Executions by hanging continued in South Dakota until the death penalty was abolished in 1915. See, 1915 S.L. Ch. 158, H.B. 21. In 1933, the death penalty was reinstated and the electric chair became the sole method of execution. In 1947, George Sitts was convicted of murdering DCI agent Tom Matthews who was attempting to arrest Sitts on a fugitive warrant from Minnesota. He also killed Butte County Sheriff Dave Malcolm; however, he was first tried for Matthew's murder and after he was sentenced to death, the state did not try him for Malcolm's murder. See, *State v. Sitts*, 71 S.D. 494, 26 N.W.2d 187 (1947). He was the first and only person executed by electric chair in South Dakota.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court held a Georgia death penalty statute violated the 8th and 14th Amendments prohibiting cruel and unusual punishment:

> Petitioner in No. 69-5003 was convicted of murder in Georgia and was sentenced to death pursuant to Ga.Code Ann. s 26-1005 (Supp.1971) (effective prior to July 1, 1969). 225 Ga. 253, 167 S.E.2d 628 (1969). Petitioner in No. 69-5030 was convicted of rape in Georgia and was sentenced to death pursuant to Ga.Code Ann. s 26-1302 (Supp.1971) (effective prior to July 1, 1969). 225 Ga. 790, 171 S.E.2d 501 (1969). Petitioner in No. 69-5031 was convicted of rape in Texas and was sentenced to death pursuant to Vernon's Tex.Penal Code, Art. 1189 (1961). 447 S.W.2d 932 (Ct.Crim.App.1969). Certiorari was granted limited to the following question: **'Does the imposition and carrying out of the death penalty in (these cases) constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?'** 403 U.S. 952, 91 S.Ct. 2287, 29 L.Ed.2d 863 (1971). The Court holds that the imposition and carrying out of the death penalty in

these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The judgment in each case is therefore reversed insofar as it leaves undisturbed the death sentence imposed, and the cases are remanded for further proceedings. So ordered.

*Id.* (emphasis added.) The court issued a per curium decision which was less than one page long which reversed the imposition of the death penalty on the three consolidated cases. Justices Douglas, Brennan, Stewart, White and Marshall each wrote separate opinions in support of the judgments. Justices Blackmun, Powell and Renquist each filed separate dissents. The problem the Court had in the *Furman* case was that there were no standards for a jury to apply to the death penalty determination:

Thus, these discretionary statutes are unconstitutional in their operation. They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments.

Any law which is nondiscriminatory on its face may be applied in such a way as to violate the Equal Protection Clause of the Fourteenth Amendment. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. Such conceivably might be the fate of a mandatory death penalty, where equal or lesser sentences were imposed on the elite, a harsher one on the minorities or members of the lower castes. Whether a mandatory death penalty would otherwise be constitutional is a question I do not reach.

*Furman v. Georgia*, 408 U.S. 238, 257, 92 S.Ct. 2726, 2736 (Ga. 1972) Justice Douglas concurring.

This case led to a de facto nationwide moratorium on the death penalty for 9 years. See, *Baze v. Rees*, 553 U.S. 35, 42, 128 S.Ct. 1520, 1526. That moratorium ended with the United States Supreme Court's decision in *Gregg v. Georgia*. 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *Id.* That decision held that the "statutory system under which Gregg was sentenced to death does not violate the Constitution." *Gregg*, 428 U.S. 207, 96 S.Ct. 2941. As a result of the *Gregg* case, state legislatures began reexamining electrocution as a "means of assuring a humane death." *Baze*, 553 U.S. 42, 128 S.Ct. 1526. In order to eliminate the issues the Court found in the *Furman* case, Georgia enacted a statutory scheme for the imposition of the death penalty. *Gregg*, 428 U.S. 161, 96 S.Ct. 2920. The trial was bifurcated into the guilt or innocence phase by either a judge or jury. *Id.* After a guilty verdict or finding, a presentence hearing was conducted before whoever made the guilt determination. *Id.*

"(T)he judge (or jury) shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas: Provided, however, that only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. The judge (or jury) shall also hear argument by the defendant or his counsel and the prosecuting attorney . . . regarding the punishment to be imposed." s 27-2503. (Supp.1975).

5

The defendant is accorded substantial latitude as to the types of evidence that he may introduce. See *Brown v. State*, 235 Ga. 644, 647-650, 220 S.Ed.2d 922, 925-926 (1975). Evidence considered during the guilt stage may be considered during the sentencing stage without being resubmitted. *Eberheart v. State*, 232 Ga. 247, 253, 206 S.E.2d 12, 17 (1974).

*Gregg*, 428 U.S. 163-164, 96 S.Ct. 2920-21.

Furthermore, under the statutory scheme, the jury or court must have also found beyond a reasonable doubt, at least one aggravating circumstance as found in the statute. The statutory scheme also included an expedited direct review by the Georgia Supreme Court. If the Court affirmed the death sentence, then it was required to reference similar cases it took into consideration. *Gregg*, 428 U.S. 167, 96 S.Ct. 2922.

Interestingly, part of the Supreme Court's decision in *Gregg* looked at the history of the death penalty:

> It is clear from the foregoing precedents that the Eighth Amendment has not been regarded as a static concept. As Mr. Chief Justice Warren said, in an oft-quoted phrase, "(t)he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, Supra, 356 U.S. at 101, 78 S.Ct., at 598. See also *Jackson v. Bishop*, 404 F.2d 571, 579 (CA 8 1968). Cf. *Robinson v. California*, supra, 370 U.S., at 666, 82 S.Ct., at 1420. Thus, an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment. As we develop below more fully, see Infra, at 2926-2927, this assessment does not call for a subjective judgment. It requires, rather, that we look to objective indicia that reflect the public attitude toward a given sanction.

*Gregg*, 428 U.S. 173, 96 S.Ct. 2925. The Court further examined the role of the judiciary in determining the constitutionality of a legislative enactment:

> But, while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators.
>
> > "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures." *Dennis v. United States*, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring in affirmance of judgment).

Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not

cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

*Gregg*, 428 U.S. 175, 96 S.Ct. 2926.

Ultimately, the *Gregg* court upheld Georgia's death penalty statutes:

In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Gregg*, 428 U.S. 195, 96 S.Ct. 2935.

Following the *Gregg* decision, a new version of the death penalty was enacted in South Dakota in 1979. See 1979 SB 53; see former SDCL 22-6-1 (1979); SDCL 22-16-9 (1979). SDCL 22-19-1 (1979). This statutory scheme embraced the dictates of *Gregg* and provided for aggravating circumstances, a mitigation hearing, an expedited direct review and a proportionality review of the sentence. No one in South Dakota was executed between the 1947 electrocution of Sitts and the 2007 execution of Elijah Page by lethal injection.

The South Dakota legislature amended SDCL 23A-27A-32 in 2007 to provide for execution "by the intravenous injection of a substance or substances in a lethal quantity." The statute instructed the "Warden, subject to the approval of the secretary of corrections, [to] determine the substances and quantity of substances used for the punishment of death." SDCL 23A-27A-32.

Per the directives given to him by SDCL 23A-27A-32, the Warden promulgated a policy effective June 14, 2007, providing for execution by: (1) "Sodium Pentothal, (aka Sodium Thiopental)…in a quantity sufficient to ensure the inmate is and remains unconscious and is not subjected to the unnecessary and wanton infliction of pain;" (2) Pancuronium Bromide to stop the inmate's breathing, and; (3) Potassium Chloride to stop the inmate's heart. See Exhibit 3.

Subsequent to formulating the June 14, 2007, protocol, the United States Supreme Court's *Baze* decision detailed the safeguards the court deemed constitutionally sufficient to protect condemned inmates from anesthetic maladministration. *Baze v. Rees*, 553 U.S. 54-61, 128 S.Ct. 1533-1538. As a result, the Warden consulted with legal counsel to determine what changes should be made to the June 2007 policy. The DOC revised the policy in August 2010 to incorporate further safeguards against anesthetic maladministration mandated by *Baze*. See Weber Affidavit, Exhibit 3R, ¶¶ 6-8. The revised protocol called for execution by the same three chemicals as originally specified in the June 14, 2007, protocol, but with newly specified dosages. *Id*. at ¶8.

In response to emerging judicial acceptance of pentobarbital as an execution anesthetic, the Warden again modified the protocol in October of 2011 to provide for execution via a one-drug, pentobarbital protocol for all prospective executions. Id. at ¶9. South Dakota has now joined Ohio, Washington, Idaho, Oklahoma and Pennsylvania with having a one drug protocol. While the October 13, 2011, protocol retains three and two drug options utilizing sodium thiopental, those exist as backup procedures should future circumstances require DOC to revert to those earlier procedures.

After the executions of Eric Robert and Donald Moeller in October 2012, the Warden modified the protocol slightly to provide inmates with express assurance that any compounded execution drugs would be prepared according to the governing standards of the United States Pharmacopeia. The November 2012 protocol retains *Baze's* safeguards for the proper administration of the anesthetic. See Exhibit 2R.

### Issue One

**Whether Petitioner's challenge to the lethal injection protocol adopted and implemented by the State of South Dakota as set forth in detail in Petitioner's Habeas Petition Grounds 8, 11 and 12, complies with the mandates of the United States Supreme Court as set forth in the *Baze v. Rees* and the Eighth Amendment to the United States Constitution?**

### A. *Baze v. Rees* and Substantial Risk of Serious Harm and Suffering

Petitioner claims that the lethal injection protocol adopted and implemented by South Dakota "does not adequately guard against substantial risk of serious harm and suffering." See Petitioner's Pretrial Brief, p. 1. Petitioner further argues that South Dakota has not "chosen individuals to carry out the execution who have adequate and appropriate training and experience to guard against that risk." *Id.*

Like *Baze*, where the United States Supreme Court addressed whether Kentucky's three-drug lethal injection method of capital punishment posed an unacceptable risk of significant pain and was cruel and unusual punishment under the Eighth Amendment, Rhines' argument centers on the risk of serious harm and suffering. *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520 (2008). Ultimately, the Court held that Kentucky's method of capital punishment satisfied the Eighth Amendment:

> The Eighth Amendment to the Constitution, applicable to the States through the Due Process Clause of the Fourteenth Amendment, see *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, **nor cruel and unusual punishments inflicted.**" We begin with the principle, settled by *Gregg*, that capital punishment is constitutional. See 428 U.S., at 177, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and STEVENS, JJ.). It necessarily follows that there must be a means of carrying it out. Some risk of pain is inherent in any method of execution—no matter how humane—if only from the

prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions.

*(emphasis added), Id.*, 553 U.S. 47, 128 S.Ct. 1529. Thus, Rhines does not challenge lethal injection per se. Rather, the challenge is to the protocol and the manner in which the execution is carried out. Petitioner argues that there is a significant risk that the drugs will not be properly administered which will lead to severe pain when the other chemicals are administered and therefore, the possibility of improper administration of the drugs would be violative of the Eighth Amendment. However, the Supreme Court has held that in order to prevail on a claim of cruel and unusual punishment there must be "substantial risk of serious harm":

> To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be "sure or very likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 33, 34–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

*Baze v. Rees*, 553 U.S. 49-50, 128 S.Ct. 1530-31. The Court further explained that "simply because an execution method may result in pain....does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* It is important to note that following *Baze*, no federal appellate court has invalidated a lethal injection protocol under the Eighth Amendment. *Cooey v. Strickland*, 589 F.3d 210, 221 (6th Cir. 2009); *Nooner v. Norris*, 594 F.3d 592, 596 (8th Cir. 2010); *Clemens v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2007).

The *Cooey* court explained in detail what Baze does not require:

> In thinking about what Baze requires, it is helpful to remember what it does not. The opinion contains several controlling premises within which Biros must formulate his challenge: Capital punishment is constitutional, see id. at 1529; death-row inmates cannot use method-of-execution challenges to prohibit what the Constitution allows, id.; "the Constitution does not demand" a pain-free execution, id. at 1529, 1537; and an inmate cannot question a state's execution protocol without providing "feasible, readily implemented" alternatives that " significantly reduce a substantial risk of severe pain," see id. at 1532 (emphasis added); id. at 1531 ("[A] condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative."). Significantly, the Constitution does not allow the federal courts to act as a best-practices board empowered to demand that states adopt the least risky execution protocol possible. See id. at 1529, 1531. Within this framework, the Supreme Court has never held that an inmate met the "heavy burden" of demonstrating that a state's execution protocol is "cruelly inhumane" in violation of the Constitution. See id. at 1533 (citing *Gregg*, 428 U.S. at 175, 96 S.Ct. 2909); see also id. at 1529, 1531; *Harbison*, 571 F.3d at 535 (rejecting a challenge to Tennessee's lethal injection protocol after *Baze* ).

With these standards in mind, the next step is to compare the *Baze* requirements with South Dakota's protocol to determine whether they are substantially similar and thus, constitutional.

## B. South Dakota's Lethal Injection Protocol is Substantially Similar to *Baze* and is Constitutional on its Face

After *Baze* was decided by the United States Supreme Court in 2008, South Dakota's Warden consulted with legal counsel to determine what changes, if any, should be made to South Dakota's existing protocol in order for it to be compliant with the mandates of *Baze*. Department of Corrections revised its existing protocol in August 2010. Weber Protocol Affidavit, Exhibit 3R, ¶¶ 11-14. This revised protocol used the same three-drug protocol approved in *Baze*. In response to emerging judicial acceptance of pentobarbital as an execution anesthetic, South Dakota's Warden again modified the protocol in October of 2011 to provide for execution via a one-drug, pentobarbital protocol for all prospective executions. Exhibit 2R, ERM A.12(B)(H), Weber Protocol Affidavit, Exhibit 3R, ¶14. At that time, South Dakota joined Ohio and Washington in moving to a one-drug protocol. Since then, Idaho, Oklahoma, and Pennsylvania have also adopted a one-drug, pentobarbital protocol.

After the executions of Eric Robert and Donald Moeller in October, 2012, the South Dakota Warden modified the protocol slightly to provide inmates with express assurance that any compounded execution drugs would be prepared according to the governing standards of the United States Pharmacopeia. The November 2012 protocol retains *Baze's* safeguards for the proper administration of the anesthetic. Exhibit 2R, ERM A.12(B)(D)(1). Those are:

1. The execution is performed under the oversight and command of the Warden, who, by statute and policy is charged with numerous duties to ensure a humane execution. Exhibit 3R, Weber Protocol Affidavit, ¶ 2.

2. The Warden assures that two complete sets of pentobarbital syringes are prepared for the execution. Exhibit 3R, Exhibit 2R, ERM A.12(B)(A)(3).

3. Ambulance staff equipped with advanced life support capabilities, including a heart defibrillator and such supplies and equipment as would be needed to attempt to revive an individual who has been injected with pentobarbital shall be on standby at the SDSP. Exhibit 3R, Exhibit 2R, ERM A.12(B)(A)(5).

4. Execution team members must be qualified to carry out their functions. Persons responsible for inserting the needles and establishing IV lines must be "trained to perform venipuncture and to administer intravenous injections." To meet qualifications, the persons who "connect, monitor, and maintain intravenous lines" must be "certified or licensed and have at least two (2) years professional experience" as one of the following: "medical or osteopathic physician, physician assistant, registered nurse, certified medical assistant, licensed practical

nurse, phlebotomist, paramedic, emergency medical technical, or military corpsman." Exhibit 2R, ERM A.12(B)(B)(1)(3).

5. The person responsible for mixing the drugs, preparing the syringes, and administering the injections must "demonstrate proficiency through relevant training and two years' experience in the administration of drugs by intravenous injection; preparation of syringes for such administration; and mixing and preparing of drugs for such administration." Exhibit 2R, ERM A.12(B)(B)(2).

6. The two sets of chemicals are labeled and contained in numbered syringes. Exhibit 2R, ERM A.12(B)(C)(1).

7. The pentobarbital is mixed or prepared in accordance with USP 797 and is thereafter maintained in accordance with manufacturer's instructions. The pentobarbital must be mixed or prepared in bright, undimmed light. Exhibit 2R, ERM A.12(B)(D)(3); Exhibit 4R, at ¶¶6, 9, 11; Exhibit 5R, Deponent #1 Affidavit at ¶1, Exhibit 3R, Weber Protocol Affidavit, at ¶9.

8. DOC staff responsible for performing the execution is required to "drill at least weekly for six to eight weeks prior to the scheduled date of execution," as well as to perform "additional drills the week of the scheduled execution" at the Warden's direction. Exhibit 2R, ERM A.12(B)(D)(1).

9. At least one week prior to the execution, a medical provider examines the inmate and prepares a report "describing the inmate's physical condition and any medical condition of the inmate that may lead to potential problems establishing the IV site." Exhibit 2R, ERM A.12(B)(D)(2).

10. The protocol requires that every effort be made to ensure that no unnecessary pain is inflicted on the inmate. Exhibit 2R, ERM A.12(B)(D)(10).

11. The inmate is secured to the execution gurney in such a position that "at all times" his "head and face are visible to the Warden and to those in the chemical room." Exhibit 2R, ERM A.12(B)(D)(9).

12. The IV team shall establish "two independent IV lines to the inmate's veins. The IV team will establish IV lines only in peripheral veins located in the inmate's arms, hands, legs or feet, preferably one in each arm." Exhibit 2R, ERM A.12(B)(D)(8). The lines must be secured "in such a way as to leave them visible for monitoring."

13. If the IV team "cannot secure one (1) or more sites within one (1) hour," the execution will cease and a request shall be made that the execution be "scheduled for a later date during the week of the execution." Exhibit 2R, ERM A.12(B)(D)(11).

14. The IV team will "start a saline flow and a sufficient quantity of saline solution shall be injected to confirm that the IV lines have been properly inserted and are not obstructed." Exhibit 2R, ERM A.12(B)(D)(12).

15. The Warden stands in the execution chamber with the condemned and issues the order for the execution to proceed from there. Exhibit 2R, ERM A.12(B)(E)(2).

16. The executioner then administers syringe #1 containing 2.5 grams of pentobarbital in a 50 cc solution followed by syringe #2 containing 2.5 grams of pentobarbital in a 50 cc solution followed by syringe # 3 containing 25 ml. of normal saline. Exhibit 2R, ERM A.12(B)(C)(3); ERM A.12(B)(H)(4)-(6).

17. The person responsible for pronouncing death monitors the IV lines and the inmate's response to the injection over the next 15 minutes. If the person responsible for pronouncing death is not able to do so after 15 minutes, "the Warden shall order a second set of chemicals to be administered." Exhibit 2R, ERM A.12(B)(H)(7).

18. Ten minutes after the second round of the drug is administered, "[t]he person responsible for pronouncing death shall enter the chamber and confirm death by checking the inmate's heartbeat, breathing, pulse, and pupils." Exhibit 2R, ERM A.12(B)(H)(10).

ERM A.12(B), compare with *Baze*, 553 U.S. at 44-46, 51, 55-56, 128 S.Ct. at 1528, 1531, 1533-34 and *Baze* Protocol, Exhibit 2R, ERM A.12(B).

A comparison of South Dakota's ERM A.12(B) protocol with the *Baze* decision reveals that South Dakota's lethal injection protocol is "substantially similar" to, and in many respects more protective than Kentucky's as set forth in *Baze* and is therefore, constitutional on its face. *Id.* Petitioner has failed to show that the lethal injection protocol adopted by South Dakota "does not adequately guard against substantial risk of serious harm and suffering." Consequently, Rhines' argument set forth in Grounds 8, 11 and 12 that the lethal injection protocol adopted by South Dakota is unconstitutional and violates the 8th Amendment of the United States must fail.

## C.

### South Dakota Implements its Protocol in a Constitutional Manner

Rhine's also argues in Grounds 8, 11 and 12 of the habeas petition that the manner in which the lethal injection protocol is implemented is unconstitutional. More specifically, Rhines argues:

1) the execution team member known as Witness #3 does not have adequate training and experience to administer the lethal injection protocol; and

2) that execution team member Witness #3 does not have adequate experience and is not placed properly in the execution chamber, to recognize infiltration of the IV line which can result in reduced efficacy of the IV; and

3) that execution team member Witness #3 does not have proper experience and placement to ensure that the IV line is properly set at the outset, to monitor the IV lines in operation, or to place a central line in, if needed, and as called for under the protocol; and

4) that execution team member Witness #2 is charged with administering the lethal injection from a control room separated from the execution chamber; and

5) that execution team member Witness #2 has limited experience in administration of intravenous drugs; and

6) that execution team member Witness #2 lacks the training and experience to recognize if drugs are being taken up by the body in a proper fashion, to monitor the effect of the drugs, to recognize a proper administration rate or to understand the proper handling and administration of barbiturates like pentobarbital; and

7) that the compounded drug in not reliably pure and potent; and

8) that the execution protocol does not guarantee adequate medical monitoring and does not require that individuals with adequate training or experience select the members of the team; and

9) that the protocol creates a system that impermissibly increases the risk of error or mishap which can result in a cruel and unusual execution.

See Petitioner's Pretrial Brief, p. 1-2. Each of these arguments will be addressed below.

### i. Witness #3
### IV Setter

Witness #3 (also referred to as Deponent #3) is the person responsible for setting the IV lines. ERM A.12(B)(3) describes the qualifications:

> The person(s) selected by the Warden to insert the intravenous needles into the veins of the prisoner and connect, monitor, and maintain intravenous lines shall be certified or licensed and have at least two (2) years' professional experience as one of the following: medical or osteopathic physician, physician assistant, registered nurse, certified medical assistant, licensed practical nurse, phlebotomist, paramedic, emergency medical technician, or military corpsman.

These qualifications are consistent with, and even exceed, those set forth in *Baze*. *Baze* approved Kentucky's requirement that the IV setter have one year of professional experience as an EMT. *Baze*, 553 U.S. at 55, 128 S.Ct. at 1533. Kentucky met this requirement by employing an EMT who had "daily experience establishing IV lines for inmates," but neither the Kentucky protocol nor the *Baze* decision require "daily" experience.

Witness #3 who was part of the execution team for the Page, Robert and Moeller executions has a bachelor's degree in health education. Exhibit I at p. 8, line 12. Prior to obtaining his bachelor's degree, he received two years of paramedic training from an accredited institution. Exhibit I at p. 10, lines 3-11. That training included setting IV lines and administering IV drugs. Exhibit I at p. 10, line 15; p. 11, line 2. Witness #3 also worked for 15 years as a field supervisor and response medic on an ambulance. Exhibit I at p. 12, line 11. He then worked as an ambulance response medic before assuming supervisory duties. Exhibit I p. 12, line 19; p. 13, line 6. As part of his job, he is required to go on ambulance calls and to maintain his paramedic certification. Exhibit I at p. 15, line 20.

Witness #3 has been a state certified paramedic for 29 years. Exhibit I at p. 14, line 20, p. 15, line 3, p. 106, line 4. During that time, he has set thousands of IV lines. Exhibit I at p. 106, line 4. He has also participated in numerous executions. Exhibit I at p. 44, line 14. Witness #3 testified that he has never had a complication arise during an execution. Exhibit I at p. 41, line 15. He is also trained to recognize signs of IV malfunctioning, such as swelling, leaking, or discoloration in the lines. Exhibit I at p. 77, line 7; p. 86, lines 10-21; p. 87, line 14-88, 25; p. 89, lines 15-25; p. 100, line 7. If an IV line was malfunctioning, Witness #3 testified that he would switch to the secondary line or start a new one. Exhibit I at p. 81, line 12; p.87, line 4. Witness #3 stated that in the executions he has participated in, the inmate very quickly becomes lethargic, goes unconscious, takes some labored respirations, then goes into respiratory arrest. Exhibit I at p. 45, line 21; p.101, line 24. Signs of respiratory arrest are no chest wall movement and no air way sounds. Exhibit I at p. 46, line 7.

Witness #3 clearly is qualified under ERM A.12(B)(3) and the *Baze* decision. Thus, Rhines' arguments that Witness #3 does not have adequate training and experience to administer the lethal injection protocol, does not have adequate experience to recognize infiltration of the IV line and that Witness #3 does not have proper experience and placement to ensure that the IV line is properly set at the outset, to monitor the IV lines in operation, or to place a central line if, if needed, and as called for under the protocol are all without merit.

### ii. Witness #2
### Drug Administer

Witness #2 is the person responsible for administering the injections. ERM A.12(B)(4) provides:

> The person(s) selected by the Warden to administer the injections shall demonstrate proficiency through relevant training and two years' experience in the administration of drugs by intravenous injection.

Again, as with Witness #3, the qualifications required of Witness #2 are consistent with *Baze*. Witness #2 testified that approximately 11 years ago, he began several months of training to administer lethal injection drugs. Exhibit H at p. 18, line 12; p. 19, line 8. Witness #2 received his training from a fellow correctional officer who was experienced in performing lethal injections. Exhibit H at p. 18, line 24. He observed several executions before participating in one. Exhibit H at p. 48, line 10. Since first participating in an execution more than ten years

ago, he has performed numerous executions without complication, including executions using pentobarbital. Exhibit H at p. 112, line 5; p.20, line 1; p. 36, line 8; p. 103, line 13.

When performing an execution, Witness #2 consults the protocol to learn the drugs which will be used and the concentration. Exhibit H at p. 29, line 22. He checks the drug labels and compares them with the protocol to ensure that he has the correct drugs. Exhibit H at p. 30, line 2; p. 30, line 19. He testified he would not administer a drug that was not in the protocol. Exhibit H at p. 77, line 10; p. 93, line 14. He inspects the condition of the drugs to be administered to make sure they have been stored properly (temperature, sealed, appearance) and also checks the seals on the syringes and IV tubes. Exhibit H at p. 25, line 7; p. 70, line 13; p. 71, line 14; p. 86, line 9. He is also trained to detect catheter site swelling and back pressure on syringes that would suggest poor flow. Exhibit H at p. 105, line 14; p. 106, line 5; p. 106, line 15; p. 107, line 4, 20.

Each time he has administered pentobarbital, Witness #2 has observed no signs that an inmate experienced pain. Exhibit H at p. 83, line 17. He expects to participate in drills prior to performing an execution in South Dakota. Exhibit H at p. 83, line 17.

Witness #2 clearly is qualified under ERM A.12(B)(4) and the *Baze* decision. Rhines' arguments that execution team member Witness #2 is inexperienced and lacks training to recognize if drugs are being taken up by the body in a proper fashion, to monitor the effect of the drugs, to recognize a proper administration rate or to understand the proper handling and administration of barbiturates like pentobarbital are unfounded.

### Drug Compounding and Pharmacist Qualifications

Rhines argues that the compounded drug is not reliably pure and potent and therefore, the administration of the protocol poses a substantial risk of severe pain to the inmate. He also argues that the pharmacist is incompetent to compound pentobarbital.

### iii. Drug Compounding

At the December hearing, Rhines introduced the trial deposition of Dr. Mark Heath who testified that he was not a pharmacist and that he did not have a high level of expertise in the mechanics of compounding. Trial Exhibit 9 at p. 14, lines 16-25; p. 15, lines 2-6. He stated that his opinions were related to the effect the drug would have if compounded incorrectly. Trial Exhibit 9 at p. 15, line 18. He went on to explain the areas where he believes errors could occur:

In a broad level I think there are two main areas that things can go wrong. One would be that there's a chemical accidentally or inadvertently introduced or formed in the material that could cause an undesired reaction or response, in other words, having an extra thing that sound [sic] shouldn't be there. And the other realm of problem is that should happen to degrade the drug, the pentobarbital that is there so that the amount there is inadequate.

Trial Exhibit 9 at p. 16, lines 3-12. When asked specifically about whether South Dakota's protocol for implementing lethal injection posed a "substantial risk of severe pain to an individual," Dr. Heath testified as follows:

> But to clarify, when I talk about a substantial risk, it factored in several things, also the likelihood of it happening and also the gravity or severity of the event were it to occur and also how easily it is to obviate or eliminate the risk. So it's a factor of things, a mix of things. And in this instance, there's a risk of terrible thing [sic] happening. I think everybody would agree that nobody wants the prisoner to end up brain damaged. They wouldn't—probably wouldn't even execute them if that the outcome of an attempted execution. It's unlikely, but it's a terrible thing to have happen, and nothing is a hundred percent preventable. It's more preventable than it currently is. In those terms I would say, it's a substantial risk—unlikely, severe, preventable.

The trial court has great discretion when it comes to the weight to be given to any witness' testimony. Dr. Heath's does not give any testimony regarding the actual compounding of the pentobarbital but rather focuses on the physiological effects that could occur if the drug was compounded incorrectly. But as is shown in his testimony quoted above, he testified that the risk was unlikely.

> We have often said that fact finders are not required to accept an expert's opinion. As with all witnesses, it falls on the trier of fact to decide whether to believe all, part, or none of an expert's testimony. *Sauer v. Tiffany Laundry & Dry Cleaners*, 2001 SD 24, ¶ 14, 622 N.W.2d 741, 745 (citations omitted); *Lewton v. McCauley*, 460 N.W.2d 728, 732 (S.D.1990) (citation omitted).

*Great Western Bank v. H & E Enterprises*, LLP, 2007 S.D. 38, 731 N.W.2d 207. This court does not find Dr. Heath's testimony on whether South Dakota's protocol for implementing lethal injection poses a "substantial risk of severe pain to an individual" to be relevant or useful.

Rhines also relies on the Declaration of Dr. Sarah Sellers who was an expert in the Donald Moeller case. Dr. Sellers is the executive director and consultant for Q-Vigilance, LLC. See Trial Exhibits 1 and 2. She stated that her work focuses on the public health risks of drug compounding. In her opinion, "this pentobarbital sodium API formulated under the indicated …recipe cannot be used for compounding as doing so would result in risk of serious harm to Mr. Moeller." See Trial Exhibit 2, p. 15, ¶ 5. She did not testify live at Rhines' hearing.

In contrast to Dr. Sellers' testimony, Respondent introduced the trial deposition of Dr. Mark Dershwitz. See Exhibit 26R0. Dr. Dershwitz has a bachelor's degree in chemistry, went to medical school at Northwestern University and also obtained a Ph.D. in pharmacology. Exhibit 26R at p.5, lines 22-24; p. 6, line 1. He did his residency in anesthesiology followed by a research fellowship and he worked in academic anethesiology since 1986 teaching at Massachusetts General Hospital, Harvard Medical School and Massachusetts Medical School. When asked about the practice of compounding drugs he testified as follows:

Q: Were you aware of allegations in that case [Moeller] by Mr. Moeller's attorneys that compounding drugs was somehow a fringe occupation or an unusual practice in the practice of either pharmacy or medicine:

A: I have heard that allegation, and at least with regard to anesthetic drugs and in my practice, that is just not true.

Q: Insofar as you use compounded drugs in the practice of anesthesia, does the standard of care require you or any other anesthesiologists to trace the drug back to its origins of manufacture before you use it?

A: No. I rely on the pharmacy to properly prepare the medication and label it before they send it to the hospital.

Q: And the standard of care in the practice of anesthesiology permits you to rely on a licensed pharmacist in good standing to provide you with an effective, potent and sterile drug?

A: Yes.

Q: And doctor, does the licensure of a drug supplier, whether they're either a manufacturer or merely a wholesaler, does the FDA licensure of that manufacturer, supplier provide you with sufficient assurance as an anesthesiologist that the drug that you are using on a patient is pure, effective and sterile?

A: Yes.

Exhibit 26R p. 16, lines 23-24-p.18, line 3. Dr. Dershwitz also opined that ERM A.12 (B) if performed as written would provide a painless and humane death. Exhibit 26R, p. 19, line 18. Like Dr. Heath's testimony, this Court does not find Dr. Sellers' testimony to be particularly reliable, relevant or useful. Rather, this Court finds Dr. Dershwitz's, who is an anesthesiologist and has a degree in pharmacology, to be more credible and believable.

> We give deference to circuit courts in determining the credibility of a witness. *Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 26, 784 N.W.2d 499, 511 (reiterating that "the credibility of the witnesses, the import to be accorded their testimony, and the weight of the evidence must be determined by the trial court, and we give due regard to the trial court's opportunity to observe the witnesses and examine the evidence.").

*Nemec v. Goeman*, 2012 S.D. 14, ¶24, 810 N.W.2d 443, 449. Petitioner has not submitted any credible evidence that the compounded drug is not reliably pure and potent and poses a substantial risk of severe pain to the inmate. In fact, post-compounding testing of pentobarbital used in the Robert and Moeller executions proved that it was, in fact, compounded into a sterile, USP-compliant injectable solution. Exhibit 11R, at ¶V(G); Exhibit 4R, ¶¶9, 11, 12; Exhibit 3R, Weber/Moeller Affidavit at ¶6; Exhibit 5R, Deponent #1 Affidavit at ¶1. Therefore, Rhines'

argument that the compounding of pentobarbital results in a drug that is not reliably pure and potent must fail.

### iv. Witness #1
### Compounding Pharmacist

Rhines further argues that the pharmacist hired to compound the pentobarbital is incompetent. Again, the pharmacist employed for the Robert and Moeller executions meets and surpasses the minimum qualification thresholds set by *Baze*. Witness #1 has a bachelor's degree in pharmaceutical science. His education program required five years of undergraduate/graduate education. Exhibit G, p. 25-28. He also obtains approximately 20 hours a year in continuing education. Exhibit G, p. 25-28. He has specialized training in sterile compounding. Exhibit G, p. 86. He is licensed and registered with a Board of Pharmacy. His pharmacy license and registration are current. Exhibit G, p. 21-22. He has never been investigated for improper compounding practices. Exhibit G, p. 38, 57. He has many years of experience as a working compounding pharmacist. Exhibit G, p. 22, 28. Witness #1 testified that compounded drugs do not require FDA approval like commercial drugs. Exhibit G, p. 41, 155. His pharmacy complies with USP guidelines for sterile compounding. Exhibit G, p. 86, 133-135, 152.

Witness #1 is qualified under ERM A.12(B) and the *Baze* decision. Rhines' argument that the compounded drug is not reliably pure and potent and that the pharmacist is incompetent to compound pentobarbital are without merit.

### Issue Two

### Whether Petitioner's challenge to the lethal injection protocol adopted and implemented by the State of South Dakota as set forth in detail in Petitioner's Habeas Petition Grounds 8, 11 and 12, violates Article VI, §23 of the South Dakota Constitution prohibition against Cruel and Unusual Punishment?

Rhines' final argument is that the South Dakota State Constitution, Article VI, §23 provides greater protection than the United States Constitution. He further argues that the South Dakota Supreme Court has not addressed the issue of the manner of carrying out the death penalty. The South Dakota Constitution provides in Article VI, §23:

Excessive bail shall not be required, excessive fines imposed, nor cruel punishments inflicted.

While Rhines' argument focuses on the manner of carrying out the death penalty instead of whether the death penalty is unconstitutional, it is clear that the South Dakota Supreme Court has addressed the issue of the death penalty:

The South Dakota Constitution employs slightly different language in limiting the government's power to impose criminal penalties. Article VI, § 23, of the South Dakota Constitution states: "Excessive bail shall not be required, excessive fines imposed, nor cruel punishments inflicted." (Emphasis supplied.) Moeller argues that South Dakota's

*Moeller*, p. 487-488, ¶102. The South Dakota Supreme Court went on to hold that South Dakota's capital punishment was constitutional and met the three part test set forth in *Gregg*.

> We conclude that capital punishment meets all three of these requirements. To begin with, the death penalty comports with South Dakotans' contemporary standards of decency. Because the legislative branch is most representative of the views of the people, legislative enactments are one of the most accurate indicators of societal mores. *Gregg*, 428 U.S. at 179–81, 96 S.Ct. at 2928–29, 49 L.Ed.2d at 878–79; *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 968 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); Black, 815 S.W.2d at 189; *State v. Campbell*, 103 Wash.2d 1, 691 P.2d 929, 948 (1984), cert. denied, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 526 (1985). The South Dakota Legislature reenacted the death penalty in 1979, and has made occasional amendments to the statutory scheme since that time. 1979 S.D.Sess.L. ch. 160; 1981 S.D.Sess.L. ch. 186; 1989 S.D.Sess.L. ch. 206; 1992 S.D.Sess.L. ch. 173; 1994 S.D.Sess.L. ch. 178; 1995 S.D.Sess.L. ch. 132. These statutes have remained undisturbed by the electorate, despite the power of the people to vote death penalty proponents out of office or to reject legislative enactments through a referendum election. This public acquiescence is strong evidence that capital punishment reflects the will of the people of South Dakota.

As noted in *Baze*, States have long explored using lethal injection as a manner of assuring humane method of execution. Baze, 553 U.S. 35, 42, 128 S.Ct. 1526-1527. At the time *Baze* was decided in 2008, 36 states had adopted lethal injection as the exclusive or primary means of implementing the death penalty. *Id*. It is also the method used by the Federal Government. *Id*. See 18 USC § 3591 *et seq*. (2000 ed. and Supp.V).

In South Dakota, the Supreme Court has found the death penalty to be Constitutional under both the United States Constitution and the South Dakota Constitution. In this Court's opinion, lethal injection is the most humane manner of implementing the death penalty and therefore, it is constitutional under the South Dakota Constitution.

### III. CONCLUSION

For the reasons set forth above, the Court hereby denies Petitioner's Writ of Habeas in its entirety.

# ORDER

ACCORDINGLY, it is hereby ORDERED that Petitioner's Writ of Habeas Corpus is denied and Respondent shall submit Findings of Fact and Conclusions of Law in accordance with this decision.

Dated this _27_ day of February, 2013 at Rapid City, Pennington County, South Dakota.

BY THE COURT

Honorable Thomas L. Trimble
Circuit Judge, Seventh Judicial Circuit

ATTEST:
Ranae Truman, Clerk of Courts

By: _____
Deputy Clerk

(SEAL)

Pennington County, SD
FILED
IN CIRCUIT COURT

FEB 2 7 2013

Ranae Truman, Clerk of Courts
By_____ Deputy

21